**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES *ex rel.*      :     CIVIL ACTION FILE
SCOTT POGUE             :     NO. 99-3298 (RCL)
                         :
   Plaintiff and Relator,    :     (Part of 2001-MS-50)(RCL)
                         :
   v.                  :     JUDGE ROYCE C. LAMBERTH
                         :
                         :
DIABETES TREATMENT CENTERS  :
OF AMERICA, *et al.*        :
                         :
   Defendants.         :

**RELATOR A. SCOTT POGUE'S OPPOSITION
TO DTCA'S MOTION FOR SUMMARY JUDGMENT
WITH MEMORANDUM OF POINTS AND AUTHORITIES**

Respectfully submitted,

Frederick M. Morgan, Jr.
Jennifer M. Verkamp
MORGAN VERKAMP LLC
700 Walnut Street, Suite 400
Cincinnati, Ohio  45202

Scott A. Powell
Don McKenna
HARE, WYNN, NEWELL & NEWTON
Massey Building, Suite 800
2025 Third Avenue North
Birmingham, Alabama 35203

Nels Ackerson
Elaine Panagakos
SOMMER BARNARD ACKERSON, PC
1666 K Street, N.W., Suite 1010
Washington, D.C. 20006
Telephone: (202) 833-8833

***Counsel for Relator A. Scott Pogue***

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

CONCISE STATEMENT OF THE ISSUES FOR WHICH
GENUINE ISSUES OF MATERIAL FACTS EXIST TO BE TRIED. . . . . . . . . . . . . . . 1

SUMMARY OF THE EVIDENCE INDICATING THAT GENUINE ISSUES OF
MATERIAL FACTS EXIST TO BE TRIED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Defendants' Business Model was Wholly Premised
            on the Need to Pay Physicians to Refer Patients to
            Hospitals With Which DTCA Contracted. . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Purpose of DTCA's Arrangements with Hospitals
            and Medical Directors was to Solicit Referrals from
            the Latter to the Former. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          1.    The Contracts: Intended Purpose to Solicit
                Referrals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                a.    Duties Versus Payment: No Fair Market
                      Value. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                b.    DTCA Statements Regarding Intent of
                      Contracts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

          2.    The Scheme In Practice: Day-to-Day Drumbeat
                of Referral Solicitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    C.    AHC and DTCA Knowingly Decided to Risk
            Prosecution by the United States in Order to Keep
            the Company Alive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

          1.    DTCA Ignored Extensive, and Increasingly-
                vehement, Legal Advice Regarding its Exposure
                Under the Anti-Kickback Statute. . . . . . . . . . . . . . . . . . . . . . . 40

          2.    DTCA did not Fully and Accurately Report the
                Material Facts to its Attorneys: *Its Attorneys*
                *Knew About Contracts, Not Conduct.* . . . . . . . . . . . . . . . . . . . . 42

          3.    DTCA Was Repeatedly Advised that it was
                at Risk of Prosecution—*And It Routinely*
                *Decided to take that Risk.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

4.      DTCA Repeatedly Ignored the Advice of
        Counsel and "Proceeded Anyway" to take
        The Risk of Prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

5.      DTCA Restructured its Arrangements Only
        After it had Maxed the Profitability Out of
        the Hospital Business. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   52

        a.      DTCA was Struggling to Demonstrate
                Profitability to Hospitals. . . . . . . . . . . . . . . . . . . . . . . . .   53

        b.      Hospital Fraud and Abuse Concerns
                Became an Obstacle to Contract
                Negotiations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56

        c.      Advice of "Specialist" Counsel that DTCA's
                Form Contracts were Potential Kickback
                Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

                i.      Independent Opinion of Robert Sevell. . . . . . . . . .   61

                ii.     Independent Opinion of DC Counsel. . . . . . . . . . .   65

                iii.    Contemporaneous BCCB
                        Recommendation. . . . . . . . . . . . . . . . . . . . . . . . . . .   70

6.      The Restructuring. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   72

D.      The Resulting False Claims for Payment. . . . . . . . . . . . . . . . . . . . . . .   75

        1.      The False Claims Evidenced by Actual Electronic
                Claims Data Totals $43,141,839. . . . . . . . . . . . . . . . . . . . . .   76

        2.      The Estimated False Claims for Time Periods
                Prior to 1992. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   77

        3.      The Number of False Claims for Payment that
                DTCA Caused Host Hospitals to Submit to the
                Federal Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   79

RELATOR'S CONTRAVERSION OF DEFENDANTS
STATEMENT OF UNDISPUTED MATERIAL FACTS. . . . . . . . . . . . . . . . . . . . . . .   80

LEGAL ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   101

I.      Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   101

II.     Presentment of Claims: Defendants Caused the Submission
        of False Claims for Payment by the United States. . . . . . . . . . . . . . . . . . .  102

        A.      DTCA's Documents Reflecting the Presentation of
                Claims to the United States as a Direct Result of
                Its Efforts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   103

        B.      DTCA's Straw Man: Actual Claim Forms are not
                Required. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   106

        C.      Even if Actual Claims Data is Required, the Subpoenaed
                Data from CMS is Properly Submitted as Evidence of
                Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   109

                1.      The Claims Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   109

                2.      The Claims Records are Properly Authenticated. . . . . . . . . . .   113

                3.      The Electronic Claims Records Are Business and
                        Public Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   116

III.    Falsity: The Claims at Issue are False Claims in Violation of
        Anti-Kickback Laws. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  118

        A.      Law of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   119

        B.      The Case Law Uniformly Supports the Validity of the
                Legal Theory in this Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   121

        C.      Materiality: The Natural Tendency Test. . . . . . . . . . . . . . . . . . . . . .   126

        D.      Materiality as Applied Here: Defendant's Kickback
                Violations are Contrary to the Core Terms of the
                Medicare Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   129

                1.      The Statutes and Regulations Establish as a
                        Matter of Law that Compliance with the
                        Anti-Kickback Laws are Central to the Program
                        Terms and are Capable of Influencing the
                        Government's Payment Decision. . . . . . . . . . . . . . . . . . . . . . .   130

                        a.      Kickbacks are a Fraud on Federal
                                Healthcare Programs. . . . . . . . . . . . . . . . . . . . . . . . . .   131

b.    The AKA was Designed to Prevent Claims Resulting from Fraud, Because they Caused the Government to inappropriately Pay Out Funds.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   133

2.    The Manual Provisions Implementing the Requirements of the Social Security Act also Demonstrate that Compliance with Anti-Kickback Laws are Material to the Claim, as a Matter of Law. . . . . . . . .   135

3.    The Current Provider Agreement and Cost Report Certification Reflect that Compliance with the Kickback and Stark Laws is a Condition of Payment. . . . . . . . .   138

4.    Mr. Yospe's Testimony does not Controvert the Materiality of Kickback Violations. . . . . . . . . . . . . . . . . . . . . . .   141

5.    DTCA Takes the Materiality Standard One Further, Arguing Underlying Statute and Regulations must Also Expressly Caution Against FCA liability. . . . . . . . . . . . . .   145

E.    DTCA Wholly Misstates the Legal Standard. . . . . . . . . . . . . . . . . . . . .   146

1.    DTCA Misstates the Need for Factual Falsity to Prevail on False Claims Resulting from Kickback Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   146

2.    DTCA Misstates the Legal Standard for Affirmative False Certification.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   147

3.    DTCA Misstates the Legal Standard for Implied Certification and Materiality. . . . . . . . . . . . . . . . . . . . . . . . . . .   148

IV.    Underlying Anti-Kickback Violations: The Evidence Amply Supports the Fact DTCA Violated the AKA Provisions. . . . . . . . . . . . . . . . . .   150

V.    Knowledge Under the False Claims Act: Genuine Issue of Fact Regarding the Requisite Knowledge Under the False Claims Act. . . . . . . . . .   156

VI.    Stark Violations: Relator Has Established a Genuine Issue of Fact Regarding Underlying Stark Violations. . . . . . . . . . . . . . . . . . . . . . . . .   160

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   164

## **INTRODUCTION**

This case concerns the false claims for payment resulting from the business model and practices of Diabetes Treatment Centers of America ("DTCA").  During the period from 1983 through 1996 and beyond, DTCA was in the business of hiring endocrinologists and others as "medical directors" for hospital diabetes units, so that the physicians would refer their patients to the centers.

Defendants would have it that their focus was on nothing but improving the lives of patients with diabetes.  What the documents and testimony in fact reveal is that their focus was on little more than ensuring that it was paying enough doctors enough money to generate enough referrals to keep the hospitals happy enough with DTCA to continue paying the "management fees" which were DTCA's only significant revenues.

Relator's case at trial will show a massive and calculated scheme which depended for is very existence on a constant drumbeat of kickbacks.  DTCA's relation-ships with physicians were about no more than how many patients they could refer. There are certainly triable issues of fact here.

## **CONCISE STATEMENT OF THE ISSUES FOR WHICH GENUINE ISSUES OF MATERIAL FACTS EXIST TO BE TRIED**

- •  Whether DTCA knowingly caused hospitals with which it had contracts to submit false claims for payment to the Government in violation of the Anti-Kickback Statute and the False Claims Act.

- •  Whether DTCA knowingly caused host hospitals to submit false claims for payment to the Government in violation of the Stark Law and the False Claims Act.

• Whether DTCA paid more than fair market value for the services of medical directors or had as a purpose of the payments to medical directors an intent to induce referrals of patients.[1]

## SUMMARY OF THE EVIDENCE INDICATING THAT GENUINE ISSUES OF MATERIAL FACTS EXIST TO BE TRIED

**A.    Defendants' Business Model Was Wholly Premised on the Need to Pay Physicians to Refer Patients to Hospitals With Which DTCA Contracted**.

American Healthcorp, Inc. was founded in 1981 by former Columbia/HCA executives Thomas Cigarran, Henry Herr, Robert Stone, Stan Kantanie, and Robert Hilton.[2]  While their original concept was to buy and manage general hospitals, they soon abandoned this model, after recruiting a well-reputed Birmingham diabetes expert, Dr. Robert Creech, to join the staff of one of their newly-purchased hospitals in Chattanooga.

Dr. Creech brought a large patient base for inpatient treatment of diabetics—a patient population with a disease that often went untreated or required expensive management of related complications.  In Mr. Cigarran's words, "this is all stuff that we learned in '82, '83 when we brought him [Creech] to the hospital, because out of the woodwork come all these patients, and doctors are referring patients to the hospital, and they started to bring their patients to the hospital eventually."[3]

_____

[1] This issue is stated in the disjunctive "or" because either (1) payments in excess of fair market value or (2) payments that have as one purpose an intent to induce referrals violate the Anti-Kickback and Stark laws.

[2] Cigarran Dep., Vol. 1, at 31. (A copy of all the deposition testimony cited herein is provided as collective Exhibit 143.

[3] Cigarran Dep., Vol. 1, at 55.

Based on the "Creech model," Cigarran realized that he did not have to purchase hospitals to make a profit. Rather, he developed a business model around persuading existing hospitals to turn a portion of a patient floor into a "diabetes treatment center," recruiting physicians like Dr. Creech to serve as "Medical Directors," and charging the hospital a fee based on the number of admissions the medical directors and other physicians made to the "treatment center."[4] AHC's wholly-owned subsidiary, Diabetes Treatment Centers of America, was begun shortly thereafter.

DTCA's first medical-director contracts were signed with Dr. Richard Perley in Los Angeles in 1983 and with Dr. Paul Davidson, of Atlanta, in 1984.[5] Once it had recruited the doctors, it set out to find hospitals willing to participate. The first DTCA units were opened in Lakewood Hospital in California and Shallowford Hospital in Georgia.[6]

DTCA moved quickly to recruit medical directors and then find hospitals to open centers across the country. Instead of buying hospitals, DTCA hired medical directors and provided on-site staff, typically consisting of a program manager, a clinical educator, and a nurse.[7] DTCA's costs remained approximately-fixed for the life of the contract, with the most significant cost being medical director payments and staff

---

[4] Cigarran Dep., Vol. 1, at 57-58.

[5] Exh. 113 & 114 Perley and Davidson contracts.

[6] Exh. 120, Shallowford, Lakewood and West Paces contracts. The Shallowford center in Atlanta was relocated to West Paces Medical Center in 1987.

[7] Beard Dep. at 10, 16.

salaries.[8]  Its income, on the other hand, was not fixed and had considerable upside

potential.  Remuneration by the host hospitals to DTCA was based on the number of

admissions to the center, and its fees increased as patient census increased.[9]

From the moment of conception, then, DTCA's revenues were intensely census-

driven.  DTCA promised hospital clients that they would realize census increases if they

contracted with DTCA.  DTCA actively promoted this as the primary purpose of the

hospital contract.  It made this crystal-clear to both the hospitals with whom it con-

tracted, with its employees, and with the medical directors themselves.

> By way of example, DTCA wrote to hospital administrators as follows:
> The **primary reason for Columbia Regional to contract with DTCA is
> to increase the number of discharges** for people with diabetes.[10]
>
> [O]ur **primary goal...is to significantly increase the volume of
> business** at your center.[11]

---

[8] Conrad Dep., Vol. 1, at 61-63.

[9] In DTCA's early years of operation, the majority of hospital contracts computed DTCA's compensation on the basis of the number of patient days in a given time period (if a center had 10 beds, and seven were occupied on a particular day, that would constitute seven "patient days.")  Over time, most of these provisions were amended to included a fixed management fee and a variable fee (also called an incentive fee) based on the number of incremental discharges.  Exh. 121 includes various DTCA and hospital contracts with per patient day fees, variable fees and fees per Medicare patient day.

[10] Exh. 1, DTCA071024, November 14, 1996 Letter from DTCA CFO, Michael Conrad, to Hospital Administrator (emphasis supplied).

[11] Exh. 2, DTCA127212-13, December 10, 1990 Letter from DTCA Regional Director of Operations to On-Site Program Manager (also stating that "a more accurate measure of volume in your center is the number of discharges.  As discharges are significantly increased, the revenue will follow").

DTCA told hospitals that a variable fee was necessary to "align the incentives" of

DTCA and the hospital:

> ...[T]he revised contract with Walthamweston provides us medical
> directors and DTCA incentives to increase activity at the Center.[12]

> The purposes of [increased per diem fees] are twofold: (1) to incent DTC
> to discharge the patient from the program as soon as possible following
> the standard five day enrollment cycle; and (2) to incent DTCA to increase
> the volume over and above the existing levels.[13]

> 50% gross percent fee for all outpatient education...will incent Diabetes
> Treatment Centers of America...to facilitate additional business through
> this avenue.[14]

DTCA made clear to all its personnel, *including medical directors,* that its focus

was on "*the hospital's number one priority—growing the census.*"[15]   DTCA paid its

operational employees based on increased census.  Simply put:

> The ultimate Goal = to increase census, which increases revenues, which
> increase your bonus.[16]

---

[12] Exh. 3, DTCA037020, December 14, 1987 Letter from DTCA Vice-President,
Dana Williams, to Medical Director Goldstein.

[13] Exh. 4, DTCA136477-78, September 13, 1988 letter to Dana Williams from
Mercy Hospital.

[14] Exh. 5, DTCA059992, August 16, 1995 Letter from DTCA Regional Director of
Operations to Elmer Cummings.

[15] Exh. 6, DTCA035607-09, August 23, 1990 Letter from DTCA President Jim
Deal to Medical Directors (emphasis supplied).

[16] Exh. 7, DTCA036568, American HealthCorp Marketing Manual.

DTCA actively informed medical directors that increased census was necessary to continued payment from DTCA and, as early as 1986, told them "to tak[e] whatever steps are necessary to increase volume.[17]

DTCA's all-consuming focus on increased census was unmistakable.  Its second-highest paid medical director observed,

> There is *too much obvious concern about profit* rather than giving service.[18]

A hospital CEO in South Carolina described DTCA as

> the '*Nashville cash register'* whose only objective is to take as many hospital dollars out of Charleston as possible.[19]

A DTCA employee wrote that:

> [DTCA was] interested in census just so that the company could make more money.[20]

Census was DTCA's lifeblood.  Increased census meant more money, not only to the hospitals, but to DTCA and its executives.  This formula was fertile ground for Medicare fraud and abuse, particularly in light of the Anti-Kickback Statute and its

---

[17] Exh. 8, DTCA075400-401, November 5, 1986 letter from Senior VP Bob Stone to all Eastern Division Medical Directors.

[18] Exh. 9, AP000001-02, November 1, 1994 Letter to Robert J. Tannenberg, M.D. from Paul C. Davidson, M.D. (emphasis supplied).

[19] Exh. 10, at DTCA127248, October 22, 1990 Memo from RDO Bob Mueller to Morrie Maple regarding customer satisfaction surveys.

[20] Exh. 11, DTCA121926, July 28, 1987 Memo from Pam Goebel to Senior VP Barbara Dowl regarding comments of a clinician and nurse educator that resigned because of objections to "marketing" duties outside their clinical field; Exh. 18 (BCCB 001966-69)

prohibition of paid arrangements with a purpose of inducing patient referrals.  Yet DTCA's officers, including Chairman Tom Cigarran, testified that hundreds of DTCA employees in its Centers around the country had day-to-day interactions with medical directors, exhorting them to refer ever more patients, with no training on the prohibitions on Medicare fraud and abuse laws and no guidelines as to what was permitted or not permitted in terms of the extent of their actions to influence the referral decisions of physicians.[21]  What the employees did know was that they needed increased census to make money for the company; to keep the centers open; and ultimately, to keep their jobs.[22]

> **B.    The Purpose of DTCA's Arrangements with Hospitals and Medical Directors Was to Solicit Referrals From the Latter to the Former**.

The overarching purpose of DTCA's contractual arrangements was to solicit the referral of patients to federally-funded healthcare programs.  We demonstrate *infra* that these arrangements caused the submission of a huge number of false claims to the United States and its agents.  The language of the contracts and testimony of DTCA officers and managers interpreting that language demonstrate that the expected result was referrals paid for by DTCA's customer-hospitals.

Relator also has, through extensive discovery, looked behind the four corners of the contracts into how they were implemented in the field.  This inquiry reveals over-whelmingly not just that DTCA, the hospitals, and the medical directors all understood

---

[21] See Section B.(2) Infra pages 30 to 32.

[22] Exhibit 6, for example, identifies for medical directors "Center Census Growth" as the top priority for the 1991 Fiscal Year, and notes that the "hospital's number one priority" is "growing the census."

that census was critical, but that DTCA's incessant emphasis on increased census did, in fact, result in the day-to-day solicitation of referrals from paid medical directors and other physicians in exchange for money from the hospitals.  In this manner, DTCA's willful violations of the healthcare fraud and abuse laws are really two-fold: (1) DTCA negotiated arrangements which, on their face, reflect that a purpose was to induce referrals; and (2) DTCA received remuneration from hospitals in exchange for implementing day-to-day strategies for the solicitation of referrals from paid medical directors and other physicians.

The following pages address *seriatim* these two distinct violations of Medicare fraud and abuse laws.

### 1.      The Contracts: Intended Purpose to Solicit Referrals.

The express terms of DTCA's contracts with both hospitals and medical directors powerfully demonstrate the purpose of soliciting referrals.  At the most basic level, the medical director contracts *specifically state this as a duty of the medical directors* and there is no demonstrable connection between the performance of any legitimate duties and the payment levels in the contracts.  As Judge Gesell said even as DTCA was ramping up its business model, "[p]ayment exceeding fair market value is in effect deemed payment for referrals."[23]  Such provisions were included in DTCA's contracts from the early 1980s, when the company began, until the mid-1990s when the Stark laws were passed

---

[23] *American Lith. Soc. v. Thompson*, 215 F. Supp.2d 23, 27 (D.D.C. 2002). "[W]e may infer that any excess paid over fair value is intended to induce referrals[.]" *United States v. Lipkis*, 770 F.2d 1447 (9th Cir. 1985).

Even were this point not made obvious by the simple language of the contracts, the evidence establishes that DTCA negotiated these contracts with precisely the purpose of paying medical directors to refer their patients to the DTCA.

### a.   Duties Versus Payment: No Fair Market Value

The contractual duties of medical director contracts entered into between 1984 and 1995[24] require that:

> (ii) Doctor shall assist the Center in development of referral sources for the Center;. . .and (iv) Doctor shall identify and encourage other physicians and referral sources whose patients could benefit from services offered by the Center.[25]

Medical directors received remuneration in many forms, including cash stipends, income guarantees, variable fees, research funding, free rent, loans, and stock

---

[24] Effective in 1995, coincident with the enactment of Stark II, DTCA amended every medical director contract to remove these duties, reduce the amount of remuneration, and add requirements consistent with the Stark exception.  Exh. 18 and Exh. 114 (*compare* Dr. Davidson's duties as medical director at p.1 of Exh. 114 *with* his duties as a medical director in 1995 at page 27).

[25] *E.g.,*Exh. 12, AP000255-63, 1985 Bode Contract.  This language was an outgrowth of the model developed for DTCA's first treatment center, the California center opened under the helm of Dr. Michael Perley.  Dr. Perley's original contract in July 1983 required him to be involved in

> identifying and recruiting physicians who would utilize those centers as the preferred sites for the inpatient and outpatient care of their patients, assisting in the development of referral sources for these centers

.
Exh. 13, DTCA147757-58 (first 2 pages).  Tom Cigarran testified that this language was inherent in every contract.  Cigarran Dep., vol 1, at 111-117.  Mr. Cigarran described Dr. Perley's duties in his deposition (Cigarran Dep. Vol 1 at 95-103).

options.[26]  The base form of payment for every contract was a monetary stipend.  Other

remuneration varied by medical director, with the most egregious forms of variable

compensation being paid to the medical directors with earlier contracts and large

patient bases.  The highest-paid medical director, Dr. Perley, was compensated

pursuant to a complicated formula which included, in addition to base pay, *inter alia*:

- a percentage based on center profits,

- an incentive fee tied to census (called an "ADC [*A*verage *D*aily *C*ensus] kicker"),

- stock options, and

- three different types of flat fees.[27]

Dr. Perley's annual compensation had a value of hundreds of thousands of
dollars.[28]

Dr. Davidson, the Atlanta medical director hired just after Dr. Perley, was paid:

- a percentage of profits,

- an ADC kicker,

- an incentive fee based on additional medical directors he recruited,

- stock options, and

- flat fees.[29]

---

[26] LaRue Depo pgs. 197-198 (noting concern with fraud and abuse risk over ADC payments);211, 220-226; 230, 234, 238.

[27] Exh. 113 is a compilation of Dr. Perley's contracts.

[28] *Id.*

[29] Exh. 114, composite exhibit of Dr. Davidson's contracts.

By paying heavy, early-on remuneration to prominent endocrinologists, such as Drs. Perley and Davidson, DTCA was able to gain the momentum necessary to convince hospital administrators to establish centers around the country.  Relying on the success of these kickback-laden relationships, DTCA was able to reduce the variable fees paid to subsequent medical directors.

Though the medical director contracts became more flat-fee-oriented over time, the amounts they were paid:

- varied widely from one medical director to another;

- bore no relationship to any amount of time spent by the medical director; and

- were the product of DTCA's budgetary restrictions and ability to negotiate with the physician, rather than any fair market value assessment.

DTCA officers admit that these payments were made without any assessment of the fair market value of legitimate services to be rendered by the medical directors. Former CFO and Vice President of Development Gary LaRue testified that no fair market value studies were ever done to determine if the amounts they were paying to the medical directors were market value; no studies were done to determine the number of medical directors needed at a center; DTCA had no idea how many hours medical directors spent performing their duties; and, there was no cap on what could be spent for medical directors at a particular center, nor was there any explanation for the differing amounts of compensation.[30]

Similarly, DTCA vice-president Dana Williams testified:

---

[30] Gary LaRue Deposition at 56, 61- 62, 65-69

A.      I think that the fair market value stipend was *determined from conversations with the doctor individually and what they felt was fair themselves* versus what the company was willing to pay for the duties and responsibilities being performed.  And  we had a—you know, a budget that associated with every—for every  hospital, too.  And the doctor always had the right and option to refuse to  accept the fair market value as we determined it.

*   *   *

Q.      How did you evaluate whether the doctor's market value for themselves was fair?

A.      *It was primarily a judgment.*[31]

In other words, DTCA defined the "market" in *ad hoc* fashion, one doctor at a time.  Chairman Cigarran testified that this judgment amounted to "[w]hat would it cost to get them to move to become the medical director.  It's a *willing seller and a willing buyer.*"[32]  Chief Financial Officer Mike Conrad, testified that prior to DTCA's restructuring of the contracts when the Stark Laws took effect in 1995, there was never any assessment of the total number of hours necessary to run each center or of a reasonable hourly rate for a physician.[33]

DTCA's briefing implies that it relied on attorneys' advice that such payments equated to fair market value.[34]  However, not only does DTCA cite nothing in support, but there is absolutely no evidence that attorneys provided such advice.  To the contrary, *the attorneys who represented AHC and DTCA testified that they gave no*

---

[31] Williams Dep., Vol. 2, at 87-88 (emphasis supplied.

[32] Cigarran Dep., Vol. 1, at 184.

[33] Conrad Dep., Vol. 1, at 288-90.

[34] Doc. 169 at pp. 8, 40-42.

*valuation opinion on fair market value and would not have done so, even if asked.*[35]

Thomas Smith, DTCA's primary attorney, stated that, when they first started negotiating contracts, he "certainly did not ever tell DTCA or American Healthcorp that they could pay a medical director anything they wanted."[36]  Likewise, he did not advise them that fair market value constituted anything a willing buyer would pay a willing seller.  Rather, he stated, "*I don't think the lawyers can define fair market value.  I think generally that's for appraisers and accountants and those sorts of folks.*"[37]  In fact, in a 1994 letter, AHC's and DTCA's lawyers "**strongly advise[d]**" them to obtain an independent opinion regarding fair market value, even specifically recommending the name of a valuation consultant. Notwithstanding this clear advice of counsel, no such opinion was ever sought by DTCA.[38]

The complete failure of DTCA's management to engage in any legitimate attempt to assess the fair market value of the medical directors' time is demonstrated by, among other things, the following facts:

---

[35] Smith Dep. at 218-220; Mills Dep. at 65-67.

[36] Smith Dep. at 220.

[37] Smith Dep. at 219 (emphasis supplied).

[38] Exh. 14, BCCB 001962, August 1, 1994 Letter from Jay Hardcastle to Dana Williams, "I would strongly advise you to engage a consultant in determining the fair market value level of compensation for medical directors."  Exh. 15, DTCA039522-23, April 5, 1993 Letter from Robert Sevell to Mike Conrad regarding the 1993 dispute with Dr. Perley regarding reducing his compensation to lessen the fraud and abuse risk in his contract, "For AHC and DTCA protection, you may want to consider obtaining a fmv evaluation of the value of his services."

**i.      No Medical Director contract specified the number of hours the doctor was contracted to spend on Center business.**  Prior to 1995, Medical Directors had no specific time requirements.[39]

**2.      No Medical Director contract required the physician to document his time.**  Medical Directors were not required to document their time.[40]  And they did not do so:  With minimal exceptions, DTCA could produce no physician time logs prior to 1995.  Remarkably, DTCA had a form log by at least February 1989[41] bearing the plain legend "DOCUMENTATION OF MEDICAL DIRECTOR ACTIVITY IS REQUIRED FOR CONTRACT COMPLIANCE AND MEDICARE/MEDICAID REPORTING."[42]  Yet logs were not kept.  Corporate officers Dana Williams and Michael Conrad testified that there was no documentation of medical director hours prior to 1995.[43]  Chief Executive Officer Cigarran testified that he does not know if anyone knew how much time the medical directors expended during that time period.[44]

---

[39] *E.g.,* Exh. 12, 1985 Bode contract; Depo of DTCA CFO and V.P. of Development Gary LaRue at 68-69.

[40] Hunter Dep. at 290-291.

[41] Exh. 16.  The document is marked "FIN760 (RVSD 02/14/89).  Vice President Stone testified that this marking indicates it was created by the Finance Department (Stone Dep. at 217).

[42] *Id.*, Bates No. AP001956, DTCA Medical Director Log

[43] Williams Dep., Vol. 2, at 92, 125-126, 202-203, 291-292; Conrad Dep., Vol. 1, at 289-290.

[44] Cigarran Dep., Vol. 1, at 195-196 (regarding 1988-1990 time period).  There was no documentation requirement in DTCA's form contracts prior to 1995.  *Compare* Exh. 12 (pre-1995 medical director contract) *with* Exh. 17, DTCA001567-72, (post-1995 contract) at ¶ 4.

**3.** **DTCA contracted with multiple medical directors for a single center and paid them differing amounts.** Every medical director had the same contractual duties as the contractual duties were standardized[45]. However, the payments to each medical director varied widely.[46]  For example, at Mercy Hospital in Miami, Florida, Dr. Pita was paid a "stipend" of $50,000 per year from 1986 through 1995.  At the same time, eight different Mercy Miami medical directors were paid significantly lower "stipends," ranging from $1,200 per year to $35,000 per year.  At that center depending on the year, DTCA paid between three and six medical directors.[47]

Even DTCA's own CFO and Vice President of Development, who is also a former auditor, thought the number of medical directors at some DTCA Centers was excessive.[48]  However, when he raised the issue with his superiors, he was told only "we need them."[49]

**4.** **Medical directors were paid wildly different amounts for the same purported responsibilities.** Every medical director contract contained identical

---

[45] LaRue Dep. At 52.

[46] Exhibit 19 is a summary of medical director contracts as of August 1995.  It identifies "current fees" ranging from $3,000 to $84,250—for performing the same list of duties.

[47] The medical director contracts had wildly varying payment amounts.  During their respective contract periods, Dr. Pita was paid $50,000, Dr. Perez-Rodriguez was paid $35,000/year; Dr. Papic was paid $20,000/year; Dr. Florez was paid $7,500/year, Dr. Jacobi was paid $7,000/year, and Drs. Abelove and Reid were paid $1281.20/year. Exh 104.

[48] LaRue Dep. at 114-117.

[49] Id. at 117-119.

duties.[50]  Senior Vice President of Operations Dana Williams testified that the core responsibilities were the same for every medical director and that he would rely specifically on the contract for any specific medical director's duties and responsibilities.[51]

_____**5.**    **There is no evidence of variation in the operational or hourly needs of the centers.**  The existence of multiple medical directors and the payment of varying fees is neither credibly explained nor explainable.[52]  Senior Vice President of Operations Williams testified that the basic operation of each center did not significantly vary among the centers or over time.[53]  Moreover, Mr. Williams testified that the difference in the amount of time that might be needed from various medical directors may vary by only several hours per year.[54]

**6. ____Medical director fees were not adjusted downward despite testimony that less was required of the medical directors over time.**  DTCA officers testified that less was required of medical directors once the diabetes center to which they were

---

[50] LaRue Dep. at 52.

[51] Williams Dep., Vol. 2, at 78-81.

[52] In fact, because he had no explanation for the variations, DTCA CFO Gary LaRue wondered if the payments varied because of the number of patients the physicians could deliver to the center.  LaRue Dep. at pgs. 58-60.

[53] Williams Dep., Vol. 2, at 32-37.  The only justification offered for the existence of multiple medical directors is that it facilitated a synergy of medical opinion that added value to the center.  Deal Dep., Vol. 1, at 167-170, 232-234, 382-384.  This, of course, does nothing to explain the large variance in the amounts of remuneration to various medical directors.

[54] Williams Dep., Vol. 2, at 82-83.

attached was established.[55]   Chairman and CEO Cigarran testified that the medical director's "visibility" was important during the start up of the unit in order to lend credibility, but then became less important.[56]   Cigarran also testified that more was required in the beginning, during the set up of the unit, after which the time stabilized.[57]   Despite this knowledge, there was no re-assessment of the amount of remuneration paid medical directors after the center's needs "stabilized."[58]   Since DTCA did not require any reporting of time expended by medical directors, DTCA never had any idea—and based on the evidence, could not have cared less—whether the medical directors were paid the fair value of services rendered.

7. ____**In 1995, DTCA amended the contracts to pay the vast majority of doctors dramatically lower amounts for the same purported duties.**  After a *full decade* of warnings by counsel that DTCA was risking prosecution under the Anti-Kickback Statute, DTCA restructured the medical director contracts to include hourly rates, minimum time expectations, and documentation requirements, and to remove language requiring medical directors to develop referral sources or to identify and encourage physicians and other referral sources to utilize the center.[59]

---

[55] *E.g.*, Cigarran Dep., Vol. 1, at 129; Hunter Dep. at 241-243; Kirk Dep. at 148-150.

[56] Cigarran Dep., Vol. 1, at 129.

[57] Cigarran Dep., Vol. 1, at 182-183.

[58] LaRue Dep. at 121.

[59] Exh. 17, post-1995 contract.

This process required DTCA to determine "the market hourly rate . . . for the specific DTC market" and the "projected hours necessary" to fulfill the duties and responsibilities of medical director.[60]  As a result of this purported market value determination, more than ten years after the first contract was signed, most medical directors' fees were cut by more than half.[61]  These drastic pay cuts were not well-received by many of the medical directors, who believed they were now being paid less for the same services.  In fact, medical directors testified that their duties were unchanged by the restructuring.[62]  DTCA told medical directors that the contracts had to be restructured because "[t]he government has taken an increasingly aggressive stance" on the enforcement of the anti-kickback statute which "is a felony" and "[t]o make matters worse, the provisions of Stark II will go into effect on January 1, 1995 . . ."[63]  While DTCA previously "made a decision not to alter or modify its Medical Director

---

[60] Exh. 18, BCCB001966, 68-69, page 2-3 of "General Plan Strategy."  Notably, this process involved no independent determination of "market hourly rates."  Rather, Senior VP Dana Williams interviewed two or three personal contacts that were physicians, spoke with his employees about previous payments to medical directors, and then came up with an hourly range for specific geographic regions.  Williams Dep., Vol. 2, at 177-178, 227-256.  Adjustments were made within that range based on negotiations with specific medical directors.  Williams Dep., Vol. 2, at 191-192, 253.

[61] *E.g.,* Exh. 19, DTCA061740-42, Medical Director Contracts Monitoring Report.  This shows the "Current Fee," "New/Proposed Fee," and "Annualized Improvement" for DTCA's medical-director compensation budget.  Many of the fees were cut by half or more, with one, Dr. Agrin, cut from $27,000 per year to $2,000 per year.  Aggregate projected savings to DTCA as a result of the renegotiations was $1.4 million.  *Id*.

[62] *E.g.*, Black Dep. at 102; Steed Dep. at 130-131; Davidson Dep. at 376-377.

[63] Exh. 20, BCCB001970, August 3, 1994 Memo from Jay Hardcastle, Jr. to Dana Williams regarding "bullet points to cover in your conversations with medical directors."

Agreements," the enactment of Stark II "leaves no option and requires a different response."[64]  Further, "DTCA has been advised that with the enactment of Stark II, the OIG will begin to execute and prosecute *a more aggressive enforcement of the law.*"[65]

**8.      Expert Analysis by Kathy McNamara of Mayer Hoffman Mccann P.C. confirms that DTCA paid medical directors amounts which exceeded fair market value.**  DTCA studiously ignored repeated advice by its lawyers to obtain a fair market value analysis of its medical director payments.  Therefore, to confirm all of the foregoing evidence that DTCA's payments to medical directors were in fact in excess of fair market value, Relator hired an expert to conduct such an analysis under industry guidelines.  Kathy McNamara reviewed all of the Medical Director contracts and payments, as well as other relevant data, and concluded that the medical director agreements were not commercially reasonable and that the fees paid to medical directors were in excess of fair market value.[66]

---

[64] Exh. 18, BCCB001966, 68-69, page 2 of "General Plan Strategy."

[65] *Id.*

[66] McNamara Dep., pp. 9-10, 216-219, 222-223, 230.  McNamara's complete report with an analysis of why the payments were not commercially reasonable and the excess over fair market value that each medical director was paid by DTCA is Exhibit 2 to her deposition and Exhibit 105 to this Memorandum in Opposition.  Exhibit B to McNamara's report is a physician-by-physician, year-over-year analysis showing how much in excess of fair market value each physician was paid by DTCA. McNamara Deposition 204, 324-325. The industry standard for fair market value used by McNamara is the nationally recognized Medical Group Management Association. Exhibit F to McNamara report; McNamara Dep. at 84-89.  DTCA's own attorneys advised DTCA to utilize MGMA data to determine fair market value, but it never did so. Exhibit 72, August 31, 1993 Letter at 3.

These  facts demonstrate that, in addition to paying medical directors without regard to fair market value, DTCA also paid medical directors without regard to whether and to what extent legitimate services were rendered.  These facts also establish that DTCA did not pay a reasonable rate for legitimate services rendered from 1983 until, at least, 1995.

### b. DTCA Statements Regarding Intent of Contracts

DTCA's own statements regarding the intent and effect of the contracts establish that an intended purpose was to induce the medical directors and others to admit their patients to the Center.  Founder and Chairman Cigarran testified that the company expected every medical director to utilize the diabetes treatment center as a preferred site for referral of his patients.[67]  DTCA President James Deal confirmed that a purpose of recruiting medical directors was to secure their admissions.[68]  Vice-President of Operations Mary Hunter testified that the company expected medical directors to admit patients to the centers.[69]  CFO Mike Conrad testified that it was a paid responsibility of the medical directors to encourage other physicians to refer patients for admission to the centers.[70]

---

[67] Cigarran Dep., Vol .1, at 116, 132-133.

[68] Deal Dep., Vol. 1, at 236-237.  But, Deal asserted, "that wouldn't be the only purpose."  *Id.*

[69] Hunter Dep. at 217-219.

[70] Conrad Dep., Vol. 2, at 75-77.  Mr. Conrad was unaware of the vast majority of advice given by DTCA's attorneys, including the advice that such duties should be removed from the contracts in order to avoid investigation by the Inspector General and potential felony prosecution.  Dep., Vol. 2, at 145-147.

Not surprisingly, these same officers attempt to divert attention from the obvious pay-for-play nature of the relationships by describing admissions as the hoped-for outcome of creating a "center of excellence."   This, of course, is a question for the Jury.  But, in fact, former DTCA CFO Gary LaRue testified to an *understanding between DTCA and its paid medical directors that the directors would refer and admit their patients* to the center.[71]  Further, the documents reflect that this was not just a hope, but a promise.  DTCA promised these admissions to every hospital in order to secure lucrative contracts[72].

The development strategy which DTCA used when it prepared to enter a particular market highlights the point.  This strategy was called "Physicians First."[73]  The point of it was that once it identified a potentially-lucrative market, DTCA conducted research to determine what endocrinologists or internists had the highest-volume diabetes practices.  It focused its efforts on entering into medical director contracts with those patient-rich practices.  Once DTCA had the physician under contract it intensified its pitch to hospitals, *using the promise of the medical director's admissions as an incentive for the hospital to open a Center*.[74]  Development vice-president Gary LaRue testified that in developing a new market, DTCA would sign medical directors first and

---

[71] LaRue Dep. At 123-126.  At times this understanding was reduced to writing as in Dr. Hellman's five year Professional Practice Agreement wherein he agrees to use the hospital where DTCA is located as his hospital of preference. Exh. 122, ¶14.

[72] Exh. 116, Declaration of A. Scott Pogue.

[73] Deal Dep. Vol. 1 at 39-41.

[74] Exh. 116.

only then approach hospitals.[75]  LaRue also testified that DTCA would hold the medical

director contracts until the hospital signed.[76]  In this way, DTCA was able to promise the

hospital an established patient base—that is, the additional inpatient admissions which

would result from the medical director's existing patient load—when a new center was

opened.

Activity reports generated by DTCA business development personnel document

their execution of Physicians First.  For example:

> 10/02/90: Spoke with 3 medical directors, informed them of current status.
> Asked them to contact Pat and express their support and potential
> admissions.[77]

> 2/19/91: Spoke with Steve re: conversation with Lee Ann indicating that
> they were not ready to develop the "diabetes floor" at this time......I told
> him about my conversation with [Dr.] Travis Lunceford and his willingness
> to support a unit there.  *That got his interest* and he said maybe they
> could gradually move the project along.  I told him I was meeting with
> Travis's group and would let him know of their interest.[78]

> 3/05/91: Met last night with Drs. Bryant and Lunceford.  They were very
> positive and are willing to support a Center with as many admissions as
> possible.  They will call Steve to relate.[79]

---

[75] LaRue Dep. at 21-22.

[76] Id. at 21, 57.

[77] Exh. 21, DTCA092685-89, 1991 Report from Development employee William
Moore regarding contract negotiations with Miami Beach Community Hospital in Miami
Beach.

[78] Exh. 22, DTCA092648-49, 1991 Moore Report regarding contract negotiations
with Eastwood Medical Center in Memphis, Tennessee.

[79] *Id.*

3/22/91: Spoke with Travis Lunceford.  He promised to call Steve Bell [President and CEO of hospital] to express his willingness to admit all primary diabetes and secondary as feasible on a case by case basis.[80]

12/29/92: Spoke again with Beverly.  She had spoken with David Shado-wen MD and he spoke highly of us but was in the process of recruiting a new partner and did not have the time to devote to developing a center.  I told Beverly that was no problem and we could do it with little of David's time.  She was going to speak to her boss again and get me to come up for a "dog and pony show."[81]

8/23/93: Spoke with Beverly [hospital associate administrator]...She also gave me a list of key physicians I would need to move the hospital in this direction.[82]

This promise of medical director admissions is reflected throughout the documents.  An especially-compelling illustration of DTCA's true purpose in contracting with medical directors (*i.e.*, to secure patient referrals) is a 1988 lawsuit in which Salt Lake's Holy Cross Hospital sued DTCA breach of contract *resulting from DTCA's failure to recruit an additional medical director to secure an additional patient-referral base.* DTCA's "Tikka" Beard, DTCA Program Manager at HCH, testified unequivocally *upon examination by counsel for DTCA* that DTCA was in the business of soliciting admissions through paid medical directors:

> **[O]ur intent was to solicit the participation, either contractual or through their admitting practices, to admit patients to the hospital** or, I'm sorry, to the center, to DTC.[83]

---

[80] *Id.*

[81] *Id.*

[82] Exh. 23, DTCA092656-57, 1991 Moore Report regarding negotiations with HCA Greenview Hospital in Bowling Green, Kentucky.

[83] Dep. of Mary Catherine Beard (Oct.17, 1988) at 11 (emphasis supplied).

-23-

Ms. Beard testified that it was an implied duty of DTCA's contract with the hospital that DTCA would contract with "a physician that would bring a new patient base to the center."[84]  In April 1986, Beard documented in an internal report that DTCA and Holy Cross "discussed the role of medical director and Holy Cross Hospital's expectation of *increased market share through additional admissions with the physician or associate medical director.*"[85]  She testified that they attempted to bring in a physician who was not already on staff at the hospital for the express purpose of bringing a new patient "load" to the hospital.[86]

The unvarnished desire on the part of DTCA management to use payments to medical directors to generate inpatient referrals to DTCA's client hospitals[87] is mirrored in documents regarding negotiations with the medical directors.  With regard to negotiations with potential medical director, Dr. Stanchfield, who was not on staff with Holy Cross, Center Manager Beard testified: "[W]e were interested in, again, securing his interest and admissions to Holy Cross."  Dep. of Beard at 28.   And in a site visit in

---

[84] Dep. of Beard at 32.

[85] Dep. of Beard at 31-32 (quoting document) (emphasis supplied).

[86] Beard testified:

There were *meetings in which the need to enhance census, specifically through the recruitment of an outside physician who would be bringing another patient load to Holy Cross that wasn't previously there*, so there were conversations to that end.

Dep. at 31 (emphasis supplied).

[87] Beard Dep. at 45 (referencing document) (emphasis supplied).

September 1986 by potential medical directors, she reports that the purpose was to

"..show them the unit.  Again, *to solicit potential admissions*."

Dr. Stanchfield told Ms. Beard and DTCA Senior Vice President Barbara Dowl, that:

> [H]e can deliver physicians and he personally has on any given day 4-6 patients in St. Mark's; his 2 partners have at least 2 patients per day, and the major Retinal group and nephrology practice would utilize the center.[88]

This is just one of many examples.  DTCA's often-repeated expectations reflect

that a primary purpose of its payments to medical directors was to increase admissions

to the hospitals from those medical directors and other physicians who the medical

directors influenced.  The explicit, and often desperate, clarity of DTCA's purpose to

obtain admission from paid medical directors is shown throughout its documents.  The

following examples are culled from a vast library:

- "We reduce physician compensation to $25,000 to provide the Medical Director leadership with Dr. Motto.  This would be a reduction from his $60,000 fee currently in place.  *The risk may be that he does not support the program and may take one-third of his patients elsewhere*.  It is my assessment that the hospital will be willing to take this risk."[89]

- "[T]he revised contract with Walthamweston provides us medical directors and DTCA incentives to increase activity at the Center.  To achieve these new goals, we need to: 1) maximize utilization among the directors and 2)

---

[88] Exh. 24, DTCA065165 (October 15, 1986 Memo).  Barbara Dowl told the Hospital that Dr. Stanchfield "has committed to refer outpatients to Holy Cross at this time.  However, the real thrust of this contribution will be derived initially on the inpatient side of the center." Exh. 25, DTCA065096, September 21, 1986 Letter to Ken Rock from Barbara Dowl.

[89] Exh. 26, DTCA105955-59, July 1990 Internal DTCA Memo regarding proposal to decrease costs after Alexian Brothers Hospital threatened to discontinue its contract with DTCA (emphasis supplied)

seriously reconsider recruiting new associate or assistant directors who do not necessarily join DAEM unless your group feels it appropriate."[90]

• "Our goal is to **develop Associate Medical Director relationships** with other specialists in the South County area **to maximize the networking of referrals** for this rapidly growing area."[91]

• At this time, Dr. Stanchfield and DTCA are proceeding to agree upon a letter of understanding which outlines the terms of a formal agreement[.] Ken, as you may be aware, **Dr. Stanchfield visited the Center today, and has committed to refer outpatients to Holy Cross at this time**. However, the real thrust of this contribution will be derived initially on the inpatient side of the Center.[92]

• "Paula is also working through [DTCA executive, Mike] Conrad to prepare a background review of all endocrinologists in Louisville **to determine which physicians to approach to increase the utilization of the program.** We will also contact Dr. Pfeifer in Lexington to revisit a possible relocation to Louisville . . . We also met with DTC staff . . . to specifically discuss ways to reduce length of stay and increase diabetes admissions."[93]

• "Jim, operational considerations are as follows:

—Clark will never be the Director we want and need; he's not going to change his admitting practices...

---

[90] Exh. 3, DTCA037020, December 14,1987 Letter from VP Williams to Medical Director Goldstein regarding increases in medical director fees and renewal of hospital contract.

[91] Exh. 27, BCCB009004, October 11, 1985 Letter to potential Associate Medical Director Benjamin Milchiker regarding proposed DTC at Western Medical Center in Santa Ana, California (emphasis supplied).

[92] Exh. 23, DTCA065096, September 21, 1986 Letter to Ken Rock at Holy Cross Hospital from Barbara Dowl (emphasis supplied).

[93] Exh. 28, CHS0116, September 20, 1991 Letter from CFO Conrad to CEO of St. Mary & Elizabeth Hospital (emphasis supplied).

—Dr. Regans' contract expires 5/4/91.  In FY '89 he contributed <u>$63,270</u> in revenue and our Medical Director fee was <u>$12,576</u>.[94]

—I am requesting approval to provide financial assistance [income guarantee] for Dr. Margaret Maciulis . . . We estimate that Dr. Maciulis will contribute the following patient volume to the center:

—7 admissions per month (1.15ADC). . . $185 per day . . . $77,700/year."[95]

• "Now we can create a feeling of ownership in him and he will also be able to see the long term financial effect of the hard work that he is doing now. **He will also be able to see, again long term, what a good census at the Center means to him.  This would perhaps encourage him to take a very active part in census building with other physicians** both on the staff at Shallowford Community Hospital and those who are not."[96]

• "The **primary reason for Columbia Regional to contract with DTCA is to increase the number of discharges for people with diabetes**[.]  Our goal is to assist you in increasing the number of discharges for people with diabetes from one year to the next."[97]

• <u>"OBJECTIVE A - INCREASE DIABETES DISCHARGES BY A MINIMUM OF 10% ABOVE 1991</u>

—Increase admissions from Medical Director

—Increase admissions from other endocrinologists

—Increase admissions from other physicians"[98]

---

[94] Exh. 29, DTCA041176, September 18, 1989 Internal Memo.

[95] *Id.*

[96] Exh. 30, DTCA118039, January 7, 1985 Internal Memo regarding offering stock options to Dr. Davidson (emphasis supplied).

[97] Exh. 1, DTCA071024, November 14, 1996 Letter to Hospital from CFO Conrad (emphasis supplied).

[98] Exh. 31, DTCA127836, 41, Memorial Medical Center Incremental Diabetes Profitability Analysis, May 1, 1990 - April 30, 1991.

- "Implement individualized physician office marketing plans for our top admitters in order to **increase office practice volume and resultant admissions."**[99]

- "It has been DTCA's experience that focusing efforts on physician marketing results in the greatest return on investment of both money and time...strategies focus on continuing long-term relationships with medical directors, targeted physicians...to increase volume and decrease length of stay (LOS)."[100]

- "WPMC Expectations for DTC: . . . **To retain Medical Directors and their business**."[101]

These examples demonstrate, well beyond the threshold of demonstrating a dispute of material fact argument, that DTCA's principal reason for contracting with medical directors was to generate patient census for its hospital clients.  Documents and testimony regarding the implementation of these contracts show that these intentions flowed down into a continuing course of violating the Anti-Kickback and Stark laws resulting in the submission of a steady stream of false claims by the DTCA host hospitals.

    **2.**    **The Scheme In Practice: Day-to-Day Drumbeat of Referral Solicitations**

During the entire time period relevant to Relator's allegations, DTCA's primary source of revenue was the fees paid to DTCA by hospitals pursuant to management

---

[99] Ex. 32, DTCA002111, 29, Annual Report, DTC at West Paces, 1989-1990. Marketing for medical directors was paid for by DTCA, thus providing a financial benefit to the medical directors (emphasis supplied).  LaRue dep at 111-113.

[100] Exh. 33, DTCA001761-71 (Selected pages), Business Plan for DTC at West Paces September 1993 - August 1994.

[101] Exh. 33, Business Plan for DTC at West Paces September 1993—August 1994 (emphasis supplied).

contracts.  These contracts were structured to increase DTCA's fees as DTCA in-creased census for its hospital clients.

In order to deliver the census increases essential to justify the hospitals' payment of management fees, DTCA promised hospitals that it would engage enough medical directors to (1) secure a patient referral base from their practices, and (2) aggressively market to their colleagues for referrals.[102]

In order to ensure aggressive marketing, DTCA paid its employees bonuses based on increases in census.  In fact, a 1988 directive from Bob Stone modified the bonus program to tie it *more directly to* census increases, based on his conclusion that "the most significant contributor [to centers which have not experienced a census increase] is the apparent failure of the program manager to maintain his/her marketing efforts."[103]

DTCA employees knew that they were required to aggressively market to in-crease census.  They knew that if census did not increase, they were not compensated under the bonus plan.  They also knew that if they did not perform in accordance with the bonus plan, they would be terminated.[104]  Even more to the point,  DTCA em-

---

[102] Exh. 116; notes 98 and 100, *supra.*

[103] Exh. 34, DTCA131567-68, September 9, 1988 memos from Bob Stone regarding PMR bonuses.

[104]  Kirk Dep. at 316 (Q. ...did you tell [Mr. Pogue] that unless he developed more centers that he could face termination? A. The expectation was written in  the bonus plan.  It was part of the  reviews that the expectation was three centers).  *Accord* Kirk Dep. at 27-28, 336-339.

ployees knew that if census did not increase, DTCA would not receive the fees necessary to keep the center open, and there would be no job at all.

These operational personnel were the ones who had day-to-day interactions with medical directors.  Despite the requirements of the fraud and abuse laws, and the repeated cautions of its business and health-care attorneys, DTCA took no steps to ensure that employees with a financial interest in census  did not attempt to influence increased census from the medical directors.  Thomas Cigarran testified that he was aware that the company had hundreds of people in the field that were incentivized to increase census, who had day-to-day contact with doctors, and who had far less health care experience than he or other corporate officers.[105]

Yet he and his company did nothing to educate them on the requirements of the Medicare fraud and abuse laws.  It never gave them a copy of the statutes or regulations,[106] nor provided summaries of the requirements of the law.[107]  It never distributed any guidelines as to proper and improper means to increase census.[108]  There was no written policy, no formal training, and no what-to-do or not-to-do when it came to compliance with fraud and abuse laws.  No employees below the highest corporate levels were informed about what the lawyers advised with regard to the risks inherent in all the arrangements. Even core management such as CFO Conrad and Senior Vice President

---

[105] Cigarran Dep., Vol. 2, at 106, 127-129.

[106] Cigarran Dep., Vol. 2, at 133-134.

[107] Cigarran Dep., Vol. 2 at 136-138

[108] Cigarran Dep., Vol. 2, at 123-124.

Hunter had no idea that, in the 1980's and early 1990's, lawyers had repeatedly advised that DTCA's contractual arrangements with medical directors exposed the company to investigation and prosecution for anti-kickback violations.[109]

Mr. Cigarran says he did not provide training specific to the kickback laws because it was a "gray area;" that it was too complicated to explain all the AKA's provisions and regulations and would have been "out of context" to give them just a part of it; and, that doing so was "dangerous" because then employees would overlay their own interpretations onto the statute's requirements.[110]

This was bunk.  Not only was Cigarran a seasoned hospital executive—a veteran of Columbia/HCA, in fact—who know full-well the ins and outs of the fraud and abuse laws, but his lawyers advised him no later than 1989 that this fact necessitated additional training of the company's employees.  In an August 15, 1989 letter, Nashville attorney and DTCA's primary attorney, James I. Vance Berry, advised Tom Cigarran and Jim Deal that:

> ...we are receiving an increasing number of requests—**several each week**—involving different methods of compensating doctors who happen to be the source, or the potential source, of substantial referrals.  While some of these proposals are clean, some are not and the mere volume of the transactions casts a shadow even upon those that might otherwise pass muster. Thus **we have an increasing concern about your ability to successfully defend all of the arrangements**[.]

---

[109] Conrad Dep., Vol. 2, at 50, 53-54; Hunter Dep. at 254-264 (believed contracts were compliant with the law; was told by lawyers that contracts had to be restructured to be in compliance with Stark II).

[110] Cigarran Dep., Vol. 2, at 126-127, 133-139.

We can of course qualify our opinions that this is an unsettled area of law....but qualified opinions really don't serve your purpose.  There is no magic line and no magic black and white.

***We do get a feeling that some of your people who are nego-tiating contracts may not fully appreciate all of the considerations that go into dealing with this problem.***  Frequently, where a client has a group of employees dealing with a similar set of problems, we have arranged to put on an ***in-house seminar designed to inform the employees of the legal considerations involved and of the pitfalls.***  Because of the high exposure that this area presents for you, we believe such a program could be beneficial and should make the discussions between us more readily understood.

We would like to do this with your people and would of course expect this to be on a non-fee basis.[111]

DTCA flatly ignored this advice and *never accepted counsel's offer to provide free fraud-and-abuse training to its personnel*.  Rather, Cigarran testified that the company made a decision not to disseminate specific information as to the potential outer limits of the law because it was too "dangerous" given the complications of interpreting the "gray areas" in the law.  Cigarran's chosen alternative to training his employees was to give them no guidance at all.[112]

DTCA's focus on profit and the census growth which enabled it—coupled with their complete lack of emphasis on compliance with fraud and abuse laws—resulted in unrestrained fraudulent conduct.  In most other cases, "smoking-gun" documents are few and far between.  Here, the documents are replete with statements proving that DTCA was being paid by hospitals to influence referrals and that it paid its staff to do

---

[111] Exh. 35, BCCB002118-19, August 15, 1989, letter from James Berry.

[112] Cigarran Dep., Vol. 2 at 133-139.

the same.  The following excerpts are examples of direct communications with paid

medical directors soliciting referrals to the centers:

- "The staff . . . make themselves available to the physicians for assistance at those moments of truth when the physician interacts with the patients . . . **We are also taking these opportunities to ask these physicians for more of their patients** so we can again demonstrate the Columbia/DTCA difference."[113]

- Please find attached Dr. Huttner's letter of request for a development contract and $9,000 additional compensation per year.  He has **high-lighted specific areas where he plans to increase census** for the additional compensation.  **Walt is aware that we need incremental census to justify any expense and I feel he will make sure the $750.00 per month is at a minimum.**[114]

- Dr. Hellman is **requesting that DTCA assist financially in the establishment of a Foundation for his research**.  The sum of the request is $75,000/year for three (3) years.  He indicated that his support for DTC will be commensurate with our funding assistance . . . .  Dr. Hellman feels that if we fund this Foundation, DTC will:

  —**Continue to receive the inpatient support of Dr. Hellman**.  In 1988, Hellman contributed 332 admissions; 2687 patient days; and 8 LOS.

  —The DTC image will be enhanced through association with the Foundation.

  —**Dr. Hellman will continue to market DTC to outside groups.**[115]

- From Dr. Perley: I have a percentage ownership in that unit and if you lower the revenues, that affects my reimbursement by $200,000.  **Who is going to make that up?  You may not see any difference in the**

---

[113] Exh. 36, HCA-WP-055040, "Ways in Which DTCA Staff Members Have Helped to Increase Volume" at Columbia South Bay Health Care Network since May 1995 (emphasis supplied).

[114] Exh. 37, BCCB009279, July 6, 1988 memo to Bob Stone from Pam Goebel (emphasis supplied).

[115] Exh. 38, DTCA038147, September 15, 1988 memo to Bob Stone from Morrie Maple.  (emphasis supplied)

**census in the next week or two, but by the end of the year you will see changes**.

•   Handwritten comment by DTCA: If census drops off—does that create any rights for us [against Dr. Perley]?[116]

•   Dear Dr. Bueso: . . . [Center Manager] Emily is telling me you are **already having a significant impact on the census of the Center**.  I have great expectations for building your practice and I think we will have fun working together as we grow Park Plaza's diabetes product line...As we agreed upon, **your Medical Director fee will be increased to $18,000/year** beginning January, 1990.[117]

•   Dear Dr. Sweeney: ...As I promised, enclosed you will find a projection of stock value representing your 5% ownership... Increased activity will, of course, result in increased value for you...Moreover, on an annualized basis the value is $16,984.80, which when considered in addition to the income provided from referral office visits and admissions, exceeds the annual impact you have indicated you were anticipating from your association with us.[118]

•   Regarding a meeting with Dr. Clarke to inform him, among other things, that "his admissions to the Center were the least representative in the Division."  **Dr. Clarke asked "how many patients it would take to 'keep the center.'"  Barbara Dowl told him "at least 15 patients everyday in the Center would be necessary, and how did he plan to facilitate that census."**[119]

•   Regarding discussions about an inexperienced physician hired by DTCA in Atlanta:

    —President Deal—Wait a minute.  A guy coming out of a fellowship, most likely, is not going to be a medical director of a center.  If he is going to be

_____

[116] Exh. 39, DTCA102619, November 6, 1987 Memo to File from Barbara Dowl. Re: Michael J. Perley, M.D.

[117] Exh. 40, BCCB009256, November 9, 1989 letter to Gerardo Bueso, MD. from Morrie Maple (emphasis supplied).

[118] Exh. 41, DTCA060417-18, December 9, 1986 letter to Howard Sweeney, M.D. from Robert E. Stone.

[119] Exh. 42, DTCA065165, October 15, 1986 Memo (emphasis supplied).

an associate, he is someone one of you are going to choose.  What happened in Atlanta should never happen ever and I can't imagine you letting that happen in your centers.

—Medical Director Davidson—***It was pressure to fill beds.***

—President Deal—That is an issue we need to talk about on the side.[120]

• From Program Manager: **Visit each Medical Director weekly, at their office, to encourage DTC admissions.**[121]

• From Program Manager's Report:

   ADC [Average Daily Census]—Medical Directors

   —**Analysis:** We are below budget by .2 [average daily census].

   —**Plan**:  **Encourage admissions to the center**.  Consider giving the two new MD's in practice with the medical directors a position.[122]

• From Program Manager's Report:

   Medical Directors - Contributions by medical directors fell short by -1.1 ADC compared to budgeted 4.3 ADC.

   Plan of Action

   —Continue to report weekly ADC and number of patients on center to medical directors;

   —Weekly analysis for medical directors and number of patients needed during the month to accomplish monthly budgeted ADC.[123]

---

[120] Exh. 43, DTCA075427, 38, September 24, 1985 Memo from Robert E. Stone enclosing transcript of medical directors' meeting (emphasis supplied).

[121] Exh. 44, DTCA169520, March 1990 MOR for Holy Cross-Utah (emphasis supplied).

[122] Exh. 45, DTCA179494, October 1988 MOR for Newark Beth Israel Medical Center.

[123] Exh. 46, DTCA190336, September 1988 MOR for Roper Hospital Center.

- From Program Manager:

  ADC MEDICAL DIRECTORS

  —**Analysis:**  Dr. Sweeny had twelve patients from his practice admitted this month.  Dr. Farrell and Dr. Gilbert admitted none.

  —**Plan:**  Contact associate medical directors about lack of private practice admissions, or discuss the problem with Dr. Sweeney.[124]

- From Program Manager:

  ADC - Medical Directors

  —**Analysis: Medical Directors admissions are down this month....The medical directors appear to be encouraging colleagues to use the Center. This has had a significant impact on ADC.**

  —**Plan:** Continue to reference ADC goal.  Will send formal thank you notes to directors for their referrals.  Will share marketing plan with directors and solicit their active support in implementing the plan.[125]

- From Program Manager:

  Hospital/Medical Director Relations

  —**Analysis:** ...Dr. Tulloch admitted two diabetic patients to other sections of the hospital, and delayed ordering DTC Services.

  —**Plan:** ...Will meet with Dr. Tulloch to assure his commitment to DTC goals.[126]

---

[124] Exh. 47, DTCA191243, May 1989 MOR for Mercy-Chicago.

[125] Exh. 48, DTCA191245 and DTCA191248, May 1989 MOR for DTC at Park Plaza (emphasis supplied).

[126] *Id.*

- From Program Manager: **Dr. Smith admits frequently, but only keeps patients in for a very short duration.  I will be talking with him about this.   I talked with Dr. Rose regarding no admissions.**[127]

- From Program Manager's Report:

  Enhanced Medical Staff Relationships

  —June 12 - Med First Physicians (Toco Hills) - Sally spoke with Dr. Grier about DTCA making referrals and the upcoming screening

  —June 16 - Larry Ball - Idie made marketing call to his office per request of Joni Crepps (VP operations).  NRMC introduced him to DTCA services and discussed possible referrals.[128]

The DTCA Centers had a specific census goal and budget for medical directors that was communicated from DTCA to the medical directors[129] There were additional ways in which medical directors were made aware that their continued receipt of a salary from DTCA depended on census increases.  From the inception of these arrangements, DTCA officers sent the same message to their medical directors that they sent to their operations employees—their jobs depended on increased census.  In 1986, for example, Senior Vice-President Bob Stone, told medical directors:

> [DTCA's investment] must yield a sufficient return . . . **the essential element** [to DTCA's ability to provide resources to the center] **is census**–not only in the absolute, but equally is important, as compared to budget.[130]

---

[127] Exh. 49, DTCA180132, 1987 Letter to Duell Wise from Sheila Ryan (emphasis supplied).

[128] Exh. 50, DTCA235757-62, MOR for June 1993 for DTCA at Northlake Regional Medical Center.

[129] LaRue Dep. at 135-140.

[130] Exh. 8, DTCA075400-08, November 5, 1986 Stone letter (emphasis supplied).

Stone went on to advise each medical director of the census shortfall for their respective DTCs based on actual versus projected census numbers, as well as the specific dollar loss realized by DTCA as a result of each census shortfall.[131] He then clearly stated what was expected of each paid medical director:

> There are only two ways in which that shortfall can be made up–reduced expenses or increased volume. **Since reducing expenses is as unpleasant for you as it is for us, and in some cases may be counter-productive, I hope you will join us in** *taking whatever steps are necessary to increase volume.*[132]

In 1989, DTCA President Deal told medical directors that DTCA staff were undergoing training in "professional selling skills" in order to

> **increas[e] our ability to bring more referrals to your practice and attract more patients to our centers** . . . As I hope you realize, we are extremely eager to understand your needs and satisfy as many of them as we possibly can. **Our ability to do this, however, is contingent upon maintaining our contracts with our hospitals**. To maintain these contracts we must reach out, understand our hospitals' needs and satisfy them, too . . . Without lasting relationships with hospitals, we cannot continue to meet your needs or those of your patients.[133]

With the message well and frequently delivered, DTCA's officers relied on their field representatives to make sure it was acted upon. Gary LaRue testified that DTCA Regional Managers encouraged DTCA onsite program managers to talk to Medical

---

[131] *Id.*

[132] *Id.*  (emphasis added).

[133] Exh. 51, AP000080-83, April 10, 1989 letter to Judson G. Black, M.D. from James A. Deal (emphasis supplied).

Directors about their individual census numbers and that there was no prohibition against DTCA employees talking to the medical directors about their admissions.[134]

### C.      AHC and DTCA Knowingly Decided to Risk Prosecution by the United States in Order to Keep the Company Alive

The documents show that DTCA was advised, at the latest, by 1989 that it was at risk of prosecution for felony kickback violations resulting from its contractual arrangements with hospitals and doctors.  It is equally clear that DTCA decided to take that risk.

In response to repeated warnings that their contractual arrangements posed risk of criminal prosecution, (including a remarkable series of letters in the summer of 1989, detailed below), DTCA did not take affirmative measures to ensure that such arrangements were in compliance with Medicare fraud and abuse laws.  Far from modifying its arrangements to remove any incentives to admit patients, the company's emphasis was just the opposite.  In 1989 and 1990 DTCA focused on "increasing the volume of diabetes patients at our client's hospitals"[135] and taking "whatever steps are necessary"[136] to make that happen.

---

[134] LaRue Dep. 157-160; *See also*,  Exhs. 106 & 107 (formerly exhibits 13 and 14 to the LaRue deposition) are examples of center monthly operations reports showing that program managers were discussing census numbers and the need to increase them with medical directors. LaRue testified that reports like these were sent to and available to anyone in the home office.  LaRue Dep. 155-56.

[135] Exh. 52, DTCA101398-403, November 29, 1990 Minutes of Board of Directors' Meeting at ¶ 5.

[136] Exh. 8, DTCA075400-08.  This instruction had been in place since 1986, when VP Bob Stone informed medical directors that it was necessary for them to "take whatever steps necessary" to make up census shortfall if they did not want to lose resources from DTCA.

### 1.   DTCA ignored extensive, and increasingly-vehement, legal advice regarding its exposure under the Anti-Kickback Statute

DTCA had no in-house counsel.  It retained outside counsel to advise it as to all legal matters and, as such, had sole control of all information provided to that counsel in order to obtain advice.  In 1981, DTCA, through its parent company AHC, hired Nashville's Boult, Cummings, Conners, & Berry ("BCCB") to serve as counsel.  In 1988, DTCA retained separate attorneys at Bass, Berry, and Sims to provide advice on corporate matters, but still retained BCCB as their healthcare counsel.

DTCA's decision to make BCCB their dedicated healthcare counsel is of interest because its primary contacts had little experience in health care.  The partners in charge of the account, Vance Berry and E. Berry Holt, were business lawyers with practices in real estate and finance, respectively.[137]  They delegated the substantive work and day-to-day contact with DTCA to associate Tom Smith.[138]  After graduating from law school in December 1984, Smith joined the firm in 1985.[139]  Smith testified that he was hired to be the firm's health care expert, such that "the knowledge level that [he] either would bring or develop at Boult, Cummings would exceed what they had already."[140]  Smith's experience before attending law school included seven years as a hospital administrator (1974-1981), though he states the anti-kickback laws were something they "didn't think

---

[137] Hardcastle Dep. at 29-31; Smith Dep. at 26-27.

[138] Hardcastle Dep. at 39.

[139] Smith Dep. at 12-15, 59.

[140] Smith Dep. at 152-153.

about too much" at that time.[141]  Smith attended one class in law school regarding health care.[142]

In May of 1989, Smith left the firm.[143]  Before Smith's departure, BCCB added a new attorney, Jay Hardcastle, Jr., to its AHC/DTCA matters.  Hardcastle joined the firm upon  graduating law school in 1987.[144]  Hardcastle began his practice as a real estate lawyer.[145]  He commenced work on the AHC/DTCA account in early to mid-1988, having been an attorney for about six months.[146]  Having taken only one course in law school on the topic of health care, Hardcastle "worked in an apprenticeship role with Smith."[147] Hardcastle considered three-year associate Smith to be his "mentor"—an "accomplished, experienced healthcare attorney who did a lot of day-to-day contracting."[148] After about a year, however, Smith left the firm to practice in Florida.  Two years into his practice and a year into his healthcare "apprenticeship," Hardcastle took Smith's place as the primary advisor to AHC and DTCA on healthcare issues.[149]  Though he lost his mentor, Hardcastle noted in deposition that he did attend a national health care law

---

[141] Smith Dep. at 21-22.

[142] Smith Dep. at 15.

[143] Smith Dep. at 26.

[144] Hardcastle Dep. at 12, 15-16.

[145] Smith Dep. at 26-28.

[146] Hardcastle Dep. at 229.

[147] Hardcastle Dep. at 12-13, 82.

[148] Hardcastle Dep. at 39, 217.

[149] Smith Dep. at 30; Hardcastle Dep. at 230.

seminar in San Francisco in June 1989.[150]  Not long after that conference, in August

1989, Hardcastle issued a flurry of internal memoranda and letters to the client docu-

menting BCCB's warnings regarding  the risks of Medicare fraud and abuse in DTCA's

contracts and the client's decision to proceed anyway.[151]

>          **2.      DTCA Did Not Fully and Accurately Report the Material Facts to
>                   its Attorneys:** *Its Attorneys Knew About Contracts, Not
>                   Conduct.*

        Before addressing those documents, it is important to keep in mind a few

pertinent facts.  The attorneys have consistently testified that they relied on the client to

provide all information relevant to their advice and conducted no independent

investigation as to the implementation of the contracts.[152]  Tom Smith testified that he

reviewed and approved the contract language in a vacuum: he had no knowledge

regarding how the contract was implemented or "whether the relationship was designed

to accomplish anything outside the four corners of the agreement."[153]  Further, as to the

medical directors' contractual duty to develop referral sources, Smith states:

>        When you identify any conduct in a general term, like development of
>        services, we certainly, sitting here, can review that word and envision
>        conduct that would fall within development that is legal and conduct that
>        would fall within development that is illegal.  The reason I would have
>        opined that the use of that duty development is okay in this contract is
>        because I believed from my interactions with my  client that they had a

---

[150] Hardcastle Dep. at 230-231.

[151] Exh. 108 chronological chart regarding attorney advice and attachments N-W
thereto.  *See infra* for further discussion.

[152] *See infra* testimony of Smith and Hardcastle; Mills Dep. at 101.

[153] Smith Dep. at 122-123, 181-182.  He does not recall seeing any operational
documents of any kind.  Smith Dep. at 123.

desire -- this is a general recollection, no specific conversations -- had a desire to comply with the law, and therefore, it would have been my belief that the contract on its face, using the word development, was legal, and I would have believed that my client was implementing that in a legal fashion.  Did I search beyond the four corners?  No.  Do I have a recollection of a specific conversation with them about the specific activities that were being done?  No.[154]

Smith's successor, Jay Hardcastle, testified similarly, stating that when he raised fraud and abuse concerns about the terms of the contracts, DTCA officers "were able to assure me to my satisfaction that the reality of the situation was that the medical directors were providing a valuable service and were not getting paid too much money."[155]  Hardcastle was provided no documentation of those facts, and relied on James Deal's "heartfelt" belief "convincingly presented" that the various contractual schemes, such as ones involving multiple medical directors, "generated a better quality clinical product."[156]  Deal did not communicate to Hardcastle the non-quality focus reflected by its operational documents.  During his deposition, Hardcastle was shown many of the "smoking gun" documents cited *supra* and testified that he had no knowledge of ever having seen them.[157]

Thus, based on DTCA's representations, the attorneys operated on the following assumptions:

---

[154] Smith Dep. at 179-180.

[155] Hardcastle Dep. at 444; *see also* Dep. at 417, ("Bob assured me that whatever he was doing with Hellman was up and up").

[156] Hardcastle Dep. at 445.

[157] *E.g.,* Hardcastle at 113-115.

- "[P]ayments are solely intended to be compensation for...services as a medical director";[158]

- No purpose of the medical director's payment was to obtain the referral of their patients;[159]

- Medical directors' compensation is "based on the size of the centers and the staff;"[160]

- "DTCA is not paying any more for our medical directors' services than they are worth;"[161]

- The medical director compensation is "consistent with fair market value in arms length transactions and will not be determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties;"[162]

- Medical Directors performed the duties set forth in their agreements;[163]

- DTCA was keeping records of the medical directors' performance of duties;[164]

- Multiple medical directors at the same center were necessary to "generate[] a better quality clinical product;"[165]

---

[158] Exh. 53 DTCA265528-30, May 18, 1989 Hardcastle letter to Williams.

[159] Hardcastle Dep. at 267-269.

[160] Exh. 54, AH000076, July 24, 1995 BCCB Internal Memo with a three-paragraph summary of contracts.

[161] Exh. 55, DTCA265542-43, August 11, 1989 letter from Hardcastle to Williams.

[162] Exh. 56, DTCA039529-31, February 18, 1993, Hardcastle to AMI Hospital Administrator.

[163] Hardcastle Dep. at 260.

[164] Exh. 57, BCCB001983-84, February 3, 1994 Hardcastle letter to Stuart; Exh. 58, DTCA132133-34, July 7, 1989 Deal Letter to Medical Directors.

[165] Hardcastle Dep. at 445.

- DTCA provides services to the Hospital in return for its fees and is not responsible "for procuring referrals through influencing patients or physicians or any other parties."[166]

DTCA full-well knew that these assumptions were required in order for it to be considered in compliance with the law.  The record shows that DTCA was fully informed of the scope of prohibited conduct under the AKA, but it kept its lawyers in the dark about its actual business practices.  The inference to be drawn from this is that DTCA knew it needed its lawyers to paper over its fraud, and knew that if its lawyers knew about the fraud, they would step up efforts to shut it down.  DTCA thus simply failed to tell the lawyers what it was actually doing.

### 3. DTCA Was Repeatedly Advised That it Was at Risk of Prosecution—*And It Routinely Decided To Take That Risk.*

DTCA was repeatedly advised on the basic precepts of the anti-kickback laws and was kept apprised of any developments.  Years before Mr. Hardcastle's "DTCA Fraud and Abuse" file was initiated, a BCCB internal memo dated August 1986 documents conversations between Berry Holt, Barbara Dowl, and James Deal regarding the "fraud and abuse questions which we have discussed in the past."[167]  DTCA's files contained a lengthy research memo on "fraud and abuse" authored by Tom Smith in October, 1987.[168]  This memo contained a detailed review of the anti-kickback provisions, as well as the holding in *United States v. Greber* that the anti-kickback

---

[166] Exh. 59, BCCB009340-43, July 13, 1993 Hardcastle letter to Stuart.

[167] Exh. 60, AH000127, August 27, 1986 Smith memo to Vance Berry.

[168] Exh. 61, DTCA280517-33, October 19, 1987 Smith Memo.

-45-

statute is violated if **one purpose** of the payment is to induce a referral.  Smith further

advised:

- Any remuneration related to referrals is a violation, whether as an opportunity to generate a fee, a reduced office rent for a physician who is going to refer patients, or even an opportunity to participate in a joint venture (Memo at 10).

- Payments...should be closely analyzed...an organization cannot just create a mechanism for making payments. The physician should be paid only for performing medical services, not merely for performing paperwork that does not require a physician's skills.  Further, the ***physician should be paid an amount which is reasonable in light of what others are being paid in the community for providing the same service*** (Memo at 12 (emphasis supplied)).

Thus, by 1986, DTCA had already received detailed analysis of the AKA and the

Third Circuit holding in *Greber*.  By May of 1989, it was further advised that *Greber* had

been joined by the Ninth Circuit in *Kats* and that these were the "two leading cases."[169]

By July and August of 1989, it was advised of the *Bay State* decision and its holding that

payment of fair market value is not in and of itself a defense to a Medicare fraud

action.[170]  Also in 1989, it received the proposed Stark Bill, the proposed AKA safe

harbors, and the May 1989 IG Report on Financial Arrangements Between Physicians

and Health Care Businesses.[171]  Indeed, it was kept constantly abreast on the law and

-------------------------------------------------------------------

[169] Exh. 53,  DTCA265528-30, May 18, 1989 Hardcastle letter to Williams; *see also* exh. 62, DTCA280237-38, May 30, 1989 Berry Letter to Cigarran.

[170] Exh. 63, BCCB001990, July 11, 1989 Hardcastle Letter to Stone; Exh. 55, DTCA265542-43, August 11, 1989 Hardcastle Letter to Williams.

[171] Exh. 64, DTCA280230-35, March 16, 1989 BCCB letter to Conrad; Exh. 65, DTCA035542, May 1, 1989 Client Memo; Exh. 66, BCCB009213-14, August 15, 1989 Hardcastle letter to Stone; Exh. 67, DTCA280246-52, December 6, 1989 Holt letter to Deal and Cigarran.

even hired a separate law firm in Washington, D.C. in 1993 for the express purpose of monitoring developments in the law.[172]

DTCA cannot credibly deny that it was fully informed regarding the development of the fraud and abuse laws.  DTCA officers James Deal and Gary LaRue reassured medical directors in a mass mailing in July, 1989 that they had "carefully monitored developments in the law"[173] and "are protected if the amount paid is competitive . . . To protect you, we will strive to keep accurate records of your involvement"[174].  At this time DTCA created a medical director time log and documented that it was required for medicare and medicaid reporting[175].  But DTCA never utilized the log until 1995.[176]

In addition to instructing them on the law, DTCA's attorneys repetitiously conveyed that the company risked violation of those laws. Even without knowledge of how the contracts were implemented, DTCA attorneys advised DTCA that the sheer nature of the terms of the contractual arrangements posed a risk of criminal prosecution. This advice is documented as early as 1986 and continued until the contracts were

---

[172] Exh. 68, BR00227, April 29, 1993 Mills letter to Cigarran.

[173] Exh. 69, DTCA132136-39, July 7, 1989 LaRue letter to medical directors.

[174] Exh. 58, July 7, 1989 Deal Letter to medical directors. These letters were sent to explain AHC and DTCA's decision to discontinue its practice of extending medical directors stock and other equity in the company.

[175] Exh. 16 (1989 Time Log Sheet stating that records of time are required for medicare and medicaid reporting)  Former DTCA CFO Gary LaRue testified that he is the person that developed the form and the FIN 760 stamp indicates that it came out of the finance department. LaRue Dep. at 70-71; *See also* Dep. V.P. Bob Stone 216-218 that form was developed for Medicare and Medicaid regulation compliance.

[176] *E.g.* Dep. of Medical Director Judson Black at 82-83;  Dep. of Medical Director Paul Davidson at 377; Dep. of DTCA program manager Mary Hunter at 290.

finally restructured in 1995.  The tedious nature of this advice is overwhelming and is presented more fully in the attached chronological table which quotes or details relevant excerpts of more than 50 letters or memoranda documenting such advice.[177]

These documents show that AHC and DTCA's attorneys told AHC and DTCA that "payments to medical directors...constitute possible violations of the anti-kickback provisions of the Medicare laws, and that these possible violations were especially dangerous after the *Kats* and *Bay State* decisions."[178]  Further, they advised:

> ...courts are saying that any form of payment, even if supported by fair market value consideration, may violate the statute if any portion of the payment is intended to induce the referral of patients.
>     In the face of this, we are receiving an increasing number of requests-- several each week–involving different methods of compensating doctors who happen to be the source, or the potential source, of substantial referrals.  While some of these are doubtless clean, some are not and the mere volume of the transactions casts a shadow even on those that might otherwise pass muster.  Thus, we have an increasing concern about your ability to successfully defend all of the arrangements..., many...for which our opinion has been sought.[179]

Rather than heed these warnings, CFO LaRue sent a letter to Hardcastle asking, on behalf of President Jim Deal, "at least tell us how close we are relative to the line, and that line being between the black and white on the issue of fraud and abuse...[180] DTCA's attorneys responded in no uncertain terms that there was no "magic line" and that the risk assessment was the company's alone:

---

[177] Exh. 108 Chronological Table of Advice with attached supporting documents.

[178] Exh. 70, AH000094, August 18, 1989 Hardcastle Memo to File Re. "Various Fraud and Abuse Issues."

[179] Exh. 35, BCCB002118-9, August 15, 1989 Berry letter to Deal and Cigarran.

[180] Exh. 71, BCCB009196, August 9, 1989 LaRue letter to Hardcastle.

*The ultimate decision as to whether or not to take the risk is, of course, your own.*[181]

*All an opinion letter can do is recite the law and educate...as to the risks . . . . I cannot offer any magic bullet.*[182]

*We can of course qualify our opinions that this is an unsettled area of law....but qualified opinions really don't serve your purpose.  There is no magic line and no magic black and white.*[183]

It is plain that AHC and DTCA were fully advised that their practices were inconsistent with the laws governing financial relationships between health care providers, and decided to forge ahead.  It could, in short, not afford to do business legally because its entire business was conditioned on census driven by patient referrals.

### 4.    DTCA Repeatedly Ignored The Advice of Counsel and "Proceeded Anyway"[184] To Take The Risk of Prosecution.

DTCA chose not to amend either its medical director or hospital contracts until almost a decade after the first documents identifying the risks inherent in their arrangements.  An internal memo at BCCB documents that, as early as August 1986, BCCB identified "the potential Medicare Fraud and Abuse issues" concerning DTCA's agreements—particularly as to the sheer amount of compensation to Dr. Perley—and

---

[181] Exh. 53, DTCA265528-30, May 18, 1989 Hardcastle letter to Williams (emphasis supplied).

[182] Exh. 72, BCCB009382-85, August 31, 1993 Hardcastle letter to Conrad, Deal, Stone, Kirk, Herr (emphasis supplied).

[183] Exh. 35, BCCB002118-9, August 15, 1989 Berry letter to Deal and Cigarran (emphasis supplied).

[184] *E.g.,* Exh. 73, AH000122, August 18, 1989 Hardcastle memo to AHC/Dr. Hellman File re: "Admission of Dr. Howard Rosen."

proposed a potential alternative approach which was squarely rejected by DTCA

officers.[185]

      Attorney Tom Smith's description of that series of meetings in 1986 is telling:

> After several conversations between myself and Barbara Dowl and Jim
> Deal with regard to this matter, Berry Holt and I had lunch with Jim Deal
> several weeks ago and once again raised our concerns.  We identified the
> extent of the problem based on the practice of the company since the
> execution of Dr. Perley's agreements.  We also identified an approach
> which might lessen this risk, although not eliminate it.  At that luncheon
> meeting Jim agreed to consider our approach.
>
> I was informed on this past Monday by Barbara Dowl, and this was
> confirmed yesterday by Jim Deal, that they have discussed the alternatives
> with regard to Dr. Perley's agreements and have decided the only action
> which will be taken will be that the existing agreements will be amended to
> extend the terms thereof for an additional three years.  When I talked with
> Jim Deal, I reminded him of our luncheon conversation and he restated
> their decision to merely extend the term of the existing agreement and not
> deal in any substantive way with the issues which Berry and I had raised.
>
> After relating these instructions from Jim Deal to Berry Holt, he suggested
> that I write you this memo explaining what has transpired in this
> matter....[186]

      While the 1986 memo does not identify what alternative approach was proposed,

it is obvious that DTCA could have taken myriad intermediate steps to attempt to comply

with the laws, including:

-     deleting references to developing referral sources;

-     including affirmative provisions that physicians are not required to refer;

-     obtaining a fair market valuation;

-     paying medical directors hourly wages;

---

[185] Exh. 60, AH000127, August 27, 1986 Smith memo to Berry.

[186] Exh. 60, August 27, 1986 Smith memo to Berry.

- requiring minimum number of hours; and

- requiring documentation of medical director duties.

DTCA did not do a single one of those things.  In fact, it made no effort to re-structure the agreements for *ten years.*  Far from an effort to seek legal alternatives, the documents show that AHC and DTCA officers decided to proceed with scores of transactions over their lawyer's warnings.

By mid-August 1989, DTCA's concerted decision to ignore the warnings of its counsel forced newcomer Jay Hardcastle into documentation mode.  BCCB files revealed a flurry of internal memos created by Mr. Hardcastle documenting his advice and DTCA's decision to "proceed anyway."[187]  These memos include:

- August 17, 1989 memo to file regarding a call to former lawyer Tom Smith to discuss prior advice regarding fraud and abuse.  Smith told Hardcastle he advised DTCA of his concerns with ADC kickers (payments triggered by census increases), the sheer amount of compensation (particularly to Dr. Perley), and the use of multiple medical directors.  Smith said he also advised that the likelihood of enforcement action was increasing with 1987 legislation and the tripling of the number of OIG investigators in 1988. Smith referred specifically to a conversation with CFO LaRue in mid-1988, during which "Gary & Tom decided that most of the arrangements were probably still legal in almost all cases, but there were a few incidents (most particularly, Mike Perley) which were especially dangerous."[188]

- August 18, 1989 memo to file documenting meeting between BCCB and DTCA officers regarding "pending fraud and abuse matters." BCCB advised that payments to medical directors constituted potential violations of the Anti-Kickback Act which were "especially dangerous" after *Kats* and *Bay State*. BCCB specifically discussed the problems with WPMC and

---

[187] Exh. 73, August 18, 1989, Hardcastle memo to AHC/Dr. Hellman File re: "Admission of Dr. Howard Rosen."

[188] Exh. 74, AH000079, August 17, 1989 Hardcastle Memo regarding "Conversation with Tom Smith."

eight medical directors and that the "general situation at HCA West Paces Ferry is dangerous."[189]

•   August 18, 1989 memo to file regarding advising Morrie Maple of risk of arrangement with Dr. Hellman, "but he decided to proceed anyway."[190]

•   August 18, 1989 memo to file regarding advising Bob Stone of Medicare fraud implications of letter agreement with Dr. Hellman, in response to which Stone advised "that he wanted to go ahead with the letter as is."[191]

•   August 18, 1989 memo to file regarding advising Dana Williams about the "Medicare implications" of the Dr. Agrin transaction, in response to which Williams indicated "he did not feel that there was a large enough risk to change the terms of the deal."[192]

DTCA's decision to "proceed anyway," against all warnings of counsel, continued for *six more years* until 1995, when it engaged in wholesale restructuring of its form contracts.  Though its officers claimed the impetus for the restructuring was "budget pressures" and then later, "Stark II," the series of events leading up to the restructuring are far more telling as to why DTCA finally determined, ten years too late, to heed the advice of counsel.

### 5.   DTCA Restructured Its Arrangements Only After It Had Maxed The Profitability Out of the Hospital Business.

DTCA was built on the kickbacks it received from hospitals reaping increased Medicare reimbursements as a result of referrals from DTCA medical directors.  DTCA's

---

[189] Exh. 70, August 18, 1989 Hardcastle Memo to File regarding "Various Fraud and Abuse Issues."

[190] Exh. 73, August 18, 1989, Hardcastle Memo to AHC/Dr. Hellman File regarding "Admission of Dr. Howard Rosen.".

[191] Exh. 75, AH000123, August 18, 1989 Hardcastle Memo to AHC/Dr. Hellman File regarding "Fraud and Abuse."

[192] Exh. 76, AH000124, August 18, 1989 Hardcastle Memo to AHC/Dr. Agrin File.

sole source of revenue was the fees received from the hospitals, and those fees were tied to bringing incremental growth in the number of patients admitted to the hospitals.[193] As previously described, this was immensely profitable for DTCA—its primary costs remained static, while its revenues grew.  However, if DTCA did not increase the census through more inpatient admissions, it was no longer profitable for the hospitals.  If DTCA did not demonstrate profitability for its hospital clients, contracts would be cancelled and DTCA would be out of business.

> a.    **DTCA Was Struggling to Demonstrate Profitability to Hospitals.**

This became a much bigger challenge for DTCA in the 1990's as a result of federal budget cutbacks that reduced the amount of allowable reimbursements under the prospective payment system.[194]  Vice president Dana Williams testified unequivo-cally that the company was "under financial business pressures by the marketplace and by the hospitals, our customers, because they were going under radical change in the marketplace with reimbursement changes and managed care changes[.]"[195]  In fact, Williams describes that these internal budget pressures resulted directly from the passage of federal legislation which "cut reimbursements to hospitals drastically."[196]  Of course, Williams' testimony merely cements what is obvious—that, far from its position

---

[193] Conrad Dep. at 53.

[194] Fed. Reg. 1990 Sep: 4,55(171): 35990-6175; Fed. Reg 1991 Aug 30: 56(169)113196-355.

[195] Williams Dep. at 246.

[196] Williams Dep. at 246-250.

in this litigation that it was the removed "non-provider" (having nothing to do with Medicare reimbursements), DTCA's very existence was reliant on increased Medicare payments to hospitals[197].

The legislation to which Williams referred was of enormous concern to hospitals in the 1990's.  The Omnibus Budget Reconciliation Act of 1990, among other things, cut the prospective payment rates and reduced payments for capital-related costs for inpatient hospital services for FY 1992 through 1995.[198]  The Omnibus Budget Recon-ciliation Act of 1993, which also implemented Stark II, provided for further reductions in prospective payments, including post-FY 1993 reductions in the federal rate for hospital capital expenses.[199]  As hospitals felt the pinch of such reductions, it became harder and harder for DTCA to demonstrate that it was worth it for hospitals to pay them a "management fee" in exchange for a declining benefit.  As President Jim Deal told all his program managers in 1990, "[o]ur hospital customers have spoken loud and clear.  They expect, in no uncertain terms, for us to grow their diabetes product line substantially greater than they are able to grow it themselves."[200]

And establishing this type of growth was becoming much harder for DTCA.  At least by the 1990's, the trend in the health care industry was moving from inpatient to

_____

[197] Exh. 121 various DTCA hospital contracts showing DTCA fee in dollars for each Medicare patient day.

[198] P.L. No. 101-508 (November 5, 1990).

[199] P.L. No. 103-66 (August 10, 1993).

[200] Exh. 77, DTCA225800-810, October 4, 1990 Deal letter to Program Managers.

outpatient—from symptom management to prevention.[201]  This was a problem for DTCA, whose largest revenue driver was inpatient admissions.  DTCA's emphasis on inpatient treatment is clear from the testimony and documents because, even though diabetes management became a largely outpatient-practice, DTCA was paid for inpatient admissions.[202]

Coupled with the growing risks of prosecution under Medicare fraud and abuse laws, DTCA was becoming a harder sell to hospitals.  On July 29, 1991, the Anti-Kickback Act safe harbors regulation became effective.[203] On January 1, 1992, Stark I became effective.[204]  On May 5, 1992, DTCA's lawyers at BCCB informed DTCA of the publication of new IRS audit guidelines under which auditors were closely scrutinizing arrangements between nonprofit hospitals and physicians and for-profit entities with instructions "to be sensitive to ventures that may violate the anti-kickback provisions of the Medicare and Medicaid laws."[205]  On May 7, 1992, HHS-OIG issues a Special Fraud Alert on Hospital Incentives to Referring Physicians[206].  Of note, BCCB forwarded this Alert to DTCA officers, advising them to make "absolutely sure" that they are providing

--------------------------------------

[201] Dep. of Dr. John Buse, Defendant's expert endocrinologist at 54.  Diabetes patient care is primarily outpatient.

[202]  Dep. of Medical Director Paul Davidson at 339-340; Dep. of DTCA President James Deal Vol. 1 at  pg.162; Dep. of program manager Charlotte Hodge at 246-250.

[203] 56 FR 35952.

[204] 42 U.S.C. §1395nn.

[205] Exh. 78, BCCB009210-211, May 5 1992 Hardcastle letter to Bob Stone.

[206] 59 Fr 65372.

compensation for being a medical director and "not an additional perquisite [sic]."[207]  On

January 5, 1993, the Stark II bill was introduced[208].  It was enacted shortly thereafter, on

August 10, 1993, with the effective date of January 1, 1995.[209]

> **b.      Hospital Fraud and Abuse Concerns Became An Obstacle to Contract Negotiations.**

At the same time, DTCA's hospital clients were raising weighty concerns around

the legality of DTCA's hospital and medical director contracts.  At or about October

1991, for example, DTCA was provided a copy of an internal memorandum from

Assistant General Counsel of Medlantic Healthcare Group which questioned the volume-

based provisions of the contract between DTCA and Washington Hospital Center,

concluding that they may expose both the hospital and DTCA to Medicare fraud and

abuse claims.[210]  In January 1993, Bob Stone wrote Spohn Hospital to assure that the

hospital contract does not violate Texas anti-kickback provisions because the paid

medical director agreements meet the AKA safe harbor with the exception of the

"virtually impossible to meet" scheduling requirement.[211]  In February 1993, Hardcastle

wrote to AMI Hospital, at Stone's request, to assure that the form medical director

---

[207] Exh. 79, DTCA039516-17, May 11, 1992 Hardcastle letter to Deal, cc'd to Stone and circulated to other DTCA officers.

[208] H.R. 345, 103rd Congress, 1st Session (1993).

[209] P.L. 130-66; Hunter Dep. at 223; Williams Dep. Vol 2 at 91.

[210] Exh. 80, BCCB002113-14, October 4, 1991 Internal Memorandum from Thomas Doherty to WHC Hospital Administrator, produced by BCCB with AHC fax header.

[211] Exh. 81, BCCB002341-44, January 25, 1993 Stone letter to Spohn.

agreements will satisfy the AKA safe harbor, with the exception of the scheduling requirement, as long as "the aggregate compensation...will be consistent with fair market value in arm's lengths transactions and will not be determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties."[212]

AMI, in fact, insisted on contractual provisions containing an agreement not to violate the anti-kickback laws and a specific representation that DTCA shall not offer or pay any remuneration to any person or entity with the intention of inducing referrals.[213] In the event of DTCA's breach, DTCA agreed to "indemnify and hold hospital harmless to the fullest extent permitted by law."[214]   AMI was not the only hospital to request such indemnity.  In June 1993, for example, St. Agnes Hospital in White Plains, New York, also insisted on an indemnity provision in the case of an assertion by the Inspector General, DOJ, or any other regulatory body that the hospital agreement or medical directorship agreement violates the anti-kickback laws.[215]   At or about the same time, identical language was being proposed for the contract with Virginia Beach Hospital.[216]

---

[212] Exh. 56, DTCA039529-31, February 18, 1992 Hardcastle letter to AMI.

[213] Exh. 82, DTCA034241-55 at 034245, March 31, 1993 Contract with AMI.

[214] *Id.*

[215] Exh. 83, BCCB009305, June 4, 1993 Memorandum from Phil Stuart and Hardcastle to William Tan, Vice President of Finance and Assistant Counsel at St. Agnes Hospital.

[216] Exh. 84, DTCA266558.

Parkway Hospital, likewise, was proposing termination clauses based on findings of illegality.[217]

DTCA was probably most affected, however, by the objections of its largest customer, HCA, which owned at least 15% of the hospitals with which DTCA contracted, including West Paces Medical Center.  As early as November 1993, the documents reflect that counsel for DTCA and HCA were meeting to discuss issues of fraud and abuse, and that HCA had engaged the services of Sandy Teplitsky, a "Nationwide attorney for fraud and abuse."[218]  At that time, HCA owned Parkway Regional Hospital, among others, and was in negotiation for ownership of other hospital clients as a result of a proposed merger with Columbia Hospital Corp in early 1994.[219]

The records reflect a flurry of meetings and discussions throughout early 1994, starting with a January 27 meeting at HCA between HCA counsel Dick Knight and John Wade, DTCA officers, and Jay Hardcastle.  In a letter written to his client earlier that week, Knight described that "the 'DTCA brass' will be here on Thursday to meet with me and John Wade.  I presume the focus will be on fraud and abuse."[220]  Scott Pogue found out about this meeting from fellow Director of Development, Bill Moore, who was the

---

[217] Exh. 85, DTCA265522-23, October 27, 1993 Hardcastle Letter to CFO Conrad regarding concerns raised by AMI and Parkway.

[218] Exh. 86, DTCA112418-112423, handwritten notation at top left corner of 112420.

[219] HCA merged with Columbia Hospital Corp. in February 1994.

[220] Exh. 87, DTCA270603, January 25, 1994 Knight Letter to Parkway Regional Hospital.

DTCA point-man for HCA contracts[221].  Moore described an alarming phone call from his HCA contacts in Florida who had been informed by HCA counsel that the DTCA contracts were illegal and that HCA was reviewing all its contracts with DTCA based on these concerns[222].  The potential loss of these contracts, accounting for approximately 20% of DTCA's revenue, raised pure panic at DTCA[223].

The documents make clear that these concerns were related to both hospital and medical-director contracts.  DTCA's electronic files contain a draft letter to HCA Attorney Richard Knight expressing outrage regarding a February 9, 1994 Memorandum that Knight circulated to the CEO's of all HCA Eastern Division Hospitals stating "These officials [presumably DTCA] now seem to have accepted our position that DTCA is a potential referral source.  As a potential referral source, volume-driven reimbursement methodologies are very suspect."[224]  DTCA's hard-copy files contain another memoran-dum showing that Development VP Kathy Kirk was working with HCA's fraud and abuse expert, Sandy Teplitsky, to revise the medical director agreements associated with HCA contracts to delete language that Mr. Teplitsky believed could be construed as marketing; to remove any volume-based provisions; to attach a form for the documen-

---

[221] Exh. 116 Declaration of A. Scott Pogue.

[222] *Id.*

[223] *Id.*

[224] Exh. 88, draft Letter from Deal to Knight.  Relator does not have a copy of the referenced February 9, 1994 Memorandum.  It was produced by DTCA prior to its waiver of privilege.  HCA was able to successfully assert privilege over the document *after* its production by DTCA, pursuant to Motion for Protective Order.  That document, formerly the subject of a Motion for Summary Judgment by Relator Pogue, was stricken from the record by the Tennessee Judge (Doc. 182, March 9, 1999 Order).

tation of hours; and to restructure agreements that involved multiple medical directors for a single hospital.[225]

The HCA contract renegotiations came at a high price for DTCA.  Relator Pogue was told that it reduced the value of those contracts by more than $1,800,000 per year.[226] The loss of that revenue was a major setback for DTCA, and may have tipped the scale in regard to the financial gains resulting from taking the risk of prosecution under the kickback and Stark laws.  Shortly after these renegotiations, DTCA finally determined to restructure all its medical director contracts.

There is an additional piece of evidence and advice leading up to the restructuring of the medical director contracts.  In 1993 and 1994, DTCA engaged yet more counsel to render opinions about the fraud and abuse issues raised by its contracts.  In the process, DTCA received exactly what it always had—targeted advice that its contracts violated anti-kickback laws.

> **c.    Advice of "Specialist" Counsel That DTCA's Form
> Contracts Were Potential Kickback Violations.**

On several different occasions in 1993 and 1994, DTCA engaged third party counsel to give a specialty opinion regarding Medicare fraud and abuse issues. Each of these counsel advised DTCA that the pre-1995 contracts posed potential kickback violations.

---

[225] Exh. 89, DTCA280466, June 8, 1994 Kirk Memorandum to Teplitsky re. Columbia/HCA Contracts.

[226] Exh. 116.

###### i.    Independent Opinion of Robert Sevell.

The first such opinion was sought in 1993 from Robert Sevell at Weissburg and Aronson in California.  Sevell was engaged to give a "second" opinion regarding Dr. Perley's contract when it came up for renewal in 1993.  Dr. Perley was the highest paid medical director—receiving hundreds of thousands of dollars a year—and had been the subject of repeating warnings from BCCB.  For example, in 1986, during a previous renewal period, BCCB had advised that the sheer amount of compensation "raises the fraud and abuse question we have discussed in the past" and had identified an alternative approach.[227]  At that time, DTCA officers Barbara Dowl and Jim Deal determined "not to deal in any substantive way" with the issues raised and to extend Dr. Perley's contract without modification.[228]

DTCA continued on that course until Dr. Perley's *third* renewal opportunity in 1993.  During those negotiations, DTCA tasked CFO Mike Conrad to approach Dr. Perley with a proposal to restructure his contract to significantly reduce his compensation.  CFO Conrad explained that they had determined that Dr. Perley's compensation was "excessive in terms of what we...could afford to pay" at that point and had to be reduced from a "business perspective."[229]  Dr. Perley was "not happy" with this proposal, to say the least.[230]  As early as 1987, when DTCA had proposed changes to

---

[227] Ex. 60, AH000127, August 27, 1986 Smith Memo to Vance Berry.

[228] *Id.*

[229] Conrad Dep. at 160, 158, respectively; *see also* Conrad vol 2 at 164.

[230] Conrad Dep. at 151, 159.

the *hospital* contract, Perley had threatened to stop referring patients.[231]  Because his compensation was tied to census, Perley had told DTCA that anything they did to lower revenues would affect his reimbursement.[232]  If that happened, "[y]ou may not see any differences in the census in the next week or two, but by the end of the year you will see changes."[233]  It is of no surprise that in 1993, when DTCA proposed significant direct cutbacks to his compensation, Dr. Perley was far from cooperative.

In response to Dr. Perley's objections, DTCA endeavored to convince him that the changes were necessary to comply with the law.  In light of the passage of Stark II, Conrad told Perley that his contracts had to be restructured "according to the advice we had been given by Boult, Cummings."[234]  Perley was not swayed.  He told Conrad that he "did not feel that a Nashville law firm could possibly understand the law and wanted to have someone local."[235]  In response, DTCA brought in Sevell to persuade Perley that the law required a restructured deal.[236]

Sevell did just that.  After a series of conversations with Conrad, Sevell met with Conrad and Perley.  Sevell's notes of those conversations reflect that he was tasked by Conrad to "layout [the] issues"—specifically, his "understanding of f&a and safe

---

[231] Exh. 39, November 6, 1987 Internal Memo from Barbara Dowl; *see also* Exh. 90, BCCB 003082, November 4, 1987 Dowl Internal Memo.

[232] *Id.*

[233] Exh. 39, November 6, 1987 Internal Memo from Barbara Dowl.

[234] Conrad Dep. at 162.

[235] *Id.*

[236] Conrad Dep. (vol 2) at 188-189.

harbors...”[237]  The “areas of concern” included “total compensation;” duties reflecting compensation; focus on value for value (“easier to defend but same thing”) and whether there was “a way to compensate [Perley] for what he does.”[238]  In his meeting with Perley and Conrad, Sevell advised that Perley’s existing arrangement was suspect under the anti-kickback laws.  His notes reflect that he advised Conrad and Perley of the following:

- The requirements of the Fraud and Abuse Statute, including a canvas of the one-purpose test; the holdings in *Greber, Kats, Bay State,* and *Hansleter*; and the [OIG] Fraud Alerts;

- The scope of the safe harbors;

- Proposed legislation, including Stark;

- Specific concerns regarding the terms of Perley’s agreements, including the total compensation; vagueness of hours, duties, and documentation.[239]

Sevell concluded:

> Fact that Perley is in a position to refer and does refer creates problems since law says that if any purpose (even if minor) of a payment (here for consulting services and med direction and admin services) is to induce referrals, the anti-kickback statute is violated.
>
> This implicates all [Perley’s] agreements including consulting agreement.

---

[237] Exh. 91, 067-068 Attorney Sevell notes of 3/19/93 conversation with Conrad.

[238] *Id.*

[239] Exh. 92, 055-62, Sevell notes of 3/23/93 meeting.

> Even if doctor is paid fmv for services actually rendered, still
> not entirely free from scrutiny, but certainly much safer.[240]

In the ensuing spate of correspondence, Perley proposed that the contractual language (including his duties) be revised but there be no change to the financial terms of his arrangements.[241]  Sevell firmly rejected this proposal, because Perley could be "paid no more than the fair market value of the services he actually provides."[242]

Interestingly, Conrad testified that he reported the results of his Sevell meetings and conversation to Deal, and that he did not recall Sevell's advice to be significantly different than that already received from BCCB.[243]  Despite their repeated claims that the law was confusing or "shades of gray" prior to 1995, DTCA demonstrated that it was well able to gain a clear picture of the requirements of the Anti-Kickback laws when it served its purpose.

No agreement was ever reached with Perley nor, apparently, with the hospital. Unable to make a go of it without the kickback arrangement in place, the Lakewood Center closed in 1993.[244]

-----

[240] Exh. 92, 062, Sevell notes of 3/23/93 meeting.

[241] Exh. 93, DTCA039539-40, March 31, 1993 Perley Letter to Conrad.

[242] Exh. 94, 002-003, April 5, 1993 Sevell Letter to Conrad.

[243] Conrad Dep. (vol 2) at 194-196.

[244] Exh. 123 April 1993 Lakewood monthly operations report.  "Due to loss of contract with medical director Michael Perley, the DTC has been asked to vacate premises by June 30, 1993.  We are all very saddened by this as our Center has been open for nine years".

### ii.    Independent Opinion of DC Counsel.

In 1993, DTCA also engaged the services of the Washington, DC law firm of Dyer, Ellis, Joseph & Mills.[245]  Cigarran testified that they were engaged as "super experts"[246] located in Washington who "were really there all the time who could really get to understand at a deeper level what was the intent of some of these regulations[.]"[247] Cigarran further described: "[w]e needed more and better information, the best we could get, about what the  intent of the law was and how they were going to interpret it and what was going to happen."[248]  Far from providing a back door based on the "real" intent of the federal laws, those "superexperts" confirmed what DTCA had already been told time and time again—that its form agreements posed potential violations of Anti-Kickback laws.

DTCA's primary contacts at Dyer, Ellis were Thomas Mills and Michael Joseph. The documents reflect that these attorneys were significantly involved in the renego-tiations with HCA, and were involved in multiple discussions with AHC/DTCA officers and HCA's counsel (including its "nationwide fraud and abuse counsel" Sandy Teplitsky) addressing among other things the "anti-kickback concerns on management agree-ment."[249]  In April 1994, Tom Mills issued an opinion whether DTCA's proposed

---

[245] Exh. 95, BR00227, April 29, 1993 Mills Letter to Cigarran.

[246] Cigarran Dep. (vol 2) at 310.

[247] Cigarran Dep. (vol 2) at 309.

[248] Cigarran Dep. (vol 2) at 310.

[249] *E.g.*, Exh, 95 at BR00175, 208, 236, 272, 292-293, 310-311

*restructured* financial arrangements with hospitals and medical directors complied with the anti-kickback statute.[250]  HCA objected to that opinion[251] and Dyer, Ellis issued a second opinion in November 1994 regarding the proposed restructured contracts with HCA.[252]  Those opinions, however, both concerned the propriety of *future* arrangements based on a set of factual assumptions supplied by the client (*i.e.*, payment to medical directors based strictly on hours of service at a rate reasonably commensurate with the nature of services performed).

The Dyer, Ellis opinion that is most relevant to DTCA's summary judgment motion is the one which was never finalized—an opinion related to DTCA's contracts in their original form, sent to DTCA in draft less than three weeks before the Inspector General's Office served its subpoena *duces tecum* on DTCA as a result of Mr. Pogue's allegations. Mr. Mills testified that he believes this opinion was rendered at his initiative.[253]  In the process of rendering advice regarding legislative and other developments impacting DTCA, Mills was required to become familiar with DTCA's business model.  In conjunction with that endeavor, Mills suggested to Bob Stone that the documents raised "some issues" and that DTCA "ought to have us take a look at this [sic]."[254]  DTCA sent him the agreements for the five medical directors at West Paces Medical Center, which

---

[250] Exh. 96, April 5, 1994 Dyer, Elis Opinion.

[251] *E.g.*, Exh, 97 BR00288-290.

[252] Exh. 98, November 3, 1994 Opinion Letter from Michael Joseph to DTCA.

[253] Mills Dep. at 30-33, 46-47.

[254] Mills Dep. at 46-47.

were virtually identical to the agreements in place with all the medical directors over the

past decade.[255]

Mills' draft opinion was sent to DTCA VP Dana Williams via facsimile on October

11, 1994. [256] In a sharply-worded 12-page analysis, Mills addressed each of the various

provisions of those agreements and concluded that the OIG may view such provisions

as being in violation of the antikickback statute.  Among other observations, Mills stated:

- "Certain compensation provisions...may be viewed by the OIG as in excess of fair market value and thus the OIG might view the arrangement in question as violative of the antikickback statute."[257]

- "[Multiple agreements with one director] may raise the OIG's suspicion since there is an implication that these physicians are being paid twice for providing the same service."[258]

- "Further, although medical directors are required to provide essentially the same services to the center, each is paid a different amount of compensation.  To the extent that these differences do not appear to be based on legitimate factors, the OIG may be suspicious since this may imply some physicians are being paid a greater amount for increased referrals to the center."[259]

- [Income guarantees, research funding, free rent, loan forgiveness, reimbursement for expenses] "likely would be viewed by the OIG as providing these physicians with aggregate compensation that is in excess

---

[255] Exh. 99, DTCA280465, June 1 1994 Conrad Letter to Dyer, Ellis.

[256] Exh. 100, DTCA280499-511, October 11, 1994 Facsimile from Dyer Ellis to Dana Williams, enclosing draft Mills letter.

[257] Exh. 100, Mills' draft letter at DTCA280505.

[258] Exh. 100 at DTCA280506.

[259] *Id.*

of fair market value and thus an improper inducement for these physicians'
referrals to the center."[260]

•    "[A]rrangements may not be expressly or implicitly conditioned on
physicians' referrals . . . .  Accordingly, various provisions may be viewed
suspiciously by the OIG unless further clarified or deleted to remove any
suspicion that the arrangements are conditioned on physicians' referrals . .
. . the OIG may be suspicious of . . . provisions . . . requiring the medical
director to assist in the development of referral sources for the center to
enhance the referral patterns of the area and in identifying and
encouraging other physicians and referral sources."[261]

•    "While Dr. Davidson's recruitment responsibilities may be for the purpose
of marketing the center's services, the OIG might assert that his profes-
sional services as a physician provides him with the access and ability
improperly to influence the referral practices of associates or other
colleagues."[262]

Each of these observations are equally applicable to all of DTCA's form medical

director contracts.  Indeed, Cigarran testified that DTCA's model rested on the fact that,

starting with Dr. Perley in 1984, every medical director was required to develop referral

sources and to identify other physicians to be a source of referrals.[263]

As a result of his conclusions, Mills also issued almost three pages of recom-

mendations "[f]or purposes of compliance with the antikickback statute and avoidance of

even the appearance of a violation thereof," including:

(1)    Compensation...in exchange for legitimate items and/or services and
consistent with fair market value.

*        *        *

--------------------------------------------------

[260] *Id.* at DTCA280506-7.

[261] *Id.* at DTCA280508-9.

[262] *Id.* at DTCA280509-10.

[263] Cigarran Dep. at 111-117; *see also* 95-103.

-68-

(5)     Each medical director agreement should set forth any factors
        substantiating a need for differing compensation provisions...including the
        number of hours of service required of a medical director.  If...cannot be
        justified, compensation...should be adjusted to reflect fair market value;

    *         *         *

(7)     . . . . discontinue [income guarantees, research funding, free rent, etc.]; to
        further minimize any risk of OIG enforcement action, you may also wish to
        consider requiring that these physicians reimburse DTCA the value of any
        expenses or forgiven payments . . . ;

    *         *         *

(9)     Delete provisions...requiring medical director to assist in the development
        of referral sources for the center to enhance the referral patterns of the
        area and in identifying and encouraging other physicians and referral
        sources . . . .[264]

Mr. Mills's billing records reflect that he spoke by telephone with DTCA's Dana

Williams regarding this advice on the same day that his associate Katie Tenoever faxed

it to Williams.[265]  Ms. Tenoever's records reflect that she had several conferences with

Williams and others in this time frame[266] and that, exactly one week later, she

"research[ed] False Claims Act."[267]  Williams testified that he has no recollection of the

letter or the multiple conferences regarding these issues, though he does not contend

they did not occur.[268]  Mills described the reaction of DTCA as concerned, dismayed, but

---

[264] Exh. 100, Mills draft letter at DTCA280510-12.

[265] Exh. 101, BR00156.

[266] Exh. 102, BR00139-140, 156, 167.

[267] *Id.* at BR00139.

[268] Williams Dep. vol. 3 at 26-55.

accepting: "they clearly understood the gravity."[269]  By their reaction, Mills assumed that they were not previously aware of the issues he raised in his letter.[270]  He was not told that they had received any prior advice from Boult Cummings or Weissburg & Aronson regarding those same issues.[271]

Less than three weeks later, on October 31, 1994, the Inspector General's office served a subpoena *duces tecum* on DTCA pursuant to its investigation of Relator Pogue's June 1994 *in camera* Complaint.[272]  The Mills' draft opinion was never finalized.[273]

### iii.    Contemporaneous BCCB Recommendation.

The reason that neither Mills's nor Sevell's opinions registered any surprise with DTCA is obvious.  These opinions merely echoed the repeated warnings of its long-time counsel.  In fact, BCCB had issued yet another warning around the same time DTCA was meeting with Sevell and engaging its DC "superexperts." In August 1993, Hardcastle wrote to Conrad requesting a meeting with senior management of DTCA and a representative of AHC to discuss his recommendation to reexamine DTCA's form

---

[269] Mills Dep. at 187, 191-192.

[270] Mills Dep. at 192.

[271] Mills Dep. at 186.

[272] Exh. 103, October 31, 1994 IG Subpoena.

[273] Mills testified that the document became more of a "letter of advice," than an opinion, because it pointed out so many problems.  Mills Dep. at 180-181.

medical director and hospital contracts.[274]  In that letter, Hardcastle urged DTCA to

modify its contracts for several reasons, including:

- • The passage of Stark II;

- • Increasingly aggressive public stances by the IG's office since the publication of the safe harbors in July 1991;

- • IRS position that hospital's violation of the antikickback statute could result in the revocation of the hospital's tax exempt status, resulting in a regular audit process which could, in the ordinary course of business, bring to the government's attention any fraud and abuse issues that may be inherent in DTCA's contracts;

- • Increased public awareness of fraud and abuse issues generally...which have led to great caution on behalf of hospital administrators and their counsel entering into agreements.[275]

As a result, Hardcastle observed that it was becoming more and more difficult to

sell DTCA's product since legal counsel were commonly raising fraud and abuse issues.

Because, as DTCA was aware, neither the form medical director or hospital agreements

met the requirements of the safe harbor, Hardcastle warned that opinion letters could

"offer very little comfort" and "can only educate the recipient as to the risks of the

transaction."  Concluding that he "cannot offer any magic bullet to entirely reduce the

risk," Hardcastle suggested that DTCA consider:

1. Changing the form medical director contracts so that physicians are paid by the hour.

---

[274] Exh. 72, August 31, 1993 Hardcastle Letter to Conrad.

[275] *Id.* at 1-2.

2.      Requiring in the medical directorship agreements that physicians keep time logs . . . .[276]

3.      Tying the hourly rate to an objective, defensible standard in an attempt to meet the "fair market value" provision of the safe harbor . . . .

4.      Creating an "out" clause...in the event that it, upon the advice of counsel, determine that the contract is inconsistent with applicable law.  In the past, we have resisted this sort of clause because it presents an obvious red flag. . . .

5.      Keeping the number of medical directors at any one center to a minimum.

6.      Reassessing the fee structure in the hospital contract.  The fact that the DTCA's fee fluctuates with volume, and the fact that DTCA usually receives an increased fee on incremental volume raises a red flag . . . .

7.      Instituting a company-wide formal compliance program.[277]

By 1994, DTCA finally determined to take this advice in regard to the medical director contracts, but never substantively modified the volume-based provisions of the hospital contracts.  Forensically, it is apparent that what had changed was not the substance of the advice or the law, but rather the financial incentive to accept the risk of violating the law.

### 6.      The Restructuring.

DTCA restructured its medical agreements, effective on or about January 1, 1995.[278]  Those agreements contained many of the specific recommendations of Mills

---

[276] He also mentions that he understood DTCA to require medical directors to keep time logs, demonstrating yet again that DTCA kept its attorneys operating on a false set of assumptions.  DTCA officers confirmed that no time logs were required prior to 1995.

[277] Exh. 72, August 31, 1993 Letter at 3-4.

[278] Exh. 18 (BCCB001966-1968).

and Hardcastle, including modification of the "duties" provisions to eliminate references to referral sources; a specification of the number of hours required by each medical director; compensation tied to an hourly rate; and the requirement of time logs.[279]

The restructuring purported to modify all the medical director contracts to reflect the fair market value of an hours-worth of work from each medical director and to specify the amount of hours needed from each medical director to operate the center. Significantly, this process resulted in a marked reduction in the amount of compensation paid to each medical director—with most stipends cut by half.[280]

Dr. Perley was not the only medical director unhappy about these reductions, but they had little leverage. An internal memo shows that Williams' "bullet points" for his conversations with medical directors addressed not just Stark II, but the "increasingly public stance" of the government regarding kickback violations.[281]

DTCA's 1995 restructuring is telling, both for what it represents and what it concedes about what was *not* done in the past. CFO Conrad testified unequivocally that he believed that the reduced compensation represented fair market value and that the number of contracted hours represented the actual amount of time necessary to operate each center[282]. Moreover, DTCA officers, including Conrad, testified that they are not aware of a fair market value assessment being conducted prior to the 1994-1995 time

---

[279] *E.g.*, Exh. 17, Post-1995 contract.

[280] *E.g.,* Exh. 19.

[281] Exh. 20, August 3, 1994 Hardcastle Memo to Williams; *see also* Exh. 18, General Plan Strategy.

[282] Conrad Dep. at 296-300.

frame.[283]  Neither are they aware of any pre-1994 assessment of the amount of hours

necessary to operate a center.[284]

It is worth noting that DTCA never sought a fair market value analysis—not even

when it reduced compensation.  Its attorneys testified that they made no fair market

value assessment (nor did they view it to be within the scope of their competency).[285]

BCCB advised DTCA to engage a consultant to advise as to an appropriate hourly

rate.[286]  BCCB also advised it to use an objective, defensible standard, such as that

provided by the AMA or Medical Group Management  Association.[287]  DTCA did not do

that.  Instead, it commissioned its own employee, Dana Williams, who created a range

of rates per geographic region *based on conversations with DTCA's regional directors

and two or three physician friends.*[288]

The lack of any significant effort to obtain a professional fair market value analy-

sis is merely symptomatic of DTCA's failure to make any real effort to change its

business model.  The 1995 restructuring facially modified the medical director contracts,

and reduced some of the financial incentives, but did not restructure the model.  This

wholesale restructuring of both the hospital and medical director contracts was recom-

--------

[283] Williams Dep. at 92, 125-126, 202-203, 291-292; Conrad Dep. at 289.

[284] Conrad Dep. at 290-291.

[285] Smith Dep. at 218-220; Mills Dep. at 65-67.

[286] Exh. 14.

[287] Exh. 72 at 3. This is the group utilized by Relator's expert, Kathy McNamara to access Fair Market Value, Exh. 105.

[288] Williams Dep. at 177-178, 191-192, 227-256.

mended by counsel, but was ignored.  As a result, DTCA was still being paid by hospitals based on the volume of patients admitted to the centers, and was still in the business of paid-marketing to physicians to make sure those admissions happened.

> **D.**      **The Resulting False Claims for Payment**

DTCA's improper medical director relationships, designed to induce patient referrals to the DTCA centers in host hospitals, caused the submission of false claims for payment to the Government by the host hospitals.  The claims for patients referred by medical directors with improper financial relationships with DTCA are false because the claims violate the medicare fraud and abuse laws.

In order to determine the dollar amount of false claims for payment DTCA caused to be submitted, Relator first subpoenaed and paid $76,000 for claims data from the Federal Government for claims submitted by host hospitals for diabetes patients referred to the host hospital by the medical directors receiving improper financial inducements for referrals.  Relator Issued two subpoenas.[289]  The first was for data related only to the five Defendant doctors from West Paces Ferry Hospital.[290] The second subpoena was much broader and requested claims for each host hospital that indicated the item or service was referred or ordered by the medical director listed on the subpoena.[291]  The host hospital names and provider numbers were provided to the government as well as the medical director name and unique physician identification number ("UPIN number"). *Id.*

--------------------------------------------------

[289] Exhs. 109 and 110 subpoenas to federal government for claims.

[290] Exh. 109

[291] Exh. 110

The Government responded to the subpoena by providing electronic claims data compliant with the subpoena for the years 1991 through 2000.[292]  The data was provided in electronic form and contained detailed information about each claim at issue including claim date, admitting diagnosis code, physician UPIN, medical record number, claim amount and reimbursement amount[293].

The claims information was provided to Mayer Hoffman McCann accounting expert Alan Thibault for purposes of determining the total dollar amount of false claims submitted by host hospitals related to physicians who were referring and admitting patients in violation of the medicare fraud and abuse laws.  Mr. Thibault performed three different calculations.  The first calculation was of the hard government electronic claims data related to medical director referrals and admissions at host hospitals.  The other two calculations are extrapolations from the electronic data and other information provided to Mayer Hoffman McCann.[294]

### 1. The False Claims Evidenced By Actual Electronic Claims Data Totals $43,141,839.

The Government's response to Relator's subpoena for claims information contained claims from hospitals which had kickback contracts with DTCA related to just

---

[292] Exh. 111  As explained herein, claims after May 20, 1996 were not included in Relator's calculation as they were outside of the time period set by the Court.  The Government does not have sufficient electronic claims data prior to 1991.

[293] Exh. 117.

[294] The detailed steps of each calculation and the results are described in Mr. Thibault's expert report Exh. 112 and pages 25-27, 102-105 of  his deposition confirming this is his report.  Mr. Thibault's affidavit affirming his report is part of Exh. 112.

89 of the 276 DTCA medical directors[295].  Thus, this figure is extremely conservative in nature in that it does not include claims for 187 of the medical directors from 1991 forward[296].  To arrive at this dollar figure for the actual claims submitted and paid data provided by the Government, Mr. Thibault required that the claim be identified with an attending or admitting UPIN number of a DTCA medical director; that the patient's diagnosis contain a diabetes related diagnosis code; that the host hospital be identified; and, the date of the claim be between 1992 and May 20, 1996[297].  Thus, Relator has direct evidence of $43,141,839 of false claims submitted and paid to hospitals with which DTCA had kickback contracts.

### 2. The Estimated False Claims for Time Periods Prior to 1992.

As stated above and explained by Mr. Thibault in his deposition, the Government does not have complete claims information prior to 1992.  Thus, in order to estimate the dollar amount of false claims for periods prior to 1992, Mr. Thibault performed some reasoned extrapolations[298].  Mr. Thibault, who does work similar to this case for Medicare in the arena of Medicare fraud damage calculations, explained that, in the field of Medicare data analysis extrapolations are often employed when the data set is incom-

---

[295] Thibault Deposition at 202-204, 222.

[296] Prior to 1992, the claims data stored by the government is sparse and often missing fields.  Therefore, Mr. Thibault used 1992 forward for this analysis.  Thibault Dep. at 42-46.

[297] Exh. 112 (Thibault Expert Report ) p. 3 and Schedule A.  A more detailed step by step analysis is provided in the report.

[298] The step by step nature of the extrapolations is contained in Ex. 112 Mr. Thibault's expert report.

plete. [299]  His methodology for each extrapolation is set forth in detail in his report and can be followed by any expert or finder of fact seeking to examine it.[300]

The first extrapolation Mr. Thibault performed was for medical directors that had responsive electronic claims data from the Government and were listed in schedule A of Mr. Thibault's report.[301]  For these medical directors, Mr. Thibault performed an extrapolation to estimate the total dollar amount of false claims for these 89 medical directors from January 1, 1986 through December 31, 1991.  The steps and data used to perform the extrapolation are set forth in his report and the results are listed in Schedule B.[302]  The total estimated dollar amount of false claims for these medical directors from January 1, 1986 through December 31, 1991 is $29,726,644.[303]

The second extrapolation Mr. Thibault performed was for the medical directors for which no electronic claims data was provided by the Government in response to the subpoenas for the period January 1, 1986 to May 20, 1996.[304]  Mr. Thibault based his extrapolation and estimate on comparable data for the medical directors for which electronic claims data was provided by the Government.[305]  The total estimated dollar

---

[299] Thibault Dep. at 37-41, 354-55.

[300] *Id*. at 355.

[301] Exh. 112, Thibault report.

[302] *Id.*

[303] *Id.*

[304] *Id.*

[305] *Id.*

amount of false claims for this group of medical directors from January 1, 1986 though May 20, 1996 is $63,616,498.

The total dollar amount of false claims from host hospitals related to medical directors (both hard claims and estimates) is $136,484,981.

### 3. The Number of False Claims for Payment That DTCA Caused Host Hospitals to Submit to the Federal Government.

The electronic claims data provided in response to the subpoena issued to the federal government was provided on a claim by claim basis[306].  An examination of the claims on the CD indicates that 17,206 claims for payment were submitted by host hospitals related to patients of medical directors[307].  Relator contends that the foregoing evidence makes clear that each of these claims for payments is a false claim for payment because it was submitted in violation of the Medicare Fraud and Abuse laws–specifically Anti-Kickback Act and Stark–with an express and/or implied certification that the claims were in compliance with those laws.

---

[306] Exh. 117 and declaration of Don McKenna and Exh. 119.

[307] *Id.*

## <u>RELATOR'S CONTRAVERSION OF DEFENDANTS'</u>
## <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

Most of the relevant material facts asserted by Defendants to be undisputed are disputed in the statement of genuine issues and facts in support set forth above.  To be certain that the Relator complies with Local Rule LCvR 56.1, which states that facts not controverted may be deemed admitted by the Court, Relator lists each of the facts asserted by the Defendants below and then strikes through the portion of the asserted factual statement which is controverted by the Relator.  Underneath each asserted fact, Relator cites the Court to the specific section of Relator's statement of genuine issues and supporting evidence in which the Defendant's asserted fact is controverted or Relator cites the Court directly to evidence which controverts the asserted fact.  If the asserted fact is not disputed, Relator so states underneath the asserted fact.

1.      Beginning in 1984, DTCA set up diabetes treatment centers that coordinated and managed specialty care and clinical support for diabetes patients at hospitals across the United States. (Thomas Mills Dep. at 35-37).

**Relator's Response: Not disputed**.

2.      In the early years, the treatment centers consisted of an actual unit or wing of a hospital with dedicated patient beds, an exercise facility, a classroom, and a dining facility with a staff of diabetes specialists provided by DTCA. (Dr. Judson Black Dep. at 49; Kathy Kirk Dep. at 178).

**Relator's Response: Not disputed.**

3.      Although conventional diabetes treatment at that time focused on treating diabetes complications, DTCA centers were founded on the notion of a more aggressive

treatment method known as tight blood glucose control ("tight control"). (Derek Freed Dep. at 53-54; Dr. Paul Davidson Dep. at 87; Dr. Richard Hellman Dep. at 22-23; Irene Thomas Dep. at 129-30; Jim Deal I Dep. at 32-34).

**Relator's Response: Not relevant.  Relator also presents evidence that centers also founded on business model of increasing federal healthcare business.**

4.      An early form of preventative medicine, tight control was an intensive treatment that required strict attention to diet and exercise, frequent glucose level measurement and routine insulin dosing through injections or pumps based on the belief that if diabetics kept their glucose levels as close to normal as possible, they could prevent or slow the progression of many known diabetes complications, including cardiovascular disease, nerve damage and kidney malfunction. (Dr. Judson Black Dep. at 47; Dr. Bruce Bode Dep. at 52, 143-44; Dr. Michael Perley Dep. at 116).

**Relator's Response: Not disputed and irrelevant.**

5.      From 1984 to 1996, DTCA contracted with approximately 120 hospitals to run diabetes treatment centers at those hospitals. (Declaration of Henry Herr ¶ 4, which is attached hereto as Exh. 2).

**Relator's Response: Not disputed.**

6.      The hospitals provided the equipment and furnishings necessary for the centers and retained responsibility for routine patient services, ~~including patient admissions~~ and billing. (*Id.*. ¶ 5; Conrad I Dep. at 55).

**Relator's Response:** A doctor is required to admit the patient to the hospital.(LaRue Dep. at 124, Davidson Dep. at 276, Williams Dep., Vol. 3 at 130).

7.      DTCA provided staff that operated the centers, ~~including staff responsible solely for patient education and training.~~ (Herr Decl. ¶ 6; Black Dep. at 98-99; Deal I Dep. at 56-59).

**Relator's Response:** DTCA staff were also responsible for things such as marketing the center and marketing the medical directors. ( Exh. 11 staff member resigning because of objections to marketing duties, Exhs. 32 & 33, LaRue Dep. at 111-113).

8.      DTCA entered into ~~management~~ contracts with its hospital customers, ~~which required those hospitals to pay DTCA a management fee for operating the centers.~~ (Herr Decl. 4).  The business proposition for the hospital was ~~that by creating a "center of excellence" for diabetes treatment,~~ the hospital would be able to increase its market share of patients in the community with diabetes patients who required hospitalization. (Herr Decl. ¶ 4; Pogue III Dep. at 189-90; Perley Dep. at 118-19).

**Relator's Response**: DTCA entered into contracts with hospitals, the purpose of which was to increase hospital admissions of diabetes patients.  DTCA promised to increase admissions by bringing on medical directors with patient loads that would increase admissions and corresponding diabetes discharges at the hospital. (Section A, *supra*, and Exhs. 1, 6, 116).

9.      ~~While DTCA's management contracts with hospitals evolved over time, most were categorized as either "A" or "B" contract models.  Under an "A" model contract, DTCA was responsible for the operating expenses of the centers, including staff salaries, medical director fees and marketing expenses. Under the "B" model contract, the hospital paid those same operating expenses. (Conrad I Dep. at 59-60; Dana Williams I~~

~~Dep. at 93-94).~~

**Relator's Response**: DTCA had many with contracts with hospitals that paid fees based on per-patient day as well as a fixed fee plus a fee for each incremental diabetes discharge above a baseline.  Thus, payments under the DTCA contracts with hospitals varied with diabetes patient volume. (*See* for example Exhs. 121, 120 and *supra* note 9).

10.    ~~Under both arrangements, DTCA's fees were based on the center's operating performance under various contractual arrangements~~. Early on, DTCA often was paid on a per-patient, per-day basis. Later contracts based DTCA's compensation on changes in the hospital's market share of diabetes patients, and in some circumstances, the hospital's cost of providing diabetes care to patients. Still later, most hospital contracts became flat-fee arrangements. (Conrad I Dep. at 30, 53-54*,* 61; Ben Leedle Dep. at 30).

**Relator's Response:** DTCA had many contracts with hospitals that paid fees based on per-patient day as well as a fixed fee plus a fee for each incremental diabetes discharge above a baseline.  Thus, payments under the DTCA contracts with hospitals varied with diabetes patient volume. (*See* for example Exhs. 120, 121 and *supra* note 9).

11.    DTCA did not submit claims to Medicare or any other payor for services provided to patients in the diabetes treatment center. (Herr Decl. ¶ 5).

**Relator's Response:** Irrelevant.  While DTCA did not directly submit claims to Medicare, Relator's allegation and substantial evidence is that DTCA caused host hospitals to submit false claims for payment to Medicare, Medicaid and other Federal Payors. (Section D *supra*).

12.    In general, the staff at a DTCA center consisted of nurse educators, dietitians,

exercise physiologists and counselors. (Hodge Dep. at 270-71; Bode Dep. at 146; Tom Cigarran II Dep. at 85-86; Deal II Dep. at 31-32).

**Relator's Response:** Incomplete.  Each center also had a program manager responsible for marketing, meeting with medical directors, tracking and reporting patient census to the home office, and talking to medical directors about their patient census. (Exhs. 34, 106, 107 and LaRue Dep. at 157-160).

13.     The staff and center were supervised by a DTCA program manager, who also was responsible for community, hospital and physician relations. (Kaplan-Lewis Dep. at 36-37; Deal II Dep. at 37-38).

**Relator's Response:** The program manager was also responsible for marketing, meeting with medical directors to discuss their patient referrals, tracking and reporting patient census to the home office, and recruiting additional medical directors to contribute census. (Exhs. 34, 106, 107, Beard Dep. at 31-32, 45, and LaRue Dep. at 157-160).

14.     DTCA additionally retained physicians who specialized in diabetes treatment to serve as the medical directors of the centers. (Deal I Dep. at 156-58; Pogue III Dep. at 198).

**Relator's Response: Not Disputed.**

15.     ~~Although the particular services performed by the medical directors varied by physician, the medical directors generally were responsible for supervising medical treatment provided at the center, educating center staff and patients about tight control, interfacing with hospital medical staff and administration, overseeing center and hospital~~

~~quality control, community outreach, and helping ensure that each hospital had a~~

~~diabetes treatment "center of excellence."~~ (Derek Freed Dep. at 30; Williams I Dep. at

39; Pogue II Dep. at 47-48, 82-83; Pogue III Dep. at 198; Thomas Dep. at 111).

**Relator's Response:** Each paid medical director had identical duties spelled out in form

contracts.  These duties included:

> (ii) Doctor shall assist the Center in development of referral
> sources for the center. . . .and (iv) The doctor shall identify
> and encourage other physicians and referral sources whose
> patients could benefit from services offered by the center.

(Section B(1)(a) *supra* and notes therein, LaRue dep. at 52, Exh. 12).

16.   ~~Depending upon circumstances and need,~~ centers could have one medical

director or multiple medical directors. (Cigarran I Dep. at 191-92; Cigarran II Dep. at 248-

49).

**Relator's Response:** DTCA had multiple medical directors at most centers.  The

purpose of the medical directors was to deliver a diabetes patient base to the host

hospital by way of referrals for admission.  (Section B(1)(a) *supra* and notes therein).

17.   The tight control model was considered "revolutionary" at the time, as it was not

generally accepted by physicians and most physicians did not know how to practice it.

(Hellman Dep. at 23; Williams II Dep. at 173-74; Davidson Dep. at 238; Perley Dep. at

117; Deal I Dep. at 32-34; Dr. John Buse Dep. at 47-48).

**Relator's Response: Not disputed but irrelevant to the issues**.

18.   Conventional diabetes treatment models focused on minimizing diabetes

symptoms and treating diabetes complications and feared that aggressive management

would lead to an unreasonable number of episodes of hypoglycemia, which was life-threatening. (Stone Dep. at 27; Debra Kaplan-Lewis Dep. at 277-78).

**Relator's Response: Not disputed but irrelevant to the issues**.

19.     One of the ~~most important~~ roles of the DTCA medical directors, especially during the early years of the centers, was to advocate the tight control treatment model to diabetics and other physicians. (Freed Dep. at 44). DTCA believed that the success of its centers depended upon medical directors like Dr. Paul Davidson ("Dr. Davidson"), who were convinced of the benefits of tight control and would champion the centers to diabetics and their physicians. (Pogue III Dep. at 177).

**Relator's Response:** Relator agrees that DTCA believed the success of its centers depended upon medical directors like Dr. Paul Davidson.  One of the most important roles of these directors was to refer patients and generate patient referrals to the DTCA center in the host hospital so that DTCA could make money under its contracts with the host hospital.  (Sections B(1)(a) and (b) *supra*).

20.     The data did eventually bear out ~~the correctness of what DTCA was doing.~~ (Perley Dep. at 118). From 1983 to 1993, the National Institutes of Health had funded a clinical study called the Diabetes Control and Complications Trial ("DCCT") that compared the effects of conventional diabetes treatment and intensive control on the complications caused by diabetes. (Buse Dep. at 41-48). The results of the DCCT, which were announced in 1993, showed that elevated blood glucose levels are the cause of long-term complications and concluded that major benefits could result from intensive diabetes therapy. (LaJaune Dep. at 89-90).

**Relator's Response**: Relator disputes that paying medical directors to refer patients and encourage referrals of patients is correct.  (Sections C(3) *supra* and Exh. 108).  The remainder of this statement of fact is irrelevant to the issues in the case.

21.     The results of the DCCT affirmed the approach to diabetes care that DTCA had been practicing since its founding and led to the general acceptance of tight control as the standard of practice for diabetes care. (Davidson Dep. at 238; Laurel Fuqua Dep. at 149-50; Thomas Dep. at 178).

**Relator's Response**: **Not disputed but irrelevant** to the issues in the case.

22.     Between 1984 and 1996, DTCA contracted with ~~more than 300~~ physicians to serve as medical directors at the various diabetes treatment centers. (Herr Decl. ¶ 6).

**Relator's Response**: The parties, by and through counsel, circulated an agreed list of 276 physician medical directors contracted by DTCA.  However, the precise number of medical directors is immaterial for summary judgment purposes.

23.     Every DTCA medical director had a written contract that specified the director's duties and compensation, and director payments were documented in the company's financial records. (Hen Decl. ¶ 7).

**Relator's Response**: Not disputed.

24.     Most medical directors received a monthly stipend ~~in exchange for their services~~. (Herr Decl. ¶ 8). ~~In the formative years of DTCA, a few~~ medical directors received other forms of compensation, including income guarantees, loans, equity appreciation rights, research funds, office expenses, moving expenses and continuing medical education funds. (Herr Decl. ¶ 9; Cigarran I Dep. at 340; Deal II Dep. at 154-56).

**Relator's Response:** Relator does not dispute that medical directors received a monthly stipend.  Relator does dispute that the stipend was in exchange for services as no fair market value study was ever conducted of the value of the physicians services and the physicians kept no time records of their services performed.  (Sections B(1)(a) *supra* & LaRue Dep. at 56, 61-62, 65-69).   Relator also disputes that the additional compensation listed was only provided to a few medical directors and only in the formative years.  These additional forms of compensation continued well into the 1990s. (Examples of these forms of compensation to medical directors in the 1990s at Exh. 124).

25.    As time passed and as DTCA became more established, ~~those forms of compensation were phased out by DTCA.~~ (Herr Decl. ¶ 9*; Deal II Dep. at 298).

**Relator's Response:** The stipend compensation was always provided.  The additional forms of compensation listed in paragraph 24 were provided well into the 1990s. (Exh. 124).

26.    The medical directors were paid different amounts from each other ~~depending upon the negotiations between DTCA and the particular physician.~~ (Williams III Dep. at 141).

**Relator's Response**: Relator agrees that medical directors were paid differing amounts for the same standard contractual duties.  However, the payment was not based in any way on fair market value for services.  (Sections B(1)(a) &(b)).  In fact, Relator's evidence shows that DTCA paid the medical directors to refer patients to DTCA and to encourage others to do so (Sections B(1)(a) &(b) and  Exhs. 115 & 12).

-88-

27. ~~DTCA based compensation on the physician's credentials, experience, reputation, and level of services performed at the center. (See Id). DTCA believed the amount it paid to physicians to be fair market value in exchange for the services performed by those physicians. (Conrad I Dep. at 298-99).~~

**Relators Response:** This asserted fact is disputed in its entirety in sections B & C *supra*.

28. ~~DTCA never paid any physician for his or her admissions.~~ (Herr. Decl. ¶ 9, Bode Dep. at 112, 116-17; Perley Dep. at 124; Kaplan-Lewis Dep. at 283-84; Thomas Dep. at 180-81; Deal Dep. at 123-24; Pogue III Dep. at 172-73, 199, 212-13).

**Relator's Response:** This asserted fact is wholly disputed by Relator.  (Exhibit 115 and sections B(a)(a) and (b) *supra*).

29. ~~Medical directors were paid a flat amount that did not vary according to the number of patients admitted by the physician.~~ (Herr Decl. ¶ 8).

**Relator's Response:**  Relator has substantial evidence that physicians were paid for their referrals. (By way of example Dr. Walt Huttner in exhibit 37 stated that he knew he had to increase his census to justify the additional payments.  Relator's statement of facts has additional substantial evidence to controvert this assertion at Sections B(1)(a) and (b)).

30. The medical director contracts generally were for multiple years and ~~did not provide DTCA with termination rights for a physician's lack of admissions.~~ (Herr Decl. ¶ 8). ~~DTCA did not discipline a medical director or threaten to terminate a medical director's contract for lack of referrals.~~ (Kaplan-Lewis Dep. at 281; Perley Dep. at 26).

-89-

**Relator's Response:** Many Medical Director contracts provided that the contract would only be renewed if the census at the DTCA center was not maintained at a certain level, effectively giving DTCA termination rights with regard to the medical directors. (See for example Exh.125 medical director contracts composite exhibit: DTCA 013862 Dr. Phillipson ¶4 extension of contract is conditioned upon maintaining census at certain level; DTCA012214 Dr. Young ¶4 of contract-extension conditioned upon maintaining at certain level; DTCA020199 Dr. Agrin ¶4 of contract extension conditioned upon maintaining census at certain level).

31.     Medical directors admitted their diabetes patients to the hospital where the diabetes treatment center was located ~~because they believed their patients would receive better care there than from other hospitals.~~ (Davidson Dep. at 235; Bode Dep. at 43, 114; Hellman Dep. at 124).

**Relator's Response:** At least one reason medical directors referred their patients to the hospital where the diabetes treatment center was located was that DTCA paid the medical directors more than fair market value to induce them to refer their patients to the hospital where the DTCA was located. (Sections B(1)(a) and (b) supra and Exh: 115).

32.     The clinical level of service and care for diabetes patients at the DTCA diabetes treatment center was better than other hospitals in their market. (Perley Dep. at 119; Black Dep. at 57-58; Pogue III Dep. at 200-01).

**Relator's Response: Not disputed but irrelevant** to the summary judgment issues.

33.     Drs. Karpas, Bode, and Black were admitting their diabetes patients to the diabetes treatment center at West Paces Medical Center prior to becoming medical directors of the center. (Karpas Dep. at 46; Bode Dep. at 43—44; Black Dep. at 60).

**Relator's Response:** Not disputed that they admitted some of their patients to West Paces prior to becoming medical directors.  However, DTCA paid all medical directors, and made it their written contractual duty, to encourage other physicians to refer patients to the DTCA center at the host hospital. (Sections B(1)(a) and (b) supra).

34.     ~~The medical directors who were deposed performed substantial services on behalf of the diabetes treatment center.~~ Davidson Dep. at 64, 201; Black Dep. at 74; Bode Dep. at 51-52, 72-73; Freed Dep. at 30-31; Thomas Dep. at 111.

**Relator's Response:** There are no records prior to 1995 of the services these medical directors performed for DTCA and how much time they spent performing any service. DTCA developed a medical director time log in 1989 which on its face acknowledges that it is required for Medicare and Medicaid reporting.  Yet, DTCA did not require medical directors to begin utilizing this form until 1995.  (Section B(1)(a) supra and Exh. 16).

35.     Relator has no personal knowledge regarding the amount of time spent by the five West Paces medical directors performing their medical director duties. (Pogue II Dep. at 154-55). Relator has no personal knowledge regarding whether any medical director was or was not performing his medical director duties. (Pogue III Dep. at 279; Pogue IV Dep. at 347; 362).

**Relator's Response: Not disputed, but immaterial** to the issues in summary

judgment.  More to the point, DTCA has no idea and no way to prove the services performed by the five West Paces medical directors because they failed to require the medical directors to keep time logs. (Section B(1)(a) supra).

36.   DTCA's contracts with medical directors and hospitals were drafted and reviewed by Boult, Cummings, Connors & Berry ("Boult Cummings"), which has served as the company's outside counsel since the founding of the company. (Williams Dep. at 63; Cigarran I Dep. at 260-61).

**Relator's Response:** Not disputed that the paper contracts were reviewed.  However, Boult Cummings attorneys testified that they performed no fair market value analysis and did not look at the conduct behind the contracts and relied solely on DTCA to provide them with information.  (Section C(2) supra).

37.   ~~Boult Cummings worked closely with DTCA to advise the company regarding its relationships with hospitals and physicians as healthcare regulations changed over the course of years.~~ (Jay Hardcastle Dep. at 355, 397-98; Cigarran II Dep. at 72-73).

**Relator's Response:** Boult Cummings reviewed many DTCA contracts and warned DTCA repeatedly that its contracts put it at risk of prosecution under the Medicare fraud and abuse laws. (Section C(2) and (3) supra).

38.   ~~DTCA relied in good faith on legal advice from Boult Cummings in structuring its arrangements with medical directors and hospitals~~. (Herr Decl. ¶¶ 10, 11; Cigarran I Dep. at 284-86).

**Relator's Response**: DTCA failed to disclose material facts to its counsel.  DTCA repeatedly ignored its counsels' advice that its arrangements with medical directors put it

at risk of prosecution under the Medicare fraud and abuse laws. (Sections C (2), (3) & (4) supra).

39.   ~~Boult Cummings attorneys would not sign off on agreements unless they believed that the contract did not violate any laws.~~ (Thomas Smith Dep. at 63-64; Hardcastle Dep. at 120).

**Relator's Response:** DTCA failed to disclose material facts to its Boult Cummings Counsel.  Boult Cummings Counsel repeatedly advised DTCA that its arrangements with medical directors put it at risk of prosecution under the Medicare fraud and abuse laws. (Sections C(2) & (3) supra).

40.   DTCA did not limit the company personnel who could have contact with counsel, and ~~DTCA did not~~ instruct employees to ~~withhold information from counsel~~. (Pogue IV Dep. at 417-18; Hodge Dep. at 149).

**Relator's Response:** DTCA failed to disclose material facts to its counsel. (Section C(2) supra).

41.   Boult Cummings spent "countless hours" with DTCA discussing how the company worked, the company's contracting model, and the fraud and abuse risks of various arrangements. (Hardcastle Dep. at 355; 397-98). The firm did not rubber stamp all of DTCA's proposed arrangements. (Hardcastle Dep. at 305; 333-34).

**Relator's Response: Not disputed**.  Nevertheless, DTCA failed to disclose material facts to its Boult Cummings Counsel.  Boult Cummings Counsel repeatedly advised DTCA that its arrangements with medical directors put it at risk of prosecution under the Medicare fraud and abuse laws. (Sections C(2) & (3) supra).

42.      Over the years, Mr. Hardcastle raised concerns regarding several proposed arrangements between DTCA and particular doctors. (Id. at 350). ~~In response, DTCA would either change the arrangement or discuss with Mr. Hardcastle its justification for the arrangement. If the justification satisfied Mr. Hardcastle, then he would approve the contract.~~ (Id. at 439). ~~Mr. Hardcastle never advised DTCA of any arrangement that constituted a violation of the AKS.~~ (Id. at 120).

**Relator's Response:** Attorney Hardcastle repeatedly advised DTCA that its arrangements with medical directors put it at risk of prosecution under the Medicare fraud and abuse laws.  DTCA's decisions to ignore his advice caused Hardcastle to repeatedly generate documents to his "Fraud & Abuse" file that he had advised DTCA of the risk of prosecution and its officers chose to make no changes in response to his advice. (Section C(3) & (4) supra).

43.      In 1994 and 1995, DTCA restructured its medical director contracts to provide that the fixed annual stipend would be based on a target number of required hours multiplied by a ~~fixed~~ hourly rate of compensation. (Williams III Dep. at 65, 141-42; Williams II Dep. at 189-90). DTCA restructured the medical director contracts to fully standardize the terms and ~~compensation being paid~~ to its directors and ~~in response to the Stark Law~~. (Williams I Dep. at 88-94; Williams II Dep. at 91-92, 200-01, 202-03, 245-47).

**Relator's Response:** The restructured medical director payments continued to vary widely from medical director to medical director even among DTCA medical directors within the same hospital.  The hourly rates were not based upon any fair market value

analysis as advised by DTCA's attorneys.  In addition to Stark, DTCA restructured its

medical director contracts under pressure from its attorneys, Columbia HCA, and service

with a subpoena *duces tecum* from HHS-OIG after the filing of the complaint in this

case. (Sections C (5) & (6) and Exh. 108 chronology chart 8/31/1993 forward and

attachments referenced with each date as well as Exh. 19).

44.    ~~Under all of DTCA's medical director contracts, including the 1995-1996~~

~~restructured contracts subject to the Stark Law, compensation to the directors did not~~

~~vary with or otherwise reflect the volume or value of the directors' referrals of diabetes~~

~~patients to the hospitals at which the centers were located.~~ (Williams I Dep. at 58-59;

Cigarran II Dep. at 342-43).

**Relator's Response:** Relator's statement of genuine issues and material facts sets forth

substantial evidence that DTCA's medical director contracts reflected the volume or

value of referrals from the medical directors and that at least one purpose of the medical

director agreements was to induce referrals of patients to the DTCA at the host hospital.

(Sections B (1) (a) & (b) supra and the exhibits noted in those sections).

 46A.  ~~From 1984 to May 20, 1996, there was no authority for HCFA or a FI to deny~~

~~payment of a hospital's UB-82 and UB-92 claim forms for an interim payment or cost~~

~~report because of the hospital's violation of the AKS. (Yospe Dep. at 189-93, 264-64,~~

~~267-69).~~

**Relator's Response:** If a potential fraud and abuse situation is suspected by an FI,

there is a mandatory requirement to refer to report it to the Office of Program Integrity or

Office of Inspector General for investigation. Ex. 128, manual excerpts; Yospe Dep. at

56, 61-65.   A "potential fraud or abuse situation" is specifically defined as "Soliciting, offering or receiving a kickback, bribe or rebate." Ex. 128 at § 2060.5(A); §4100.2. Indeed, all providers are subject to audit to discover fraud and abuse, one of the audit priorities of the HCFA.  Ex. 128 at § 4104.  Decisions regarding next steps are to be made by the OPI or the OIG.  Ex. 128 at § 4101. The results of an investigation could result in an audit of a provider's claims being discontinued. Ex. 138 at § 2060.5.  *See generally* Section III.D.2. *infra.*

46B.  ~~During that time period, neither HCFA nor any FI refused to process a claim form for payment, or denied reimbursement of medically necessary services claimed in a hospital cost report, because the claim's services resulted from an AKS violation.~~ (Yospe Dep. at 265, 284)

**Relator's response:**  Mr. Yospe testified that he is not personally aware of <u>any</u> occasion in his tenure when a provider "came forth and said my cost report included kickbacks." Yospe Dep. at 149-50.  Mr. Yospe testified that he could recall no situation, either in his personal experience or reported to him in his position as "Chief of the Audit and Reimbursement Branch" where HCFA knew that the provider had accepted kickbacks. Yospe Dep. at 149-152.  Mr. Yospe also testified that he expected that providers would <u>not</u> engage in fraud and abuse (Yospe Dep. at 81-82) and that he would have no way of knowing whether any particular claim that resulted from a kickback was or was not medically necessary (Yospe Dep. at 183).  There is no evidence of the Government being provided with truthful statements regarding kickback violations. There is, however, evidence of procedures in place—implementing statutes and

regulations—to discover fraud and abuse, including kickbacks, during review of claims and to report even the suspicion of fraud to the OIG for investigation.  *See generally infra* Section III.D.4.

In addition, Yospe testified only as to his personal knowledge, and did not purport to testify regarding what the agency overall did or did not do.  Moreover, "processing" a claim for payment is a term of art regarding what happens when a claim is received.  It does not refer to the right to retain payment.  *Id.*

47.   ~~From 1984 to May 20, 1996, HCFA only would have denied a hospital claim if the specific information required by the claim form-such as the description of the claimed services or the physician's certification of medical necessity—was discovered to be false. (Yospe Dep. at 97-98, 101-02, 189-93, 258-60, 267-69).~~

**Relator's Response:**

DTCA's statement is misleading regarding how claims are processed.  When cost reports are submitted, "[t]he intermediary examines the cost report, audits it when found necessary, and issues a written "notice of amount of program reimbursement.'"[308] Cost report audits and subsequent settlements can sometimes take years.  Of note, the current Manual provision provides that cost reports not scheduled for audit must be settled within 12 months "unless you have a documented reason why the cost report cannot be settled (for example, bankruptcy, OIG investigation, DoJ investigation)."  Ex. 140, Manual provision § 90.   Cost reports can be "re-opened" within 3 years for various reasons.  Ex. 140, Manual provision at §100; 42 C.F.R. § 405.1885 .  Thus, the question

---

[308] Regions Hosp. v. Shalala, 522 U.S. 448, 452 (1998).

of whether HCFA "would have paid the claim,"even if this appropriately set out the materiality standard, rests not so simply on interim payments received by the provider, but on their right to retain those payments under the system set out by the Medicare and Medicaid programs.  Indeed, even Mr. Yospe concedes that kickbacks on cost reports are not allowable.  Yospe Dep. at 68-69.

48.   ~~No statute, regulation or Medicare policy made a hospital automatically ineligible for Medicare reimbursement upon violating the AKS.~~ (Yospe Dep. at 229-30, 282-83). If an FI thought that a hospital may have violated the AKS, HCFA's policy ~~only~~ required the FI to refer the hospital to its fraud unit or the OIG, and to continue processing the hospital's claims after the referral unless instructed to stop by the OIG pending completion of the OIG's investigation. Yospe Dep. at 189-94, 227-28. ~~Even if the OIG had found fraud following such a referral, the remedy at the time was limited to prospective exclusion from the Medicare program, not retroactive denial for the services already provided.~~ (Yospe Dep. at 225-30, 271-72, 278-80, 282-83).

**Relator's Response:** The witness's answers were confined to his personal opinions. The first sentence is a conclusion of law and is irrelevant.  The third sentence is a conclusion of law and is incorrect, because, *inter alia*, the United States utilized the False Claims Act to recover from providers who profited from kickbacks during the time period in question, *e.g.*, United States v. Roter, 1989 U.S. Dist. LEXIS 6555 (E.D. Pa., June 12 1989); the government had available to it a remedy for violations of the Anti-Kickback Statute under the Civil Monetary Penalty statute, *e.g.*, Shalala v. Radiation Care, Inc., 1995 U.S. Dist. LEXIS 749 (N.D. Ga., January 5, 1995).  Moreover, the

Department of Heath and Human Services, during the relevant time period, had the authority to reopen a Cost Report within three years to recapture improper payments. Finally, the United States has always had available to it common-law remedies and remedies under the False Claims Act by which to remedy violations of law by Medicare providers.

As the United States District Court for the Northern District of Illinois held in United States v. Rogan, 459 F. Supp. 2d 692, 728 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008) (brackets in original):

> If agents of the federal government, acting on behalf of the United States, paid claims submitted by Edgewater as a result of Rogan's actions "under an erroneous belief which was material to the decision to pay, [the Government] is entitled to recover the payments" under a mistake-of-fact theory. *Mead, 426 F.2d at 124*. Here, the express and implied certifications of compliance with the Anti-kickback and Stark Statutes contained in Edgewater's cost reports and UB-92 forms were material to the United States' decision to pay Edgewater; and, as these certifications were false, the United States erroneously paid Edgewater.

49.     From 1984 to May 20, 1996, the UB-82 and UB-92 Medicare claim forms did not require ~~any~~ certification of compliance with the AKS or Stark Law. (Yospe Dep. at 187-88, 259-60).

**Relator's Response: Irrelevant**. The UB-82 and 92 forms did not contain an affirmative certification of compliance with such laws.  However, as established *infra* Section III, under the law of the case and the law of the land, submission of a claim known to have been the result of a kickback violates the False Claims Act.

50.     From 1984 ~~to May 20, 1996~~, HCFA's cost reports did not require a hospital's certification of compliance with the AKS as a condition of payment. (Yospe Dep. at 233,

272-273, 276-78, 287).

**Relator's Response: Irrelevant**.  HCFA's costs report forms did not contain an *affirmative* certification of compliance with the AKA prior to 1992.  The form was revised to include an *affirmative* certification of compliance with all laws governing the provision of healthcare services in early 1993.  However, as established *infra* Section III, under the law of the case and the law of the land, submission of a claim known to have been the result of a kickback violates the False Claims Act.

## LEGAL ARGUMENT AND AUTHORITIES

**I.**    **STANDARD OF REVIEW**

This Court has recently described the standard applicable to summary judgment:

Where the pleadings, affidavits, depositions, answers to interrogatories, and admissions of record demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law, summary judgment shall issue. At the outset, the burden is on the movant to demonstrate the lack of a material factual dispute. . . . At this stage, the Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. . . .

United States ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 56 (D.D.C. 2007) (Lamberth, J.) (internal citations and quotation marks omitted).

In ruling on a summary judgment motion, Rule 56(c), Fed. R. Civ. P.,  permits the court to consider "the pleadings, any discovery and disclosure materials on file, and any affidavits."  "On a motion for summary judgment, a district court may rely only on material that would be admissible at trial."  Rubens v. Mason, 387 F.3d 183, 189 (2d Cir. 2004). However, a non-moving party is not required to produce evidence in a form that would be admissible at trial in order to oppose summary judgment; rather, the evidence must be capable of being converted into admissible evidence.  Gleklen v. Democratic Congressional Campaign Committee, Inc.  199 F.3d 1365, 1369 (D.C. Cir. 2000).

Documents tendered in response to discovery request or subpoena are self-authenticating.  *See infra* section C.1; Architectural Iron Workers Local No. 63 Welfare Fund v. United Contractors, Inc., 46 F. Supp. 2d 769, 772 (N.D. Ill. 1999); United States v. Hubbell, 167 F.3d 552, 567 & n.20 (D.C. Cir. 1999). All exhibits submitted in support of this memorandum were produced either in response to sub-

-101-

poenas or discovery requests served in this litigation.  Exhibit 118, Declaration of

Jennifer M. Verkamp at ¶¶ 14-16.

Summary judgment is not appropriate where, as here, the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).

## II.      PRESENTMENT OF CLAIMS: Defendants Caused the Submission of False Claims For Payment by the United States

As this Court has previously recognized, the FCA creates liability for any person

who "knowingly presents, or causes to be presented, to an officer or employee of the

United States Government . . . a false or fraudulent claim for payment or approval. "

Hockett, 498 F. Supp.2d at 57, quoting 31 U.S.C. § 3729(a).

Here, DTCA is liable for knowingly causing hospitals to submit claims to the

United States in violation of the Anti-Kickback and Stark laws.  At the outset, DTCA

argues that Relator has not identified that claims were presented to the United States

because he has not brought forward "properly authenticated and admissible evidence" of

the actual claims (De. Mem. at 16).  Specifically, DTCA challenges that the electronic

claims data subpoenaed from CMS is unverifiable and so cannot constitute evidence

that claims were presented to the United States.  DTCA's argument goes one further,

arguing that Relator simply "supposes" claims "must have been presented" to the United

States.  Notwithstanding that the subpoenaed claims information is sufficient evidence

(as addressed in Section C below), DTCA's argument is stupefying in light of its own

documents, which concede that claims were presented to the United States as a result

of its efforts—indeed, that was the point.

A.    **DTCA's Documents Reflecting The Presentation of Claims to the United States As a Direct Result of Its Efforts.**

DTCA does not dispute that the claims at issue are the claims for outpatient and inpatient services referred to its hospital customers by DTCA's paid medical directors.[309]

Nor does DTCA deny that claims were presented to the United States as a result of referrals from DTCA-paid medical directors.[310]  Nor can it: Document after document *produced by DTCA* concedes that its business model was aimed at increasing claims for hospital services:

> Letter to Hospital: "our primary goal for FY '91 and FY'92 is to significantly increase the volume of business at your center" (Ex. 2, DTCA127212).

> Letter to Program Managers: "The Fiscal 1991 Program Manager Incentive Plan is based upon our hospital customer's number one expectation–Census Growth" (Ex. 7, DTCA225801).

A driving number of these claims were paid by Medicare and Medicaid.  In fact, DTCA engineered its business model so that the amount of its management fee was geared to admissions and including whether admissions were Medicare, Medicaid or "other" payors.  *E.g.,* Exhibits 120, Lakewood, Shallowford and West Paces contracts; Exhibits 121 at 1987 Waltham Weston contract and 1989 HCA Bayonet contract.   Its initial contracts specified that it was paid on a "per patient day" basis, with a different fee

---

[309]  Specifically, these are: (1) CMS Forms UB-92 and UB-82 (interim claims for inpatient hospital services); (2) CMS Forms 2552 (the hospital's annual cost report or "final claim"); and (3) CMS Forms 1500 (claims for outpatient services). Def. Mem. at 14, n.10 (stating that they do not dispute that these are the claims at issue and that they constitute "claims" within the meaning of the FCA).

[310]  Notably, even the testimony cited in DTCA's brief concedes that the medical directors admitted patients to DTCA's unit.  Def. Mem. at 34 ("the medical directors generally preferred admitting patients to the diabetes treatment center") (citing Davidson and Black depos.).

for federal payors.  Although the model stayed the same, the exact contract structure

changed over time, to include DTCA being paid both a fixed fee and a variable fee for

incremental discharges resulting from its centers.  Ex. 121, examples of contracts over

time.[311]

Thus, DTCA's entire model was geared to generate claims for hospital services,

including Medicare and Medicaid claims.  Evidenced not just by its contracts, but by a

plethora of other documents regarding its practices, DTCA's goal was to generate

healthcare claims.  Indeed, in order to convince a hospital to contract, DTCA routinely

prepared pro forma showing the projected financial impact on its efforts on the hospital's

admissions, including Medicare and Medicaid revenue.  Ex. 126.

Indeed, because its hospital contracts were geared toward increasing census,

and in most cases, the amount of its management fee was driven by the monthly volume

of admissions or discharges, DTCA was collecting the actual patient claims data from

the Hospitals on a regular basis and specifically tracked the number of the admissions

by referral source and payor source.  *See* Exhibit 127, Hospital Contract requiring

monthly submission of patient data to DTCA (DTCA144921); Exhibit 128, DTCA internal

---

[311] DTCA states that its contracts evolved over time and that, later in time, the hospital contracts became "flat fee arrangements." Def. Mem. at 5.  This is imprecise. While flat fee arrangements were introduced in later time frames, the majority of arrangements contained a variable fee element (based on volume of healthcare business generated) through the end of the relevant time frame.  *See., e.g.,* Exhibit 121, 1995 Bristol Regional contract.  In fact, of the approximately 643 contracts produced to Relator in discovery, only 31 reflect a purely fixed fee arrangement. Exhibit 118, Declaration of J. Verkamp at ¶ 17.  This is of no matter, of course, to the fact that the amount of the fee, whether flat or variable, accommodates the volume of business to be generated by the center (and to include the cost of medical director payments made to induce the referral of that business).

document reflecting monthly reporting of UB-82 information from each center (DTCA092806 at 2809).

Thus, from the very inception of its contracts with hospitals, DTCA contemplated that its efforts would result in Medicare and Medicaid claims. In fact, its business model depended on it. Thus, DTCA tracked these admissions regularly, by physician and by payor source, including by monthly reports by each center's program managers tracking this information. Exhibit 50, for example, is a Monthly Report from a center at Roper Hospital, and it clearly reflects the exact number of admissions and discharges and how many of them were paid by Medicare and Medicaid. On that document, over 75% of the center admissions were Medicare and Medicaid patients (DTCA235758).[312]

DTCA produced scores of these monthly reports in response to Relator's discovery requests and show clearly that, for every center, and on a monthly basis, DTCA itself was documenting that claims were presented to the United States as a result of its efforts. *See, e.g.,* Exhibit 130, compilation of monthly reports.

Thus, DTCA's production is replete with evidence reflecting that claims were submitted to the United States. *See also, e.g.*:

> Exhibit 131, examples of hard copy inpatient Bills from Hospitals (DTCA134975-997; DTCA 17085-89).

> Exhibit 132, DTCA memo reflecting return of UB-82's to Hospital for processing (DTCA109284-5).

> Exhibit 133, 1987-89 letters between DTCA, Medicare, and centers

---

[312] *See also* Exhibit 129, 2004 printout from American Healthways website (Ex. 118, Verkamp Dec. at ¶ 18), showing that it believed that the Medicare Modernization Act would increase the Medicare market for its business: "The new Medicare Modernization Act will increase addressable disease lives by 14-20 million."

reflecting DTCA's successful effort to obtain federal reimbursement for outpatient services at the centers and to guide the Hospitals on how to get reimbursed by Medicare (DTCA132185-191; DTCA136395-198).

Of note, Relator's discovery requests sought all relevant information in DTCA's possession, custody and control (*e.g.,* Exhibit 134, R.F.P. Nos. 6, 9, 34, 45, 66), including all the monthly reports and claims data it had collected.  While a significant amount of such data was produced, it was not done so comprehensively.[313]  In light of this, DTCA's current challenge is perverse, as its own failure to retain the patient information leaves it without comprehensive records of the claims resulting from the centers—but for, of course, Relator's subpoena of the information from CMS.  The lack of retention of such records does little to rebut the end goal reflected in document after document it produced—to create more claims to be paid, in significant part, by the United States.

Regardless of whether DTCA agrees its business model creates liability under the False Claims Act, it cannot credibly dispute that claims to the United States resulted from its efforts.  This fact, established through the evidence, is sufficient to withstand summary judgment on the question of whether claims were presented to the United States.

**B.    DTCA's Straw Man: Actual Claim Forms are Not Required.**

The central premise of DTCA's argument is that Relator cannot survive summary

---

[313] Relator has comparable information produced by Defendant HCA/West Paces in response to discovery requests, prior to its dismissal from this case.  West Paces produced cost reports, inpatient bills, patient claim summaries relating to the center's admissions, among other evidence of claims presented to the United States as a result of DTCA's efforts (*e.g.*, Exhibit 135).

judgment because he is unable to produce the claims themselves—that is, the actual reimbursement forms, either physical or electronic.  This premise fails.  The D.C. Court recently rejected precisely this argument in United States ex rel. Sheila El-Amin v. George Washington University, holding that "nothing in the language of the FCA requires Relators to possess (and present to the factfinder) the actual claim form, whether it be paper or electronic, submitted to the government." 522 F. Supp. 135 , 142 (D.D.C 2007).

In that case, the Defendant made the same argument—indeed, citing the same cases—that evidence of each actual claim is required.  The Court stated:

> This case presents a slightly different question [than the cases cited], for this is a question of proof. Relators have collected thousands of pages of anesthesia medical records and billing documents. The question is not whether they are able to "come forward with a single claim" that was allegedly false, like the plaintiff in Quinn, supra. The mountain of billing documents in their possession allegedly demonstrate that Defendant filed numerous claims to Medicare. The precise question raised by Defendant is whether they may proceed without having the actual HCFA 1500 claim forms. Both case law and the rules of evidence answer this affirmatively.
>
>                    *        *        *
>
> "As the Supreme Court has said, 'direct evidence of a fact is not required. Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" United States v. Williams, 342 U.S. App. D.C. 256, 260, 216 F.3d 1099, 1103 (D.C. Cir. 2000) (quoting Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 330, 81 S. Ct. 6, 11, 5 L. Ed. 2d 20 (1960)).

Id. at 142-143.

The El-Amin Court found the defendant's reliance upon United States ex rel. Aflatooni v. Kitsap Physicians Service, 314 F.3d 995 (9th Cir. 2002), and United States ex rel. Quinn v. Omnicare Inc., 382 F.3d 432 (3d Cir. 2004), also cited by DTCA, was

misplaced. In Aflatooni, the relator failed offer any evidence of the false claims alleged. On appeal, the Ninth Circuit affirmed summary judgment, observing that a False Claims Act relator must "come to court with a claim in hand or with sufficiently detailed circumstantial evidence to establish that the defendant actually submitted a false claim." Id. at 1102.

Similarly in Quinn, the Third Circuit noted that some evidence of the submission of false claims—although not necessary the actual claims forms themselves—was necessary to establish a prima facie case under §3729(a)(1) or (2). Quinn, 382 F.3d at 440. Unlike here, the Quinn relator's only proof was that the defendant carried on substantial business with Medicaid, and on the strength of this evidence alone argued a genuine issue of material fact as defendant must have double-billed the cost of the medications.

The reasoning applied by the El-Amin Court in distinguishing Aflatooni and Quinn in that case reveals the weakness of DTCA reliance on Aflatooni and Quinn here. Relator offers far more than "generalized, speculative suppositions." Quinn, 382 F.3d at 440. Indeed, he has records reflecting thousands of claims submitted to Medicare or Medicaid as a result of DTCA's efforts, both through subpoenaed records from CMS and from DTCA's own records.

The El-Amin court concluded that circumstantial evidence of the claims was sufficient to create a genuine issue of fact as to the submission of the claims themselves.
522 F. Supp. 2d 135, 143. Similarly, Relator Pogue has presented significant circumstantial evidence that claims were submitted, including in the form of subpoenaed

information from the United States.

**C.      Even if Actual Claims Data is Required, the Subpoenaed Data From CMS is Properly Submitted as Evidence of Claims.**

DTCA challenges that the claims data subpoenaed by CMS have not been properly authenticated and so constitute hearsay under the Federal Rules of Evidence 802 and 901.  Def. Mem. at 16.  Notably, DTCA does not challenge the method of calculating damages, but rather challenges the admissibility of the evidence gathered.

As addressed below, DTCA's challenge to the method of proof of claims is without merit.  The evidence of claims obtained by Relator is properly considered by this Court and sufficient to withstand DTCA's motion for summary judgment.

**1.      The Claims Records.**

The claims data at issue here was provided by CMS in response to a valid subpoenas.

Specifically, Relator served two subpoenas on the United States.  The first was for West Paces claims data already collected by the United States during discovery in the MDL.  Using the same procedure as employed by Relator here, the United States had made a previous request for data related to HCA hospitals, including Defendant West Paces.  Relator served this subpoena on United States representative Jonathan Diesenhaus on July 7, 2003, pursuant to his agreement to accept service.  Exh. 109; Exh. 118 at ¶ 3.  In response to the subpoena, Mr. Diesenhaus provided a disk containing data relating to the claims resulting from referrals to West Paces from DTCA medical directors.  Exh. 111; Exh. 118 at ¶ 4.

Relator served a second subpoena on July 15, 2003, for the remaining claims

resulting from the referrals of DTCA medical directors to the rest of its customer hospitals.  Exh. 110; Exh. 118 at ¶ 6.  Relator identified these claims by providing CMS with the provider number of each hospital and each DTCA medical director. *Id*. at ¶ 8. Relator's counsel used publically available websites to obtain this information. *Id*.  In response to this subpoena, Robyn Thomas, Director of the Division of Quality Coordination & Data Distribution at the Office of Information Services at CMS served a disk containing responsive claims data.  Exh. 117 at January 2004 letter from Robyn Thomas; Exh. 118 at ¶ 10.  Relator reviewed this disk and observed that there was no data relating to a number of medical directors.  Upon further inquiry to Ms. Thomas' office, CMS provided a second disk with additional data, explaining that certain provider numbers on the list had failed to match data in the system because of an inadvertent lower case character in some of the numbers provided. Exh. 117 at April 16, 2004 letter from M. Herman; Exh. 118 at ¶ ¶ 11-12; Exhibit 119, Declaration of Don McKenna.  The letter explained that "[t]he procedure we used was correct" and that the replacement CD contained additional data based on the correcting the issue with the lower case alpha characters provided in the subpoena attachment. April 16, 2004 letter from Michael Herman, Computer Specialist from Ms. Thomas' office; Exh. 118 at ¶ 12 Exact copies of these two disks were provided to DTCA , and to Relator's experts.  Id. at ¶ 13.  Far from being a mere series of "zeros and ones," the data on these disks–along with the record layouts provided by CMS–can be opened in a database, such as Excel and Access. Exh. 117, letters attaching record layouts; Exh. 112, Thibault Report describing opening files in a database.

     DTCA notes that the data on this disk does not contain claims for a certain

number of medical directors and for certain years.  The disk in DTCA's possession is all

the electronic data in CMS' possession regarding the providers identified.  Electronic

data only started to be submitted in 1991.[314]  Moreover, the electronic data can only

retrieve claims that are associated with the providers in question by their UPIN

appearing in the box for admitting or "other" physician.  As described by the court in

United States v. Rogan, involving the trial of a closely-analogous False Claims Act case

premised on kickback violations:

> Hospitals...during the relevant time period, were paid by Medicare on an
> interim basis for services rendered. To submit claims for specific Medicare
> patients, the hospital completed and electronically sent form "UB-92" (also
> known as form "HCFA-1450"). The UB-92 form required each hospital to
> use a unique provider number, which identified the hospital as the place
> where services were rendered. The UB-92 form also identified the
> attending physician by placing the physician's Universal Provider
> Identification Number (UPIN) in Boxes 82 and 83 of the UB-92 form. 5 The
> Center for Medicare and Medicaid Services ("CMS") maintained those
> electronic claims in the National Claims History, the agency's official
> repository of adjudicated claims.

Rogan, 459 F. Supp. 2d 692, 708 (N. D. Ill. September 29, 2006), *affirmed by* 517 F.3d

449 (7th Cir. 2008). If a particular physician was not noted on the form, even if he or she

referred the patient, that claim cannot be captured by the electronic data request.

Indeed, the methodology used to obtain electronic claims data in this case is no different

to the data used by the United States in Rogan, which defendant Rogan unsuccessfully

sought to exclude at trial on similar grounds.  As defense counsel in this case knows,

data requests to CMS for the data resulting from provider claims is not novel, and are

---

[314] *See* Exh. 136.  However, electronic submission was not required until 1993.
Thus, the electronic claims data obtained is not comprehensive prior to 1993 and is
non-existent prior to 1991.

routinely submitted to the agency in False Claims Act cases.  In <u>Rogan</u>, the United

States submitted the Declaration of Robyn Thomas to describe the process for the

retrieval of such claims.  Exh. 136, Declaration of Robyn Thomas attached to Doc. 177,

in <u>United States v. Rogan</u>, No. 1:02-cv-03310, N.D. Ill. Ms. Thomas is the Director of the

division of CMS responsible for responding to such data requests.  That office

responded to Relator's July 15, 2003 subpoena and, in fact, Ms. Thomas sent the first

responsive CD to Relator (Exh. 117).

 Ms. Thomas' Declaration describes:

> [T]the National Claims History ("NCH") file....ontains records of claims
> dating back to 1991 submitted for payment, including all adjustment
> claims, to fiscal intermediaries and carriers and includes data on the final
> action taken in connection with those claims.  A subset of records
> contained within the NCH is patient specific claims information submitted
> by hospitals across the country that is derived from UB-92's submitted by
> the hospitals.
>
>      *     *     *
>
> In my role as Director of the Division of Quality Coordination & Data
> Distribution, I receive requests from entities outside CMS for access to
> data maintained by the Office of Information Services.
>
> Pursuant to the [request in <u>Rogan</u>] from DOJ, I directed employees within
> the Division of Quality Coordination & Data Distribution to provide a copy of
> the inpatient claims record set of the NCH in standardized electronic
> format to [the Government's data analyst]

Exh. 136.  Ms. Thomas Declaration authenticated the United States' internal request for

data for trial in <u>Rogan</u>.  Here, CMS produced the data in response to a subpoena.

Of note, Relator also made diligent efforts to otherwise obtain the claims data,

whether paper or electronic.  Relator requested of defendants West Paces and DTCA all

documents that relate to claims for payment resulting from referrals from the DTCA

centers.  As previously noted, DTCA largely did not produce the actual claims data that it

had collected from hospitals. It produced monthly reports summarizing the claims data

resulting from its efforts, although not comprehensively for every month or every center

(*see supra* section A).  Relator also subpoenaed more than 100 hospitals with which

DTCA contracted.  Exh. 118, Verkamp Dec. at ¶ 14.   The subpoena responses were

revealing that many hospitals did not retain such records for the time frames relevant

here and did not catalog the data in a way that could be searched by referring physician

(as does CMS).  Subpoena enforcement of more than 100 entities to exhaust the

conclusion that records were not available would be a mammoth and potentially futile

effort, requiring the use of significant judicial resources.[315]

Having reached significant obstacles in otherwise obtaining claims data, Relator

focused efforts on the subpoenaed claims data from the United States.  As discussed

below, this data would be properly admissible at trial.

### 2.        The Claims Records Are Properly Authenticated.

DTCA argues that much of the documentary evidence in Relator's possession may

not be considered by the Court for purposes of its present motion for summary judgment

because it has not been authenticated. This argument fails for several reasons.

---

[315] In fact, as relevant to such an  effort, DTCA had subpoenaed the United
States for all such costs reports and other documents relating to various providers.  In
objecting to DTCA's motion to compel the subpoena, the United States submitted the
declaration of Charlotte Benson from the Office of Program Management at CMS, who
testified that the search for cost reports requested by DTCA was a herculean effort,
requiring the search of individual fiscal intermediaries off-site storage facilities around
the country, and will only generally be possible for documents within an eight-year
period.  Ms. Benson stated that the costs of such a search would be extremely
burdensome and costly.  Exh. 137, attachment to Doc. 1129 in ms-01-50.

Proof of authenticity under Fed. R. Evid. 901(a) requires only that its proponent to introduce "evidence sufficient to support a finding that the matter in question is what its proponent claims."  The hurdle imposed by Rule 901(a), is not a difficult one to meet, and is satisfied when the "proponent of the evidence has offered a foundation from which the jury could reasonably find that the evidence is what the proponent says it is."  United States v. Safavian, 435 F. Supp. 2d 36, 38 (D.D.C. 2006) (Friedman, J.) (internal quotations omitted); Lexington Insurance Co. v. Western Pennsylvania Hospital, 423 F.3d 318, 328 (3d Cir. 2005) (observing that "[t]he burden of proof for authentication is slight"); United States v. Reilly, 33 F.3d 1396, 1404 (3d Cir. 1994) (same); Thanongsinh v. Board of Education, 462 F.3d 762, 779 (7th Cir. 2006) ("Rule 901 does not erect a particularly high hurdle").  Contrary to DTCA's position, "the Court need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the jury ultimately might do so."  Id.

The fact that a document is produced in discovery alone is generally enough to establish its authenticity.  A number of courts have held that documents tendered in response to discovery requests are self-authenticating.  Architectural Iron Workers Local No. 63 Welfare Fund v. United Contractors, Inc., 46 F. Supp. 2d 769, 772 (N.D. Ill. 1999); Anand v. BP West Coast Products LLC, 484 F. Supp. 2d 1086, 1092 (C.D. Cal. 2007); Cantrell v. Morris, No. 2:04 cv 394, at *1 (N.D. Ind. 2006).  This self-authentication applies with equal force to any documents produced in response to subpoena.  United States v. Hubbell, 167 F.3d 552, 567 & n.20 (D.C. Cir. 1999) (holding that by producing documents responsive to a subpoena, the party "communicates" that the documents are

authentic), *citing* <u>United States v. Doe</u>, 465 U.S. 605, 614 (1984).[316]

As established above, the claims data provided to DTCA and the experts in this case was subpoenaed from the United States and thus is self-authenticating under <u>Hubbell</u>, 167 F.3d at 567.  The same applies to documents received in response to the hospital subpoenas served by Relator and the discovery responses received by DTCA and West Paces in response to discovery requests in this case. Exhibit 118.  Counsel's declaration identifying these documents as responsive to subpoenas and discovery requests issued in this litigation provides a foundation upon which a jury could find that the data is what Relators says it is.  *Accord* <u>United States v. Brown</u>, 688 F.2d 1112, 1116 (7th Cir. 1982) (where defendant was subpoenaed to produce certain records of the business of which he was the president and sole stockholder, the documents were held to be properly authenticated by testimony that they were produced by defendant's attorney who stated that they were the documents that had been subpoenaed):  "[T]he very act of producing them and representing them to be the documents described in the subpoena would have authenticated them. . . .  [H]is very act of production was implicit authentication."  <u>Brown</u> at 116.

---

[316] *Accord* <u>Chavez v. Thomas & Betts Corp.</u>, 396 F.3d 1088, 1101 (10th Cir. 2005) (letter authenticated pursuant to Fed. R. Evid. 901(b)(4) when tendered during discovery and printed on company letterhead);  <u>McConathy v. Dr. Pepper/Seven Up Corp.</u>, 131 F.3d 558, 562 (5th Cir. 1998) (upholding district court's determination that fact that document was produced during discovery is probative of authenticity under Fed. R. Evid. 901(b)(4));  <u>F.T.C. v. Hughes</u>, 710 F. Supp. 1520, 1522 (N.D. TEx. 1989) (one of four factors considered by the court in holding company records authenticated).

## 2. The Electronic Claims Records Are Business and Public Records.

The claims data contained on the two CDs in question constitute business and public records under Fed. R. Evid. 803, and thus are not barred by the rule against hearsay

Rule 803(6) provides as follows:

A memorandum, report, record, or data compilation, in any form of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Fed. R. Evid. 803(6).

Courts regularly hold that computer records constitute business records for purposes of avoiding the hearsay bar.  *E.g.*, Sea-Land Service, Inc. v. Lozen Int'l, LLC, 285 F.3d 808, 819-20 (9th Cir. 2002); United States v. Ary, 518 F.3d 775, 786-87 (10th Cir. 2008); United States v. Moon, 513 F.3d 527, 544-45 (6th Cir. 2008); Haag v. United States, 485 F.3d 1, 3 (1st Cir. 2007); United States v. Fujii, 301 F.3d 535, 539 (7th Cir. 2002).  Commentators agree.  *E.g.,* 30B Michael H. Graham, Federal Practice and Procedure § 7047 (Interim ed. 2007) ("The expression 'data compilation' is used as broadly descriptive of any means of storing information other than the conventional words and figures in written or documentary form. It includes, but is by no means limited to,

electronic computer storage").[317]

The claims data at issue also qualify as public records pursuant to Fed. R. Evid.

803(8).  That rule provides an exception to the rule against hearsay for:

> Records, reports, statements, or data compilations, in any form, of public
> offices or agencies, setting forth (A) the activities of the office or agency, or
> (B) matters observed pursuant to duty imposed by law as to which matters
> there was a duty to report, . . . unless the sources of information or other
> circumstances indicate a lack of trustworthiness.

As this Court observed when it allowed introduction of email records of the United

States Agency of International Development, "[r]ecords of public agencies . . . are

generally admissible."  Lester v. Natsios, 290 F. Supp. 2d 11, 26 (D.D.C. 2003)

The claims data is maintained by CMS, a federal agency within the Department of

Health and Human Services.  They relate to regularly-conducted activities of the agency,

namely, the daily operation the Medicare and Medicaid programs.  For the same reason

advanced with respect to the applicability of the business records exception, there is no

reason to question the trustworthiness of the data.  The claims data contained on the

CDs constitute public records pursuant to Fed. R. Evid. 803(8).

As noted above, in Rogan, the defendant similarly challenged the electronic claims

data proffered by the United States.  The United States argued that the data was properly

authenticated, and constituted admissible business and public records.  The court

---

[317] For example, in Sea-Land Service, the Ninth Circuit permitted the introduction
of electronically-stored bills of lading, reasoning that "[f]or purposes of Rule 803(6), 'it is
immaterial that the business record is maintained in a computer rather than company
books.'"  Sea-Land Service, 285 F.3d at 819.  Also, in Fujii, the Seventh Circuit held
that electronic flight reservation records qualified as business records because they
were maintained as part of the airline's routine business practice.  The Fujii Court
further held that printouts of the records made at the request of the INS were similarly
covered under the business records exception.

agreed, and held that the data was "competent evidence" of the amounts which resulted

from the illegal referrals in that case.  Further, the court held they were "business records

by CMS that reasonably fixed those amounts paid by the Government" for illegally

referred patients.  The Court considered such evidence in rendering a judgment for

damages in the amount of $64,259,032.50.  *Id.* at 728.

Here, DTCA does not challenge either the damage model or the amount of

damages by way of motion for summary judgment.[318]  Its arguments relate exclusively to

whether there is sufficient evidence of claims presented as a result of its conduct so as to

withstand summary judgment.  Relator respectfully submits that there is ample evidence

reflecting that claims were submitted to the United States as a result of DTCA's actions,

including DTCA's own documents.

## III.    FALSITY: The Claims at Issue Are False Claims in Violation of Anti-Kickback Laws.

DTCA argues that the claims submitted by the hospitals which paid DTCA's fees,

which resulted from the "stipends" paid to physician medical directors in exchange for

their referral of patients to those hospitals, are not false—even if the patient referrals

resulted from violations of the Anti-Kickback Act.

DTCA's challenge is raised in two sections.  Section III of its brief (Def. Mem at 21-

19) argues that there can be no falsity associated with claims premised on Anti-Kickback

Act violations.  Section VI argues that there is no materiality to Anti-Kickback violations

---

[318] Actual damages are not an element of a FCA cause of action.  Pogue I, 914
F. Supp. 1507, 1509 (M.D. Tenn. 1996).  However, as this Court acknowledged in
Hockett, the "theory of implied false certification is an all-or-nothing affair: if the Court
accepts the theory, all UB-92s submitted during the course of the fraudulent conduct
are permeated with that fraud and are false claims." 498 F. Supp.2d at 68.

(Def. Mem. at 45-51).  Because both these arguments challenge whether such claims are "false" within the meaning of the False Claims Act, Relator addresses these arguments together.

A.      **Law of the Case.**

This is DTCA's third challenge to the legal premise that False Claims Act is violated when an entity knowingly submits or causes the submission of claims in violation of the Anti-Kickback Laws.  Unfortunately for DTCA, this premise is now woven far more firmly into the legal tapestry than it was the first and second time.

In 1996, DTCA lost its challenge to the sufficiency of this legal theory before the United States District Court for the Middle District of Tennessee.[319]  DTCA petitioned for interlocutory appeal, and the Sixth Circuit refused.  Following transfer to this Court for coordinated pre-trial proceedings, DTCA took its second bite at the apple, filing a motion for judgment on the pleadings "ask[ing] the Court to revisit whether the submission of a claim carries with it an implied certification of compliance with underlying laws and regulations and, where those laws and regulations have not been complied with, creates False Claims Act liability."  238 F. Supp 2d 258, 261 (D.D.C. 2002).  In denying DTCA's motion, the Court both declined to revisit the law of the case and found that Judge Echols got it right the first time.  *Id.*

In its opinion, the Court carefully canvassed the cases and found that "the developing law has supported" Judge Echols's "finding that violations of the Anti-Kickback and Stark laws can support a claim under the False Claims Act."  *Id.* at 266.

―――――――――――――――

[319] 914 F. Supp. 1507, 1513 (M.D. Tenn. 1996).

More specifically, the Court re-affirmed implied certification of compliance with the Anti-Kickback and Stark laws as a valid legal theory for the basis of False Claims Act liability. *Id.* at 263-266.

Notwithstanding these carefully-reasoned rulings, DTCA again challenges the Court's legal premise.  DTCA stubbornly refuses to this the law of the case, and so *a fortiori* does not offer any grounds to revisit it.  Indeed, on pages 26-29, DTCA challenges "implied certification" as a valid legal theory here while brushing aside this Court's opinion for the proposition that implied certification of compliance with the Anti-Kickback and Stark laws is a valid basis for False Claims Act liability.

Instead, DTCA heavily (and selectively) quotes United States ex rel. Hockett,[320] a non-kickback case also pending in the MDL.  It is apparently DTCA's view that in Hockett, the Court *sub silentio* reversed its holdings in this case and in Barrett,[321] which DTCA also does not cite.

The law of the case doctrine provides that "a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation."  International Union UAW v. Donovan, 756 F.2d 162, 165 (D.C. Cir.1985).  In fact, the Court already has established law-of-the-case principles as the law of *this* case:  "Reconsideration of the law of the case is appropriate where there are 'unusual' circumstances, 'extraordinary' circumstances, 'exceptional' circumstances, to prevent a 'grave injustice,' and the like."  Pogue II, 238 F. Supp. 2d at 262.

---

[320]  United States ex rel. Hockett v. Columbia/HCA, 498 F. Supp. 2d 25 (D.D.C. 2007) (Lamberth, J.).

[321] 251 F. Supp. 2d 28.

There are no such extraordinary circumstances here.  Indeed, the case law continues to develop in strong support of this Court and the court in Pogue I that violations of the Anti-Kickback and Stark laws are a proper basis for False Claims Act violations.

The Court has established and re-established the legal principles which govern this dispute.  DTCA does not even attempt to show that it should do so a third time.

**B.   The Case Law Uniformly Supports the Validity of the Legal Theory in this Case.**

Since this Court's decision in Pogue II, the legal theory that underlies this case has been adopted nationwide.

Of greatest relevance, the Court's own subsequent decisions have re-affirmed that violations of the Anti-Kickback and Stark laws properly form the basis of False Claims Act violations, without regard to whether the defendant submitted affirmative false certifications in cost reports.  In Barrett, for example, HCA argued that kickbacks cannot give rise to an FCA cause of action in a case involving a Medicare Part B supplier (which does not file an annual cost report affirmatively certifying compliance with the Medicare laws).  This Court held that such a proposition was "contrary to existing precedent, including from this Court."  251 F. Supp. 2d at 32, *citing* Pogue II.  Further, this Court stated:

> The cases stating that kickback claims state a cause of action under the FCA rely on precedent stating that FCA liability arises where information is concealed in the submission of a claim that, if known to the government, would affect the government's decision to pay on that claim . . . .  Courts have found that kickback and Stark Law (self-referral) violations affect the government's decision to pay."

-121-

*Id.* at 32.

Barrett considered and squarely rejected defendant HCA's arguments that an explicit statement of certification of compliance with law and regulations was required for False Claims Act liability.  Instead, the Court reaffirmed that kickbacks were actionable under the FCA, because submission of a claim for payment carries with it an implied certification that the claim did not result from an illegal, kickback-induced referral.  The Court reasoned that the implied certification theory "essentially requires a materiality analysis" and found that, in the context of the Anti-Kickback and Stark laws, compliance with those laws "would affect the government's decision to pay[.]"  *Id.*  at 33.  As in Pogue II, the Court referenced standards set out in cases such as Ab-Tech Construction, Inc. v. United States, which states:

> By deliberately withholding from SBA knowledge of the prohibited contract arrangement with [the non-minority-owned enterprise], [the plaintiff] not only dishonored the terms of its agreement with that agency but, more importantly, caused the Government to pay out funds in the mistaken belief that it was furthering the aims of the [SBA] program. ***In short, the Government was duped by [the plaintiff's] active concealment of a fact vital to the integrity of that program.*** The withholding of such information— information critical to the decision to pay—is the essence of a false claim.

31 Fed. Cl. 429, 434 (Fed. Cl. 1994) (emphasis added).

This liability standard is followed by, among others, the D.C. Circuit in United States v TDC Management Corp. (defendant liable for omitting information "indicating it was acting in a manner that was contrary to the core terms of the program")[322] and Harrison v. Westinghouse Savannah River Co. (liability under the False Claims Act must meet a judicially-imposed standard of liability, which depends on "whether that false

---

[322]  288 F.3d 421, 426 (D.C. Cir. 2002).

statement has a natural tendency to influence agency action or is capable of influencing

agency action').[323]

As this Court summarized in United States ex rel. Ortega v. Columbia Healthcare,

Inc.:

> In several kickback cases now pending before this Court, for example, it is alleged that HCA violated the anti-kickback and Stark laws, which prohibit remuneration to physicians for patient referral. ***Compliance with these laws is a condition for reimbursement under Medicare, and HCA and other defendants impliedly certified compliance with these law in submitting claims to Medicare.*** In such cases, if the allegations can be proven, even if the services for which claims were submitted were medically necessary and properly provided, there were violations of the FCA. The courts examining these types of claims have acknowledged that actual damages may be difficult to determine and prove, but that will not affect the application of the statutory penalty provisions.

240 F. Supp. 2d 8, 14 n.5 (D.D.C. 2003) (Lamberth, J.) (citations omitted) (emphasis

added).

This legal premise—that knowingly submitting claims to Medicare while in

violation of kickback laws creates False Claims Act liability—has been affirmed by

virtually every court to consider it,[324] including three appellate circuits.  DTCA's failure to

so much as cite these cases speaks volumes.

---

[323] 176 F.3d 776, 785 (4th Cir. 1999).

[324] Counsel is aware of only one decision that holds differently in the context of the Anti-Kickback Act. United States ex rel. Urbanek v. LabCorp 2003 U.S. Dist. LEXIS 27469 (E.D. Pa. August 14, 2003) (rejecting implied certification in relation to the Anti-Kickback Act).  Many other decisions have decided in favor of the proposition that violations of the AKA create FCA liability.  *See., e.g.,* United States ex rel. Ven-a-Care v. Abbott, 2007 U.S. Dist. LEXIS 35672 (D. Mass May 8, 2007); United States ex rel. Barlett v. Tyone Hospital, 234 F.R.D. 113 (W.D. Pa. 2006); United States ex rel. Bidani v. Lewis, 264 F. Supp. 2d 612 (N.D. Ill. 2003).

In Schmidt v. Zimmer, the Third Circuit reversed the judgment of the district court, finding the alleged violations of the Anti-Kickback and Stark laws were properly stated under the False Claims Act.  386 F.3d 235 (3d Cir. 2004).  That case involved false certifications of compliance on hospital cost reports and did not address the theory of implied certification.  Of note, however, Zimmer's focus was primarily on the liability of Zimmer who did not submit any claims, but rather "knowingly assisted" in the presentation of claims because its kickback scheme was intended to influence favorable treatment from Medicare providers and thereby increase their Medicare participation in Zimmer products.  386 F.3d at 244.  In Zimmer, as here, the defendant engaged in a kickback scheme aimed to increase the volume of its product, focusing on Medicare and Medicaid provider participation.

In McNutt v. Haleyville Medical Supplies, the Eleventh Circuit affirmed the legal premise that the submission of claims while knowing they were ineligible for payments because they violated the Anti-Kickback statute.  423 F. 3d 1236, 1260 (11th 2005).  Recognizing that "compliance with the federal health care laws, including the [Anti-Kickback] Statute, is a condition of payment by the Medicare program," the court of appeals squarely held:

> **When a violator of government regulations is ineligible to participate in a government program and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the Act, for its submission of those false claims[.]**

423 F.3d at 1259 (emphasis added).  "The violation of the regulations and the corresponding submission of claims for which payment is known by the claimant not to be owed makes the claims false under sections 3729(a)(1) and (3)."  Id.

Most recently, in United States v. Rogan, the Seventh Circuit affirmed the trail court's decision in the first civil False Claims Act kickback trial to be prosecuted by the United States.  517 F.3d 449 (7th Cir. 2008). Following trial, the  Northern District of Illinois held as a matter of law, that:

> The submission of UB-92s in violation of the Stark Statute constitutes a violation of the FCA. United States ex rel. Pogue v. Diabetes Treatment Centers of America, 238 F. Supp.2d 258, 266 (D.D.C. 2002) ("The Stark laws . . . specifically state that compliance is required in order to receive Medicare reimbursement."). **Likewise, compliance with the Anti-Kickback Statute is a condition of payment by the Medicaid program.** 42 U.S.C. §  1320a-7b(b); United States ex rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F. Supp.2d 28, 32 (D.D.C. 2003).
>
>       *     *     *
>
> Even in the absence of an express certification of compliance, the **knowing submission of claims by a person who has violated a statute or regulation that contains, on its face, a direct nexus to the government's payment decision is also actionable under the FCA**. Zimmer, 386 F.3d 235 at 244.

459 F. Supp.2d at 717-718 (N. D. Ill. September 29, 2006) (emphasis added).  The court entered a $64 million judgment against Rogan.

On appeal, Rogan did not dispute that "illegal referrals occurred, that kickbacks were paid, that the bills sent to the United States omitted this information, and that he knew it was going on."  517 F.3d at 452.  Rather, Rogan challenged that the omission of his illegal kickback and self-referral violations were material to the claims for payment, and argued that to prove his violations were material, a federal employee had to testify that the government enforced the statute by not paying claims.

Chief Judge Easterbrook scorned this proposition, stating:

> That's not a component of materiality. **A statement or omission is "capable of influencing" a decision even if those who make the decision are negligent and fail to appreciate the statement's**

***significance***. ... The question is not remotely whether Edgewater was sure to be caught--though it would have been, had it disclosed the truth on all 1,812 reimbursement requests--but whether the omission could have influenced the agency's decision.

*          *          *

> Another way to see this is to recognize that laws against fraud protect the gullible and the careless—perhaps especially the gullible and the care-less—and could not serve that function if proof of materiality depended on establishing that the recipient of the statement would have protected his own interests.

*Id.* (emphasis added). The Seventh Circuit made clear that the materiality standard is objective, and does not rest on what the United States would have done had the provider revealed that the claims were incident to illegal kickbacks. *Id.* As the Seventh Circuit noted, this is a "re-packaged version" of the materiality argument, which misplaces the actual standard *Id.* at 453. In regard to the laws against fraud, the Seventh Circuit rightly clarified that the onus is on the Defendant to "turn square corners when they deal with the Government,"[325] not on the Government to every possible net and check in place to catch every fraud and abuse against the program. The standard then is whether, objectively speaking, the omission is "capable of influencing" a decision.

### C.       Materiality: The Natural Tendency Test.

DTCA argues that the appropriate materiality standard is precisely the "outcome materiality" mocked in Rogan. DTCA asserts that Relator must prove that the Government would not have paid the claim but for the false statement. Specifically, DTCA argues, citing Pogue II and Barrett, that Relator must provide evidence that "the government would not have honored the claim presented to it if it were aware of the

---

[325] *Id. quoting* Rock Island, Arkansas & Louisiana R.R. v. United States, 254 U.S. 141, 143 (1920).

violation." Def. Mem. at 47.

At the outset, DTCA misstates the materiality standard applicable here.

It cites <u>United States ex rel. Ervin and Associates v. The Hamilton Securities Group</u>[326] for

the proposition that relator must prove the Government would not have honored the

claim, but studiously ignores the holding:

> the materiality of a false statement turns on whether the false statement **has a tendency to influence action or is capable of influencing agency action.**

370 F. Supp. 2d at 46 (emphasis supplied).  This is the identical standard recognized by

<u>Barrett</u> and <u>Pogue II</u>[327] and by the Seventh Circuit in <u>Rogan</u>.

This same standard (as well as the implied certification theory of liability) has also

been adopted by the Sixth Circuit (where this case will be tried).  In <u>United States ex rel.</u>

<u>A+ Homecare</u>, the Sixth Circuit made clear that by using the term "false or fraudulent" to

modify the word claim, "Congress intended to incorporate the well-settled meaning of

common-law fraud, including a materiality element." 400 F.3d 428, 443 (6th Cir. 2005).

The court concluded that "the natural tendency test is appropriate standard by which

materiality in the FCA civil context should be measured." *Id.* at 445.  The court explained:

> This standard "focuses on the potential effect of the false statement when it is made, not on the actual effect of the false statement when it is disc-overed."  <u>United States ex rel. Harrison v. Westinghouse Savannah River Co.</u>, 352 F.3d 908, 916-17 (4th Cir. 2003). [Such a standard is more consistent with the plain meaning of the statute, which attaches liability upon presentment of a false or fraudulent claim, rather than actual payment on that claim. 31 U.S.C. §  3729(a)(1).

---

[326]  370 F. Supp. 2d 18, 46 (D.D.C. 2005).

[327]  *Citing* <u>Harrison v. Westinghouse</u> (respectively, 251 F. Supp. 2d. at 33, and 238 F. Supp. 2d at 264) and concluding that lack of compliance with the Anti-Kickback and Stark laws would affect the decision to pay (<u>Barrett</u>, 251 F. Supp. 2d at 33).

*Id.; see also* <u>United States ex rel. Augustine v. Century Health Services Inc.</u>, 289

F.3d 409 (6th Cir. 2002) (without regard to whether cost reports were false at the time

they were submitted, liability can attach if the claimant violates its continuing duty to

comply with the regulations on which payment is conditioned).

Thus, the appropriate materiality standard is not focused on the actual effect of the

false statement, such that relator would have to prove what would have happened if

DTCA had been truthful about its involvement in illegal kickback schemes—which did *not*

happen and which in its own witness's testimony *never* happened with *any provider.*[328]

Rather, the standard is focused on the potential effect on the United States' payment

decision under the "natural tendency" inquiry.

In <u>Ervin</u>, Judge Oberdorfer's decision on which DTCA relies to the exclusion of so

many others, the plaintiff established at trial that  the false statements "not only had a

tendency to, but actually did, influence HUD's decision." 370 F. Supp. 2d at 46.  The

proof that it actually did influence certainly met the standard, but was not the requirement.

Here, the Fourth Amended Complaint alleges that the Government would not have paid

the claims had it known that DTCA was causing the submission of those claims through

illegal kickbacks paid to the referral sources.

While both <u>Pogue I</u> and <u>Pogue II</u> recognized that these allegations satisfy the

standard, it is not the *minimum* requirement under the applicable materiality standard.  As

in <u>Ervin</u>, the Court recognized the allegation in <u>Pogue II</u> that the Court would not have

paid the claims if it knew that they were incident to illegal kickbacks, but certainly did not

---

[328] Yospe Dep. at 79, 149-152, 244.

deviate from the well-recognized natural tendency test which determines materiality in False Claims Act throughout the nation.

Indeed, the D.C. Circuit has explicitly recognized that the focus is not on the actual affect on the Government, but on the nature of the omission.  In TDC Management I, the Court held that it was "of no consequence" whether the agency involved in that case ever even reviewed the actual statements submitted (in that scenario, monthly progress reports). 24 F.3d 292, 296 (D.C. Cir. 1994), *affirmed by subsequent appeal at* 288 F.3d 421 (D.C. Cir. 2002), *cert. denied* 537 U.S. 1048 (2002).  Even if the reports were completely ignored, the appropriate focus of the False Claims Act claim was the information defendant *omitted* from the reports.  *Id.*[329]

### D.     Materiality As Applied Here: Defendant's Kickback Violations Are Contrary to the Core Terms of the Medicare Program.

In TDC I and TDC II, the D.C. Circuit twice laid out that the focus of analysis for a false omission is the omission itself, not the actual effect on the government.  In TDC II, the D.C. Circuit affirmed summary judgment to the government where the defendant failed to disclose that it had sought a financial interest in the Program "contrary to Program terms." 288 F.3d at 426.  "The withholding of such information— information critical to the decision to pay—is the essence of a false claim."  *Id., citing* Ab-Tech, 31

---

[329]     The court of appeals reiterated this holding in United States v. Durenberger:

> The question is not whether [claimant] was entitled to reimbursement if he
> had submitted truthful vouchers, but whether the false statements . . .
> were "capable of influencing" the Senate's reimbursement decision.

> 48 F.3 1239, 1244 (D.C. Cir. 1995).

Fed. Cl. at 434.  In short , the defendant "defrauded the government" by omitting

information "that was contrary to the core terms of the Program." Id.

_____This is precisely what is at issue when a defendant violates the Anti-Kickback and

Self-Referrals laws–core terms of the Medicare and Medicaid Program—while still

knowingly submitting or causing the submission of claims for payment from the Program.

The determination that compliance with such laws is a core term of the Program or, put

another way, is capable of influencing the Government's payment decision, is readily

apparent from the statutes and regulations governing the program.

Relator submits that the Court may conclude, as a matter of law, that compliance

with the Anti-Kickback and Stark laws is material to claims for payment under federally-

funded healthcare programs.

> 1.    **The Statutes and Regulations Establish As A Matter of Law  That Compliance with the Anti-Kickback Laws Are Central to the Program Terms and  Are Capable of Influencing the Government's Payment Decision.**

Federal law and regulations spell out the core terms of the Medicare and

Medicaid programs.  The Supreme Court summarized it this way:

> To receive payment, a [provider] must enter into a Provider Agreement with the Secretary of HHS and it must comply with numerous statutory and regulatory requirements.

Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 9 (2000).  As the District

of Columbia also recognized, the interplay of Medicare statutes and regulations with the

provider agreement is in the nature of contractual obligations for participants in the

federal healthcare programs:

> This court agrees that the required Provider Agreement **together with** the

overall scheme under the Medicare statute and regulations allowing a provider to furnish services, to receive interim estimated payments and to continually adjust future payments according to past overpayments or under payments constitutes an executory contract. Accordingly, the right to recoupment acknowledged by the trustee is in the nature of a contract right and not a statutory entitlement.

In re Consumer Health Services of America, Inc., 171 B.R. 917, 920 (Bkrtcy. D.D.C. 1994) (emphasis supplied).

There is no dispute that compliance with the Anti-Kickback Act is among the core requirements of federal healthcare program participants. Since the inception of the program, violations of this statute have been specifically identified as a fraud and abuse on the program.

### a. Kickbacks are a Fraud on Federal Healthcare Programs.

In 1972, when the anti-kickback provisions were enacted as part of the Social Security Act (SSA),[330] the Senate Report accompanying the bill specified that the law was intended to remedy the fact that "present penalty provisions applicable to medicare do not specifically include as fraud such practices as kickbacks and bribes." S. Rep. 92-1230, 92d Congress, 2d Sess. at 43. Since that time, ferreting out this fraud on the program has been consistently reflected in the statute and regulations implementing the Medicare program. Indeed, the CMS manual that implements the Social Security Act and accompanying regulations has long mandated that the intermediaries which review claims are charged with discovering "fraud and abuse." The earliest versions of these provisions that are publicly available (1980) reflect, consistent with the SSA, that kickback

---

[330] Pub. L. 92-603, 86 Stat. 1329 (October 30, 1972) (emphasis added).

violations are defined as a fraud on the program.[331]

In 1977, as part of the Medicare-Medicaid Anti-Fraud and Abuse Amendments, in order "to strengthen the capability of the Government to detect, prosecute, and punish **fraudulent activities under the medicare and medicaid programs**," Congress amended the SSA to, among other things, make violations of the Anti-Kickback Statute a felony.  P.L. 95-142, 91 Stat. 1175 (October 25, 1977), *codified at* 42 U.S.C. § 1320a-7b.

In 1987, the anti-kickback provisions of the SSA were again amended, as part of the Medicare and Medicaid Protection Act of 1987,[332] with the very purpose:

> to improve the ability of the Secretary and the Inspector General of the Department of Health and Human Services **to protect Medicare, Medicaid... programs from fraud and abuse**....

S. Rep. 100-109, 100th Cong., 1st Sess. at 1 *reprinted in* 1987 U.S.C.C.A.N. 682, 682 (emphasis added).  One of the main elements of the amendment was to mandate exclusions for those convicted of program-related crimes and to broaden the Secretary's authority to exclude providers from the program for fraud, kickbacks, and other crimes and abuse.[333]

Thus, providers are automatically excluded from participation in any federal health

---

[331] Exhibit 138, Publication 13, Medicare Intermediary Manual, Part 2 at § 2060.5 (1980), and Part 4 at § 4100.2, Definitions (1989). These manual provisions can also be found at the official CMS website at http://www.cms.hhs.gov/Manuals/PBM/list.asp; *see also* S. Rep. 100-109, 100th Cong., 1st Sess. at 1 *reprinted in* 1987 U.S.C.C.A.N. 682, 682 (emphasis added).

[332] Pub. L. No. 100-93, 101 Stat 680 (August 18, 1987).

[333] S. Rep. 100-109, 100th Cong., 1st Sess. at 1-2 *reprinted in* 1987 U.S.C.C.A.N. 682, 682-683.

care program if they are convicted under the anti-kickback laws.  § 1320a-7(a); 42 C.F.R. § 1001.101.  Additionally even in the absence of a conviction, providers may be excluded based on a determination by HHS that they committed an act in violation of anti-kickback laws.  § 1320a-7(b) (7); 42 C.F.R. § 1001.951.

> **b.** **The AKA was designed to prevent claims resulting from fraud, because they caused the Government to inappropriately pay out funds.**

These broad powers to eliminate defrauders from the program amply demonstrate that lack of compliance with the Anti-Kickback laws is capable of influencing the Government's decision to pay.  Indeed, the very purpose of the statute, and its subsequent provisions, was to *prevent* this conduct from generating any claims because it caused Medicare and Medicaid to expend increased funds it did not intend to expend.  The relationship between increased federal healthcare payments and kickbacks was so intertwined–yet almost impossible to detect and stop[334]—that Congress made it a felony to engage in such conduct.

The legislative history is straightforward.  In 1972, the anti-kickback provisions were added to expand the definition of fraud and abuse to include kickbacks, based on

---

[334]  For example, in 1977 from the House Report: "Furnishing excessive services is probably the most costly non-criminal abuse faced by health benefit programs.  At the same time, it is relatively difficult to prove and correct." H. Rep. 95-393, 95th Cong., 1st Sess. at 47, reprinted in, 1977 U.S.C.C.A.N. 3039, 3050.  And, from the Senate Report: "When asked why so few prosecutions resulted, U.S. Attorneys and States' attorneys told the committee staff that kickbacks were among the most complicated and difficult to prove" and thus, difficult to justify since it was only a misdemeanor under the 1972 law.  S. Rep. 95-320, Kickbacks Among Medicaid Providers, A Report of the Special Committee on Aging, 95th Cong., 1st Sess. at 28  (June 30, 1977). As a result, the SSA was amended to again buttress the Government's ability to deter this fraud.

the recognition that they "contribute significantly to the cost of the programs."[335]  When

the conduct became a felony in 1977, Congress stated:

> In whatever form it is found, fraud in these health care financing programs
> .... cheats taxpayers who must ultimately bear the financial burden of
> **misuse of funds in any government-sponsored program**.  It diverts from
> those most in need, the nation's elderly and poor, scarce program dollars
> that were intended to provide vitally needed quality health services.  The
> **wasting of program funds through fraud** also further erodes the financial
> stability of those state and local governments whose budgets are already
> over extended and who must commit an ever-increasing portion of their
> financial resources to fulfill the obligations of their medical assistance
> programs.[336]

At that time, the Senate convened a Special Committee to examine this issue.

The report found that kickbacks "have the effect of **increasing the cost** of the medicaid

program" and "undermine the quality of services."  S. Rep. 95-320, Kickbacks Among

Medicaid Providers, A Report of the Special Committee on Aging, 95th Cong., 1st Sess.

at 2  (June 30, 1977) (emphasis added).[337]  The report called for the felony provisions to

be enacted and also specifically recommended "the Department of Justice should

intensify its efforts to identify medicare and medicaid fraud **and to recover federal funds**

**inappropriately paid out under these programs**."  *Id.* at 29 (emphasis added).

This legislative record amply demonstrates that kickback violations are "capable of

influencing the Government's payment decision, as a matter of law.

---

[335] H. Rep. 95-393, 95th Cong., 1st Sess. at 52-53, *reprinted in* 1977
U.S.C.C.A.N. 3039, 3055; *see also* S. Rep. 95-453, 95th Cong., 1st Sess. at 11
(emphasis added).

[336] H. Rep. 95-393, 95th Cong., 1st Sess. at 44, *reprinted in* 1977 U.S.C.C.A.N.
3039, 3047 (emphasis added).

[337] "[K]ickbacks are widespread in Medicaid . . . [and are a] pervasive practice
which picks the taxpayer's pocket." *Id.* at 28.

2.    **The Manual Provisions Implementing the Requirements of the Social Security Act Also Demonstrate that Compliance with Anti-Kickback Laws are Material to the Claim, as a Matter of Law.**

"Medicare manual provisions are the official explanation of the Medicare statute and regulations by the Secretary, which the intermediaries are required to follow in making payment decisions and of which the hospitals were required to inform themselves in submitting claims."  In re Cardiac Devices Litigation, 221 F.R.D. 318, 343 (D. Conn. 2004).

Here, the manuals make clear that kickback violations are a fraud on the program which intermediaries were specifically ordered to detect.

For example, in the Medicare Intermediary Manual (also called Publication 13), Part 2, § 2060.5, revision dates 1978-1981, it directs the intermediary to notify the Office of Program Integrity if a potential fraud or abuse situation is suspected. Exh. 138 at 2060.5(A).  A potential fraud or abuse situation is specifically defined as "Soliciting, offering or receiving a kickback, bribe or rebate." Id.  The Manual further directs that the Office of Program Integrity or Office of Inspector General will investigate in secret, and the auditor must preserve its ability to do so.  The Manual makes clear that the results of an investigation could result in an audit being discontinued:

> Where a questionable situation has been identified, it would ordinarily be appropriate for an audit to be conducted while the situation is being investigated by the Office of Program Integrity and/or the Office of the Inspector General.  Occasionally, however, circumstances may require that an audit be discontinued pending the results of the investigation.  Decisions on these questions will be made by HCFA and the Office of the Inspector General.  Under no circumstances should the auditor discuss a possible fraudulent or abuse situation with the provider or take any action to resolve such questionable situations prior to receiving instructions from the HCFA

Regional Division of Quality Control.  In addition, no action to disallow questionable costs involving possible fraud or program abuse should be taken without specific instructions from the HCFA Regional Division of Quality Control.

*        *        *

NOTE: If there is a suspicion of any intent to defraud the United States Government supported by even the initial insertion of a nonallowable item on the cost report, ***no warning is required prior to prompt referral for investigation and prosecution.***

Exhibit 138 at § 2060.5, manual excerpt (emphasis added), which can also be

accessed at the CMS website at http://www.cms.hhs.gov/Manuals/PBM/list.asp.[338]

Further, in Part 4 of the Medicare Intermediary Manual on "Guidelines for Provider

Audits (revision date 1989), it again directs that all providers are subject to audit to

discover fraud and abuse:

Providers receiving payments under Parts A and B of title XVIII of the Act, as amended, are subject to audit for all payments applicable to services rendered to Medicare beneficiaries.  The audit ensures that proper payments were made on the basis of reasonable costs of covered services, to provide verified financial information for making a final determination of allowable costs, ***to discover any instances of fraud and abuse,*** and to develop other information HCFA needs to fulfill its responsibilities.

Exh. 138 at § 4100.  Again, fraud is specifically defines to include kickbacks. *Id.* at

4100.02. The Manual again emphasizes that the auditor's responsibility to notify their

supervisors, the Office of Program Integrity and the OIG if a potential fraud and abuse

---

[338] Both the older paper-based and the new On-Line Manual System are available on the CMS website (after September 30, 2003, CMS discontinued the practice of issuing the program memoranda that comprised the paper manual system and began transitionng to an on-line manual system).
http://www.cms.hhs.gov/manuals/downloads/ intro_c00.pdf (providing crosswalk between old and new manuals).  Exh. 139 is the foreword to the Part A Intermediary Paper Manual describing how revisions are made, as well as the Introduction to the On-line CMS Manual System.

situation is suspected, which specifically includes kickback situations. *Id.* at § 4101.  The Manual again incorporates the language quoted above in § 2060.5, specifying that the Office of Program Integrity or Office of Inspector General will investigate in secret, and the auditor must preserve its ability to do so.  The Manual makes clear that the results of an investigation could result in an audit being discontinued, and that "decisions will be made by HCFA and the OIG" and not by the individual auditor. Exh. 138 at § 4101.

This part of the Manual also specifies the auditor's priority considerations for his or her work plan.  After noting that the work plan is affected by budgetary restrictions, the Manual directs certain "priority considerations," which includes a "fraud or abuse investigation as directed by the OIG.  Exhibit 138 at § 4104.

These same basic provisions regarding the procedures for provider audits exists today as part of the "Medicare Financial Management Manual, Ch. 8," which adopts the current version of this manual guidance. Exhibit 140, § 140, Fraud and Abuse (*see also* sections 30 and 40, Field and In-House Audits).

While DTCA's proffered "expert" witness, Mr. Yospe, could not credibly dispute these Manual provisions, Relator notes that he does not in fact do so.  Mr. Yospe testified that these were the procedures even prior to the existence of the Manual, and that he was not aware, in his tenure, of any major changes to these procedures. Yospe Dep. at 56, 61-65.

These Manual provisions reflect that illegal kickback schemes would have been capable of influencing the Government's payment decision.

**3.    The Current Provider Agreement and Cost Report Certification Reflect that Compliance with the Kickback and Stark Laws is a Condition of Payment.**

In both <u>Pogue II</u> and <u>Barrett</u>, the Court noted that the language of the provider agreement itself premises payment on compliance with such laws:

> I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.[339]

While this language was adopted in 2001, this Court rightly noted:

> DTCA notes that the form containing this language was adopted in 2001, and the forms in force for the time periods of the complaint did not specifically mention anti-kickback and Stark laws.  While this is true, it does not negate the evidentiary value of the current form in proving that the government would not have paid the claims had it known of the alleged violations.

238 F. Supp. 2d at 265, n.2; *see also* 251 F. Supp. 2d at 33.

This is equally true for the express certifications of compliance with the Anti-Kickback and Stark Laws on the hospital's annual cost reports, which independently establish False Claims Act liability.  DTCA makes much of the fact that the language of this certification, like the language in the provider agreement, changed over time (and, of note, Relator specifically disputes DTCA's representations regarding when the standard certification language changed).

The original certification language in the annual cost reports submitted by the Hospitals stated:

---

[339] Centers for Medicare and Medicaid Services web site, Federal Healthcare Provider/Supplier Enrollment Application, OMB Approval No. 0938-0685, at 21, ¶15.A.3., www.cms.hhs.gov/providers/enrollment/forms.

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION
> CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY
> CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR
> IMPRISONMENT UNDER FEDERAL LAW.
>
> I HEREBY CERTIFY THAT.......to the best of my knowledge and belief, it
> [the hospital cost report] is a true, correct and complete statement prepared
> from the books and records of the provider in accordance with applicable
> instructions, except as noted.

This language was in effect through 1992.[340]  The standard CMS form was revised in

1993 to state:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION
> CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY
> CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR
> IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF
> SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR
> PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF
> A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND
> ADMINISTRATIVE FINES AND/OR IMPRISONMENT MAY RESULT.
>
> I HEREBY CERTIFY THAT.......to the best of my knowledge and belief, it
> [the hospital cost report] is a true, correct and complete statement prepared
> from the books and records of the provider in accordance with applicable
> instructions, except as noted. I further certify that I am familiar with the laws
> and regulations regarding the provision of health care services, and that the
> services identified in this cost report were provided in compliance with such
> laws and regulations.[341]

DTCA concedes that HCFA revised its form and began distributing it for use in

1993 (Def. Mem. at 23).  However, it disputes the timing on other grounds, arguing that

the initial paragraph was never effective because it was not reflected in an accompanying

---

[340] Exh. 141, examples of pre-1992 cost reports from production in this case.

[341] Exh. 142, examples of post-1992 cost reports from production in this case. *See* Thompson v. Columbia/HCA 20 F. Supp. 2d 1017,1026 n.8 (S.D. TExh. 1998) (recognizing that HCFA promulgated revised form in March 1993).

regulation and, further, that the second paragraph (which was later quoted as part of a revised regulation) was not effective until 1997 (although the regulation's effective date was 1994).  DTCA rests its argument on a statutory citation that "No rule, requirement, or other statement of policy...that establishes or changes a substantive legal standard governing...the payment for services....shall take effect unless it is promulgated by the Secretary by regulation." Def. Mem. at 24, citing 42 U.S.C. §§1395hh(a)(2).

At the outset, DTCA misses the point.  The revised language did not in fact change the legal standard.  Federal health care services procured through kickbacks have been illegal since 1972, and have been subject to "criminal, civil, and administrative action."  Services that are reimbursed under federal health care programs must be rendered in compliance with the laws.

The revised certification did not heighten in any way the hospital's obligations under the law.  The fact that, since 1972, both Congress and the Secretary have had to continually buttress its safeguards to deter conduct that has always been illegal does not make that conduct any less illegal before it added a new safeguard.

In fact, the regulation cited by DTCA, 42 C.F.R. § 413.24(f) did incorporate, for the first time, the certification language from the cost report.  However, the main thrust of the regulation was to implement provisions regarding the electronic reporting of cost reports.  The revised regulation provided that "effective for cost-reporting periods after September 30, 1994 for hospitals," the hospital must submit a hard copy of the settlement summary, certain worksheet totals, and its certification statement, in addition to the electronic cost report. § 413.24(f)(iv). The final rule reported that the revision would have no "significant effect on a substantial number of Medicare participating hospitals," including because

-140-

many were already electronically submitting reports and  "Hospitals will not be required to collect any additional data beyond that which the regulations currently specify."  59 Fed. Reg. 26960 at 64.

Thus, the revised language simply reflected what providers were already obligated to do when they submitted claims for payment—comply with applicable laws and regulations, including the kickback laws.  Thus, these documents—the provider agreement and the certification forms—evidence that violations of the kickback laws affect the Government's decision to pay.

>    **4.    Mr. Yospe's Testimony Does Not Controvert The Materiality of Kickback Violations.**

DTCA offers the long-anticipated testimony of Eric Yospe, who worked for HCFA in the 1980s and 1990s, to refute that materiality can be established for kickback violations because a "'pattern of paying' certifications of compliance that it knows are not true [is] evidence that the veracity of such certifications is not material to the government's payment decision." Def. Mem. at 49.

This statement is outrageous, given Mr. Yospe's testimony that he is not personally aware of <u>any</u> occasion in his tenure when a provider "came forth and said my cost report included kickbacks." Yospe Dep. at 149-50.  Mr. Yospe testified that he could recall no situation, either in his personal experience or reported to him in his position as "Chief of the Audit and Reimbursement Branch" where HCFA knew that the provider had accepted kickbacks. Yospe Dep. at 149-152.  Mr. Yospe also testified that he expected that providers would <u>not</u> engage in fraud and abuse (Yospe Dep. at 81-82) and that he would have no way of knowing whether any particular claim that resulted from a kickback

was or was not medically necessary (Yospe Dep. at 183).

Indeed, not only does Mr. Yospe have no knowledge of any such facts, but there is no evidence in this case that the Government knew about the illegal kickback schemes that DTCA was using to cause the submission of false claims.  Given that there is no evidence of the Government being provided with truthful statements regarding kickback violations, it is beyond the par for DTCA to suggest the evidence here reflects a pattern of paying claims that it knows are not true.

Mr. Yospe did, however, affirm the procedure that was always in place at HCFA regarding suspected fraud and abuse.  The agency's procedures–as Mr. Yospe concedes and was reflected in Manual provisions—was that an auditor suspicious of fraud and abuse was required to report it to the Office of Program and Integrity or Office of Inspector General, and that those offices were delegated with the authority to investigate the suspicions, and pending the results, with the authority to discontinue an audit.  Yospe Dep. at 56, 61-65.  Pending the results of an investigation, those Offices also had the authority to exclude a provider and pursue criminal prosecutions.

Mr. Yospe does not dispute the manual provisions (Yospe Dep. at 63), which provide among other things that the OIG had the authority to make the decisions regarding the next steps during a fraud and abuse investigation. Mr. Yospe concedes that "if there was a flat out criminal confession on a claim, that I'm certain I would have had a significant problem with that claim." Yospe Dep. 191-192.  In that scenario, Mr. Yospe would have followed manual provisions to trigger the OIG process. *Id.*

The fact that the agency would at any point continue to process claims while a fraud investigation is ongoing does not negate materiality, as DTCA suggests, nor is it

particularly surprising given the claims process.  As described in <u>Rogan</u>:

> Hospitals...during the relevant time period, were paid by Medicare on an interim basis for services rendered. To submit claims for specific Medicare patients, the hospital completed and electronically sent form "UB-92" (also known as form "HCFA-1450"). ....In addition, CMS required that hospitals . . . submit an annual cost report. The cost reports were the final "claim" that a provider submitted to the Medicare program for services rendered to Medicare beneficiaries. After the end of each hospital's fiscal year, the hospital filed its cost report with its designated Medicare fiscal intermediary, stating the amount of reimbursement the provider believed it was due for the year. See 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. See also 42 C.F.R. § 405.1801(b)(1). Medicare relied upon the hospital's cost report to determine whether the provider was entitled to more reimbursement than already received through interim payments or whether the provider was overpaid and was required to reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

459 F. Supp. 2d at 708.

When cost reports are submitted, "[t]he intermediary examines the cost report, audits it when found necessary, and issues a written "notice of amount of program reimbursement.'"[342] Cost report audits and subsequent settlements can sometimes take years.  Of note, the current Manual provision provides that cost reports not scheduled for audit must be settled within 12 months "unless you have a documented reason why the cost report cannot be settled (for example, bankruptcy, OIG investigation, DoJ investigation)."  Exh. 140, Manual provision § 90.  Cost reports can be "re-opened" within three years for various reasons. Exh. 140, Manual provision at §100; 42 C.F.R. § 405.1885. Thus, the question of whether HCFA "would have paid the claim,"even if this appropriately set out the materiality standard, rests not so simply on interim payments received by the provider, but on their right to retain those payments under the system set out by

---

[342] <u>Regions Hosp. v. Shalala</u>, 522 U.S. 448, 452 (1998).

the Medicare and Medicaid programs.

Thus, Mr. Yospe's "opinion" that HCFA would have paid claims even with "proof" of a kickback (Yospe Dep. at 271) appears to boil down to his supposition–without facts—that a report to the OIG of "proof" of a kickback violation would not have resulted in any action by the OIG.  Because Mr. Yospe testified that this "proof" of a kickback violation never happened, in his experience, there is no basis for Mr. Yospe's supposition.  Mr. Yospe has certainly not been permitted to testify on behalf of the Office of Inspector General (or HCFA, for that matter).

More to the point, however, Mr. Yospe's testimony does not controvert the statutory and regulatory requirements establishing that kickback compliance is material to the decision to pay claims.  He concedes that the manual procedures govern, and that those procedures remained largely unchanged during his entire tenure (through 1996) notwithstanding the evolution of the certification language in that time frame.[343] As the agency stated in the final rule issued to implement the AKA safe harbor regulations in 1991: "No person in the Department or with the fiscal intermediaries or carriers is, or ever has been, authorized to permit a practice that the statute makes illegal."  56 Fed. Reg. 35952 at 35960.

At most, Mr. Yospe's testimony—as contrasted by the statute, the legislative history, the regulations, the manual provisions, the provider agreement, and the cost report certifications–creates a question of fact.  However, it is settled law that compliance *vel non* with the kickback laws is capable of influencing the Government's decision to

---

[343] If, as DTCA states, the certification language is such a marked departure from the legal standard, it is certainly curious that the audit process would remain consistent.

pay.

### 5. DTCA Takes the Materiality Standard Beyond its Established Contours, Arguing that the Underlying Statute and Regulations Must Also Expressly Caution Against FCA liability.

Lastly, DTCA argues that there is no "materiality" because early alerts by the Inspector General did not warn that such violations generated False Claims Act liability (Def. Mem. at 50). This argument stretches materiality even beyond "outcome materiality."  The relevant materiality standard requires that the false omission—the kickback violations—be capable of influencing of the decision to pay the claims.  It does not require, as DTCA suggests, that the United States issue "I am going to prosecute under the False Claims Act warnings" to providers before they can be liable.

Even so, Relator submits that the suggestion that DTCA did not know that its illegal scheme could defraud Medicare and create False Claims Act liability is not supportable.  In October 1987, for example, DTCA's attorney Thomas Smith sent DTCA a lengthy memorandum entitled "fraud and abuse" which provided a detailed analysis "of the basic issues involving fraud and abuse" and discussed the anti-kickback provisions (Exh. 108-B at 3) and the False Claims Act, in the context of advising DTCA of the "non-criminal sanctions" that could be levied for fraud and abuse (Exh. 108-B at 8).

Although this establishes actual notice to DTCA on this point, the fact that anti-kickback violations constituted a fraud on the program that the Government could pursue in non-criminal proceedings, including through the False Claims Act, is hardly the inconceivable notion described by DTCA.  There was enormous attention to the Government's increasing detection and investigation of kickback schemes in that time frame.  In one of

-145-

those investigations, for example, the United States brought a civil action under the False Claims Act against several medical practitioners to recover damages related to their illegal referral of Medicare patients to Medical Diagnostic Services, Inc. United States v. Roter, 1989 U.S. Dist. LEXIS 6555 (E.D. Pa. June 8, 1989).  The court found that the United States did not have to go through a peer review process to establish lack of medical necessity before recovering damages for false claims resulting from the illegal referrals.  *Id.*

While irrelevant to the issue of materiality, the False Claims was properly used then, and used now, to recover damages for false claims resulting from illegal kickback schemes.

### E.      DTCA Wholly Misstates the Legal Standard.

DTCA challenges the legal premise of this case without once acknowledging that it is also again challenging the law of this case, and of this jurisdiction.  DTCA's arguments highlight its wholesale refusal to acknowledge a basic tenet of Medicare and Medicaid law—that it was prohibited from engaging in illegal kickback schemes aimed to improperly increase the volume of federally-funded business.

#### 1.      DTCA Misstates the Need for Factual Falsity to Prevail on False Claims Resulting from Kickback Violations.

First, DTCA challenged that there are no factually false claims. Def. Mem. at 21. While Relator does not, in fact, concede that the claims were medically necessary, as DTCA asserts, this fact is irrelevant to the allegations that DTCA caused the submission of false claims by engaging in illegal kickback schemes that engendered those claims. Rather, this argument misses the point.  Kickback schemes are prohibited because they

create overutilization and corrupt the integrity of the claim.  Recognizing that the difficulty of detecting and proving this fact places an impossible onus on the Government, Congress has proscribed this conduct from occurring *at all*.[344]

Congress enacted a statutory scheme to prevent the conduct that precipitated the submission of such claims.  Had DTCA complied with these dictates, none of these claims would have been submitted.

### 2.    DTCA Misstates the Legal Standard for Affirmative False Certification.

Next, DTCA challenges that there is no liability that could arise premised on "express certification" of the claims submitted as a result of its conduct.  Notably, while Defendant concedes that a revised certification form for hospital cost reports was promulgated by CMS in 1993, it argues that the form was not "effective" at that time (notwithstanding that hospitals signed and certified its cost reports using this language, *see* Exh. 142). *See supra* section III.D.3.  Relevant to the legal standard, however, DTCA presents the new argument that, no matter the time frame, it does not recognize the language certifying compliance with the laws and regulations regarding the provision of healthcare services to create liability even under an affirmative false certification theory of

---

[344] In the 1977 legislative history:

Furnishing excessive services is probably the most costly non-criminal abuse faced by health benefit programs.  At the same time, it is relatively difficult to prove and correct.  Since the medical needs of a particular patient can be highly judgmental, it is difficult to identify program abuse as a practical manner unless the overutilization is grossly unreasonable.

H. Rep. 95-393, 95th Cong., 1st Sess. at 47, reprinted in, 1977 U.S.C.C.A.N. 3039, 3050.

liability because it is to "general" to render the certification false by DTCA's illegal kick-back schemes.  DTCA Mem. at 25-26.

The law is well-settled that the false certification of compliance on the hospital's annual cost reports creates False Claims Act liability for illegal kickback schemes. Rogan, 459 F. Supp. 2d 692; United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899 (5th Cir. 1997), *on remand*, 20 F. Supp.2d 1017 (S.D. TExh. 1998); Hockett, 498 F. Supp. 2d at 69.  Yet, DTCA contests that, even after the language was buttressed in 1993 to provide additional warnings to providers regarding their compliance obligations, a false certification creates no False Claims Act liability.

DTCA cites none of this case law, notwithstanding that Rogan is a closely-analogous case in which a finding at trial of False Claims Act liability was affirmed by the Seventh Circuit.  More to the point, DTCA's argument wholly ignores that compliance with the Anti-Kickback laws is a core term of a provider's obligations in the Medicare and Medicaid program, given its long-time prohibition as not just a crime, but as a fraud on the program.  It is impressive that DTCA remains, to this day, as much the "corporate ostrich" as it was when for a full decade it ignored its lawyers' advice and continued to pay doctors to refer patients to hospitals with which DTCA had contracts.

### 3.      DTCA Misstates the Legal Standard for Implied Certification, and Materiality.

In Pogue II, this Court laid out that the implied certification theory "essentially requires a materiality analysis" and found that, in the context of the Anti-Kickback and Stark laws, compliance with those laws "would affect the government's decision to pay[.]" Pogue II at 33.  DTCA challenges this Court's ruling, arguing that the Court's decision in

<u>Hockett</u> precludes its holding in <u>Pogue II</u>.  Further, DTCA argues that the legal standard

for materiality is outcome materiality, rather than the standard set out in this case and by

the D.C. Circuit that "the materiality of a false statement turns on whether the false

statement has a tendency to influence action or is capable of influencing agency action."

*E.g.*, <u>Ervin</u>, 370 F. Supp. 2d at 46.

Relator addressed these arguments regarding the legal standard for implied

certification and materiality *infra* and does not restate them here.  However, DTCA's

arguments—and in particular DTCA's ill-fitting description of <u>Hockett</u>, a non-kickback

case, and wholesale ignorance of <u>Rogan</u>, a kickback trial—highlight DTCA's complete

disregard of what is at issue here.

As this Court stated in <u>Hockett</u>, a non-kickback-case:

> many of these implied certification cases involve eligibility; the claimant
> implicitly certifies with each claim that it remains eligible for the specific
> federal program under which its claims are submitted.

498 F. Supp. 2d at 69, *citing* <u>TDC II</u> and <u>Ab-Tech</u>.

This is precisely what is at issue here.  As stated by <u>Hockett</u>, <u>TDC II</u>, and <u>Ab-Tech</u>,

the claims at issue represent a continuing adherence to the requirements to participate in

the Program.  The omission of information that the claims were engendered by illegal

kickback schemes omits information that is contrary to the core terms of the Medicare

and Medicaid Programs.  As aptly stated in <u>Bidani v. Lewis</u>:

> The government has entered a statement of interest in this case, arguing
> that since AKS is a critical provision of the Medicare statute, compliance
> with it is material to the government's treatment of claims for reimburse-
> ment. We agree. The AKS criminalizes receiving remuneration intended to
> affect decisions to purchase supplies for which payment may be made
> under Medicare. 42 U.S.C § 1320a-7b(b)(1). Those convicted under the
> AKS they are barred from participating in the  federal health care program.

> 42 U.S.C. § 1320a-7(a)(1). Compliance with the AKS is thus central to the reimbursement plan of Medicare. To state otherwise would be to allow participation and reimbursement for supplies purchased illegally only because the claimant had the luck of not being caught and convicted in the first place. Reimbursing a claimant for the supplies would put the government in the position of funding illegal kickbacks after the fact. This situation exemplifies the "inducing wrongful payment" test for determining materiality contemplated in Luckey, *supra*.

264 F. Supp. 2d at 618 (citations omitted).

DTCA has cited no extraordinary circumstance to revisit the law of the case, nor does it cite any fact which refutes what is established by the statutes, regulations, and implementing guidance regarding the Anti-Kickback laws.  Compliance with the Anti-Kickback laws is central to Medicare and Medicaid's reimbursement plan.

## IV.   UNDERLYING ANTI-KICKBACK VIOLATIONS: The Evidence Amply Supports the Fact DTCA Violated the AKA Provisions.

DTCA argues that Relator has not created a question of material fact to present to the jury regarding its Anti-Kickback violations.[345]  In fact, however, the evidence shows that DTCA routinely and knowingly paid physicians to refer patients to its centers, in order to allow the hospitals to bill at a level to justify payment of DTCA's fees.

---

[345] At the outset, we note that "Payment exceeding fair market value is in effect deemed payment for referrals." American Lith. Soc. v. Thompson, 215 F. Supp. 2d 23, 27 (D.D.C. 2002).  DTCA recognizes that the fair market value issue is entirely fact-driven.  Doc. 169 at 37 ("the two main variables in play are the amount that the medical director was paid and the amount of hours . . . worked).

We therefore respectfully direct the Court's attention to the 11 pages of facts and accompanying exhibits regarding fair market value issues set out above at pp. 9–20, and submit that there is a justiciable question with respect to each medical director—especially because DTCA was, in the face of repeated legal advice, completely uncaring regarding whether its medical directors were paid fair market value, and because the compensation of all medical directors was severely reduced in 1994–95 with no concommitant reduction in duties.  Relator has also submitted expert testimony demonstrating that all medical directors were paid in excess of fair market value.  Exh. 105.

-150-

The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from offering, making or accepting payment to induce or reward any person for referring, recommending or arranging for federally funded medical services, including services provided under the Medicare and Medicaid programs.[346]  The Anti-Kickback Statute prohibits payment or remuneration of any kind if one or any purpose for that remuneration was to induce referrals.   Rogan, 459 F. Supp. 2d at 722.

After railing against this conclusion for more than a decade, DTCA now admits that Relator can "use the AKS as the basis for an FCA claim" (Doc. 169 at 29, *citing* United States ex rel. Kosenske v. Carlisle HMA, Inc., 2007 U.S. Dist. LEXIS 84294 (M.D. Pa. 2007) (holding that "[a] claim knowingly made in violation of either statute constitutes a "false claim" submitted to the federal government and is prohibited by the FCA," *citing* United States ex rel. Barrett v. Columbia/HCA, 251 F. Supp. 2d 28 (D.D.C. 2003)).

---

[346] 42 U.S.C. § 1320a-7b(b) provides:

(b)  Illegal remuneration

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

DTCA now seeks refuge in the argument that because the kickback statute imposes criminal liability on those found to have violated it, "Relator must produce evidence creating a genuine issue of material fact regarding whether each element of this criminal statute can be established beyond a reasonable doubt."  Doc. 169 at 29.

No case is cited for this proposition. It is not surprising that DTCA, having had a dozen years to support this argument, is unable to do so: It is simply not the law.  This claim was squarely rejected by the district court in the closely-analogous <u>Rogan</u> case.  In <u>Rogan</u>, a hospital administrator hired "medical directors" who, like the medical directors here, were expected to refer their patients to Rogan's facility.  Given the facts of this case, a single sentence demonstrates the similarity: "Rogan never inquired as to whether [Medical Director] Barnabas was working the requisite number of hours under his contracts; yet, Rogan regularly discussed Barnabas's patient referrals" with his lieutenant. <u>Id</u>. at 701.

The <u>Rogan</u> court disposed of the issue DTCA now raises as follows in the margin of its opinion:

> Curiously, Rogan cites <u>United States ex rel. Sharp v. Consolidated Medical Trans</u>., 2001 U.S. Dist. LEXIS 13923, No. 96-C6502, 2001 WL 1035720 (N.D. Ill. 2001), for the proposition that the United States must prove every element of an Anti-Kickback Statute violation in this FCA case 'beyond a reasonable doubt,' as the Anti-Kickback Statute is a criminal statute. Rogan confuses the question of an ultimate burden of proof with the degree of intent necessary to sustain a violation of the Anti-Kickback Statute. <u>Sharp</u> merely holds that the government must demonstrate "criminal intent," i.e., a knowing violation of the Anti-Kickback Statute, if it is to use the Anti-Kickback Statute as a predicate statute for an FCA violation. Sharp, 2001 WL 1035720 at *10. The criminality of predicate offenses in an underlying civil statute, such as the RICO Act, does not mandate application of a higher burden of proof in a civil case.  <u>Sedima, S.P.R.L. v. Imrex Co., Inc</u>., 473 U.S. 479, 491 . . . (1985) ("In a number of settings, conduct that can be punished as criminal only upon proof beyond a reasonable doubt

will support civil sanctions under a preponderance standard").

459 F.Supp.2d at 716 n.12.

The next inquiry is the standard under the Anti-Kickback Statute.  Payment of remuneration of any kind violates the statute if one or any purpose for that remuneration was to induce referrals.  United States v. Greber, 760 F.2d 68, 72 (3d Cir. 1985) ("If the payments were intended to induce the physician to use Cardio-Med's services, the statute was violated, even if the payments were also intended to compensate for professional services"); United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 30 (1st Cir. 1989) ("The issue of sole versus primary reason for payments is irrelevant since any amount of inducement is illegal.") (emphasis in original); Accord United States v. Kats, 871 F.2d 105 (9th Cir. 1989) (approving jury instruction providing "It is not a defense that there might have been other reasons for the solicitation of a remuneration by the defendants, if you find that one of the material purpose for the solicitation was to obtain money for the referral of services"); United States v. Lahue, 261 F.3d 993, 1002 (10th Cir. 2001), cert. denied, 534 U.S. 1083 (2002); United States v. Neufeld, 908 F. Supp. 491, 497 (S.D.. Ohio 1995) ("numerous courts have interpreted the "in return for" language to encompass situations where only one of multiple purposes of payment was to refer patients").[347]

––––––––––––––––––––

[347]  These holdings reflect the importance of the laws against kickbacks and other bribes to the administration of the federally-funded healthcare systems:

> In the context of Congress' regulation of the expenditure of enormous
> sums of federal funds under the Medicare and Medicaid programs,
> making payments in return for Medicare referrals is corrupt. The potential
> for increased costs to the Medicare-Medicaid system and misapplication
> of federal funds is plain where payments for the exercise of such

Thus, for present purposes, Relator's burden is simply to show that there is evidence from which the Jury could find that DTCA executives knew that one purpose of their payments to medical director was to induce referrals, and that they knew it was illegal to pay medical directors to induce referrals. The evidence is overwhelming that DTCA believed this with respect to *all* of its medical directors.

DTCA also argues that the "issue is whether Relator can come forward with evidence that DTCA had the specific intent to disobey the law as to each of its medical director arrangements." Doc. 169 at 40. However, the issue in this case is *DTCA's* intent. The unwavering focus of the "Nashville cash register" was on "*the hospital's number one priority—growing the census.*"[648]

Defendant's executives confirmed that *all* medical director contracts were intended to induce referrals. Chairman Cigarran testified that the company expected every medical director to utilize the diabetes treatment center as a preferred site for referral of his patients.[349] President Deal confirmed that a purpose of recruiting medical directors was to secure their admissions.[350] Vice-President Hunter testified that the company expected

_____

judgments are added to the legitimate costs of the transaction.

United States v. Hancock, 604 F.2d 999,1001-02 (7th Cir. 1979) ("handling fees" paid to doctors by laboratory testing company were disguised bribes for referrals).

[348] Exh. 6, DTCA035607-09, August 23, 1990 Letter from DTCA President Jim Deal to Medical Directors (emphasis supplied).

[349] Cigarran Dep., Vol .1, at 116, 132-133.

[350] Deal Dep., Vol. 1, at 236-237. But, Deal stated, "that wouldn't be the only purpose." *Id.*

medical directors to admit patients to the centers.[351]  CFO Mike Conrad testified that it

was a paid responsibility of the medical directors to encourage other physicians to refer

patients for admission to the centers.[352]  Center Manager Beard testified that

> ***our intent was to solicit the participation, either contractual or through their admitting practices, to admit patients to the hospital*** or, I'm sorry, to the center, to DTC.[353]

The testimony of DTCA's officers is that DTCA had all of its medical director

agreements were executed with uniform purpose, around its business model. Moreover,

that this was DTCA's uniform intent is demonstrated by the fact that all of its medical

director contracts do not survive fair market value analysis under established FMV

principles.[354]

"The gravamen of Medicare fraud is inducement. Giving a person an opportunity to

earn money may well be an inducement to that person to channel potential Medicare

payments towards a particular recipient." Bay State, 874 F.2d at 29.  There is no credible

basis for DTCA to dispute that it expected each and every Medical Director contract to

"channel Medicare payments"—in the form of patient referrals—"toward a particular

recipient"—the hospitals which paid DTCA's fees.  While we strongly dispute, given the

---

[351] Hunter Dep. at 217-219.

[352] Conrad Dep., Vol. 2, at 75-77.  Mr. Conrad was unaware of the vast majority of advice given by DTCA's attorneys, including the advice that such duties should be removed from the contracts in order to avoid investigation by the Inspector General and potential felony prosecution.  Dep., Vol. 2, at 145-147.

[353] Dep. of Mary Catherine Beard (Oct.17, 1988) at 11 (emphasis supplied).

[354] *Supra* fn. 66 and accompanying text and exhibits, detailing the findings of Relator's fair market value expert McNamara.

myriad facts identified in this document, DTCA's assertion that "[t]here is no direct evidence that [it] had any actual knowledge that it was acting unlawfully with respect to any medical director" (Doc. 169 at 40), that point is an obvious red herring.  A purpose of each and every contract this defendant entered into with a medical director was to remunerate referrals.

Because there is ample evidence to demonstrate a Jury question regarding whether DTCA had actual knowledge that it was remunerating medical directors for their patient referrals, there plainly is a jury question as to the standard for knowledge under the False Claims Act—that DTCA acted with deliberate indifference or reckless disregard of the truth or falsity of the claims[355] which its client hospitals filed as a consequence of kickback-influenced referrals.

## V.    KNOWLEDGE UNDER THE FALSE CLAIMS ACT: Genuine Issue of Fact regarding the Requisite Knowledge under the False Claims Act.

The FCA defines "knowing" and "knowingly" to mean that a person, with respect to information: has actual knowledge of the information; or acts in deliberate ignorance of the truth or falsity of the information;  or acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required. 31 U.S.C. §  3729(b).

The Court has recognized, and this case dramatically demonstrates, that "this is a fact-intensive inquiry." Pogue II, 238 F. Supp. 2d at 266.  Notwithstanding the facts submitted here, DTCA actually argues that there is "no evidence" that it "knew" the claims resulting from its conduct were false, claiming that the  evolution of the industry's view of the law, in their view, negates any possibility of the requisite knowledge being estab-

---

[355]  31 U.S.C. § 3729(b).

lished.

DTCA's defense that "it was all so confusing" is both outrageous and patently absurd.  First and most important, DTCA is charged with knowledge of the Anti-Kickback Statute.  The very founders of DTCA were experienced health care executives who full-well knew the prohibitions against paying for referrals.  Not only is and was it the law, but by 1986, DTCA lawyers were advising about "potential Medicare Fraud and Abuse issues" around medical director contracts.  Exh. 108-A.  In May 1989, DTCA was advised of the Greber and Kats decisions and told that DTCA had exposure under the Anti-Kickback Act.  Exh. 108-F.  Two weeks later, Chairman Cigarran was advised of Kats, reminded of Greber, and "underscored" that "contracts should be based on services to be performed and compensation that is reasonable."  Exh. 108-G.  Ten days later, Vice President Stone was advised of Bay State.  A month later, President Deal asked about "the line between the black and white on the issue of fraud and abuse" in medical director compensation.  Exh. 108-M.  When counsel offered free training for DTCA personnel, the offer was refused.  Exh. 108-P.  Counsel advised of "especially dangerous" contracts.  Exh. 108-Q.  The situation at West Paces was described as "dangerous."  Exh. 108-R.  A free rent deal had a "Medicare fraud risk . . . [h]e decided to proceed anyway."  Exh. 108-T.  DTCA was told that "whenever anything of value is given to a physician who refers patients . . . we run the risk of violating" the Anti-Kickback Statute.  Exh. 108-U-.  DTCA was "advised . . . of the Medicare risk . . . and he decided to proceed anyway."  Exh. 108-V.  Bob Stone was "told . . that . . . the transaction was not entirely safe.  He advised me that he wanted to go ahead[.]" Exh. 108-W.

Perhaps most disturbing, however, is the fact that DTCA *never told its lawyers*

*what it was actually doing.*  As shown above, the lawyers testified that they were told that payments to medical directors were "solely intended to be compensation for...services as a medical director"[356] rather than as compensation for, at least in part, referrals;[357] that no purpose of the medical director's payment was to obtain the referral of their patients,[358] when DTCA executives and staff knew full-well just the opposite; that Medical directors' compensation is "based on the size of the centers and the staff"[359] when in fact it was based on what getting enough referrals to justify DTCA's fee from the hospital; that "DTCA is not paying any more for our medical directors' services than they are worth"[360] when in fact many were wildly overpaid unless the value of their referrals was factored in; that medical director compensation was "consistent with fair market value in arms length transactions"[361] when in fact DTCA never made any attempt to ensure fair market value;[362] that DTCA was keeping records of the medical directors' performance of

---

[356] Exh. 53 DTCA265528-30, May 18, 1989 Hardcastle letter to Williams.

[357] *E.g.* Deal Dep., Vol. 1, at 236-237; Hunter Dep. at 217-19; Conrad Dep. Vol. 2 at 75-77; LaRue Dep. At 123-126; Beard Dep. at 28.32.

[358] Hardcastle Dep. at 267-269.

[359] Exh. 54, AH000076, July 24, 1995 BCCB Internal Memo with a three-paragraph summary of contracts.

[360] Exh. 55, DTCA265542-43, August 11, 1989 letter from Hardcastle to Williams.

[361] Exh. 56, DTCA039529-31, February 18, 1993, Hardcastle to AMI Hospital Administrator.

[362] LaRue Dep. at 56, 61- 62, 65-69; Williams Dep., Vol. 2, at 87-88; Cigarran Dep., Vol. 1, at 184.

duties[363] when in fact it never did so;[364] that multiple medical directors at the same center were necessary to "generate[] a better quality clinical product"[365] when in fact they were simply a vehicle to more referrals;[366] that DTCA is not responsible "for procuring referrals through influencing patients or physicians or any other parties"[367] when in fact that was an activity which consumed the days of its management personnel.[368]

In sum, Relator is amply-entitled to the inference that DTCA intentionally used its lawyers as cover for the kickback scheme which was the defining characteristic of its business, keeping them in the dark about its true activities while using them to draft contracts while all but laughing at their advice about fraud and abuse.

The suggestion that DTCA was not, at a minimum, recklessly indifferent to the fact that it was causing the submission of kickback-procured claims at each and every one of its Centers is preposterous—and is certainly not a credible summary-judgment position. The False Claims Act was used to pursue kickback-based fraud no later than 1989.

---

[363] Exh. 57, BCCB001983-84, February 3, 1994 Hardcastle letter to Stuart; Exh. 58, DTCA132133-34, July 7, 1989 Deal Letter to Medical Directors.

[364] Williams Dep., Vol. 2, at 92, 125-126, 202-203, 291-292; Conrad Dep., Vol. 1, at 289-290; Hunter Dep. at 290-291.

[365] Hardcastle Dep. at 445.

[366] *E.g.*, Exh. 40, BCCB009256, November 9, 1989 letter to Medical Director Gerardo Bueso, MD. from Morrie Maple, regarding his contributions to census and his increasing fee.

[367] Exh. 59, BCCB009340-43, July 13, 1993 Hardcastle letter to Stuart.

[368] *E.g.* Exh. 44, DTCA169520, March 1990 MOR for Holy Cross-Utah; Exh. 46, DTCA190336, September 1988 MOR for Roper Hospital Center; Exh. 47, DTCA191243, May 1989 MOR for Mercy-Chicago.

United States v. Roter, 1989 U.S. Dist. LEXIS 6555 (E.D. Pa. June 8, 1989).  the one-purpose test of Kats, Greber, and Bay State were fully known to DTCA executives, as was the Anti-Kickback Statute itself.  The proposition that they were not indifferent to their legal obligations is, simply put, a disputed question of material fact.

## VI.     STARK VIOLATIONS: Relator Has Established a Genuine Issue of Fact regarding Underlying Stark Violations.

DTCA argues that the Stark laws are inapplicable to their financial relationships with doctors and hospitals.  DTCA, however, incorrectly applies the strict prohibitions of the Stark statute.

"The Stark Statute establishes the clear rule that the United States will not pay for items or services ordered by physicians who have improper financial relationships with a hospital."  Rogan, 495 F. Supp. 2d at 711;  42 U.S.C. § 1395nn.   DTCA does not challenge that causing the knowing submission of claims while in violation of the Stark statute creates False Claims Act liability.

Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992. Stark II extended the statute's per se prohibitions to referrals for ten additional designated health services, including inpatient and outpatient hospital services, on or after January 1, 1995.[369]

CMS is responsible for the interpretation of the Stark Statute, and has promul-gated regulations in various phases, including in 2001, 2004, and 2007.  See Rogan at

---

[369]  Omnibus Budget Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

711; 42 U.S.C. § 1395nn(g)(6).

DTCA's conduct must fit within a statutory exception to prevent automatically liability from attaching under the statute. DTCA does not argue that its conduct fits within a statutory exception, a burden which is on the defendant. Relator "need not prove, as an element of its case, that defendant's conduct does not fit within a safe harbor or exception." Rogan at 716, *citing* United States v. Shaw, 106 F. Supp. 2d 103, 122 (D. Mass. 2000).

Rather, DTCA argues that it does not fit within the ambit of the statute because its paid relationships with doctors and hospitals does not constitute an indirect financial arrangement under the regulations. Of note, the regulations under which DTCA seeks protection were promulgated in 2002, after the relevant time frame. DTCA argues that the 2002 interpretation applies to previous conduct—an argument that is convenient for it here, but which it wholly disregards in the context of the AKA (Def. Mem. at 44, n.53). Rogan correctly has held that these particular regulations do not apply retroactively. Id at 711-712.

Nonetheless, Relator submits that DTCA's relationships do fall within the ambit of Stark. "The Stark Statute also broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician." Rogan at 712; *see also* 66 Fed. Reg 856, 863 ("we proposed [in 1998] interpreting the concept 'indirect financial relationship' very broadly"). The 2002 regulation states:

> (2) Indirect compensation arrangement. An indirect compensation arrangement exists if-
>
> (i) Between the referring physician (or a member of his or her immediate family) and the entity furnishing DHS there exists an unbroken chain of any

number (but not fewer than one) of persons or entities that have financial relationships (as defined in paragraph (a) of this section) between them (that is, each link in the chain has either an ownership or investment interest or a compensation arrangement with the preceding link);

(ii) The referring physician (or immediate family member) receives aggregate compensation from the person or entity in the chain with which the physician (or immediate family member) has a direct financial relationship that varies with, or otherwise reflects, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the DHS . . .; and

(iii) The entity furnishing DHS has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician (or immediate family member) receives aggregate compensation that varies with, or otherwise reflects, the value or volume of referrals or other business generated by the referring physician for the entity furnishing the DHS.

42 C.F.R. § 411.354(c)(2).

DTCA argues that the second requirement is not met—that its compensation to physicians does not vary with or "otherwise reflect" the volume or value of federal healthcare business generated by the referring physician.  DTCA bases this on two factual suppositions: (1) that its physician contracts oved to flat fee arrangements; and (2) that the payments were not "conditioned in any way on medical directors' patient referrals..." Def. Mem. at 44.

The regulation specifically accounts for arrangements which reflect or otherwise account for illegal referrals, even when not overtly variable.  In promulgating Phase I of these rules, the agency stated that:

So too, any payment or other remuneration **conditioned more generally on referrals or business generated for the DHS entity** would satisfy this element of the definition of "indirect compensation arrangement," except as described in §  411.354(d)(5) (describing limited circumstances when an entity may condition compensation on referrals).

66 Fed. Reg. 856, 866.  Additionally, the Preamble to the final rule specifically

-162-

acknowledged that the "volume or value standard" in the previous regulations accounted

for:

> The language "or other business generated between the parties" meant that the payment in an arrangement had to be fair market value for the services expressly covered by the arrangement and could not include any payment for services not covered by the arrangement.

> Physician compensation arrangements that were fixed in amount but conditioned either expressly or implicitly on the physicians referring patients to a particular provider or supplier took into account the value or volume of referrals within the meaning of the statute.

*Id.* at 876. The preamble goes on to lay out specific fee arrangement exceptions added

to the revised regulation, which DTCA does not argue are applicable here.

Thus, DTCA's construct fails on several grounds. As reflected in the evidence

presented in this memorandum, DTCA's entire model was premised on the volume or

value of referrals. DTCA received a fee from hospitals to increase its healthcare

business—a fee which was largely varied with admissions for the entire time frame,

including after 1995 (Exs. 120-121)—and did so by illegally incentivizing medical directors

to refer patients. Whether it restructured its contracts–after almost a decade of legal

warnings—is not dispositive. "The Court must look behind the terms of the formal

arrangement and focus on the actual relationship between [the entities]. United States

ex rel. Roberts v. Aging Care Home Health, Inc., 474 F. Supp. 2d 810, 818 (W.D. La.

2007), *citing* United States ex rel. Kaczmarczyk v. SCCI Heath Services Corp., Civ. No.

H-99-1031, slip op. at 14-15 (S.D. Tex. Mar. 12, 2004) ("The focus of the Stark Act is on

the relationship, not the paper contract"). The critical question lies not with the contract,

but with "whether the actual relationship met the terms" of the statute. *Id.*

In 1995, when DTCA restructured its relationships, it continued under the same

-163-

business model.  Indeed, when attempting to reduce the amount of exorbitant fees paid medical directors, DTCA's VP testified that he obtained no fair market valuation. Relator's expert has opined that all medical director fees, including in 1995 and 1996 were above fair market value.  Ex. 105.  Relator has established a genuine issue of fact regarding whether DTCA falls within the second requirement of the regulation.

Second, DTCA argues that the third prong of the regulation is not met because there is no hospital knowledge that medical directors received compensation that reflected the volume of value of referrals.  Def. Mem. at 45.  This standard is easily met. The regulation is not an actual knowledge standard, but rather also encompasses deliberate ignorance and reckless disregard.  In promulgating Phase I of these rules, the agency stated that the hospital does not need to know about every link in the chain, but only has to know or "have reason to suspect" that such a relationship exists. 66 Fed. Reg. 856, 864-865.  Here, the hospitals were directly contracted with DTCA and were well aware of the business model—they paid DTCA to cultivate the business in question.

## CONCLUSION

This case represents the amalgamation of a massive amount of evidence which shows that, just as Mr. Pogue alleged when he began this effort more than 13 years ago, DTCA was paying physicians to refer their patients to hospitals which were, in turn, paying fees to DTCA.  More than that, however, it shows that DTCA's Columbia/HCA-trained founders understood full-well what they had to do to make their business model work, and were determined to continue doing it regardless of what the law (not to mention their lawyers) said about their arrangements.  DTCA may wish to try to persuade the Jury that the services it was providing were so important that it should be excused from com-

-164-

plying with the laws of the land—laws intended to ensure that scarce health care dollars are properly spent.  However, if those laws *do* apply to DTCA, then it assuredly is not entitled to summary judgment in this matter.

Defendant's motion should be denied.


Respectfully submitted,

/s/ Jennifer M. Verkamp
Frederick M. Morgan, Jr.
Jennifer M. Verkamp
MORGAN VERKAMP LLC
700 Walnut Street, Suite 400
Cincinnati, Ohio  45202
Telephone:  (513) 651-4400

Don P. McKenna
Scott A. Powell
HARE, WYNN, NEWELL & NEWTON
Massey Building, Suite 800
2025 Third Avenue North
Birmingham, Alabama 35203
Telephone: (205) 328-5330

Nels Ackerson
Elaine Panagakos
SOMMER BARNARD ACKERSON, PC
1666 K Street, N.W., Suite 1010
Washington, D.C. 20006
Telephone: (202) 833-8833

Counsel for Relator A. Scott Pogue

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of June 2008, a copy of the foregoing was served on all counsel via the Court's electronic service system.


_____ /s/ Jennifer M. Verkamp _____